No. 11-5110

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

U.S. EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION,

      Plaintiff-Appellee,

v.

ABERCROMBIE & FITCH STORES, INC.,
d/b/a ABERCROMBIE KIDS,

      Defendant-Appellant.

---

On Appeal from the United States District Court
for the Northern District of Oklahoma,
No.09-cv-602
Hon. Gregory K. Frizzell, U.S. District Judge

---

RESPONSE BRIEF OF APPELLEE
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

---

P. DAVID LOPEZ
General Counsel

CAROLYN L. WHEELER
Acting Associate General Counsel

DANIEL T. VAIL
Acting Assistant General Counsel

JAMES M. TUCKER
Attorney

U.S. EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. NE, Rm. 5NW10P
Washington, D.C. 20507
(202) 663-4870
James.Tucker@EEOC.gov

- ORAL ARGUMENT REQUESTED -

## Table of Contents

Table of Authorities.........................................................................iii

Statement of Related Cases .............................................................1

Statement of the Issues....................................................................1

Statement of Facts............................................................................2

District Court Ruling on Summary Judgment...............................17

Jury Verdict on Damages...............................................................21

Summary of the Argument ............................................................21

Argument .......................................................................................23

    I.    The District Court Properly Concluded that
        No Reasonable Jury Could Find that
        Abercrombie Reasonably Accommodated Elauf's
        Religious Belief.............................................................23

        A.    There is no genuine dispute that Elauf wears
            a headscarf in public because of a sincerely
            held, bona fide religious belief.............................25

        B.    There is no genuine dispute that Abercrombie
            was on notice of Elauf's religious belief..............30

    II.    The District Court Properly Concluded that No
         Reasonable Jury Could Conclude that Abercrombie
         Would Suffer an Undue Hardship if It Permitted
         Elauf to Wear a Headscarf At Work. ...........................47

    III.    The District Court Properly Excluded from the
          Damages Trial Evidence Challenging the Sincerity
          with Which Elauf Held Her Religious Beliefs. ............64

Conclusion.........................................................................69

Statement Regarding Oral Argument ...........................................69

Addendum

     42 U.S.C. § 12111(8) .......................................... Addendum - 2

     42 U.S.C. § 2000e(b), (j) .................................... Addendum - 5

     29 C.F.R. § 1605.2(c)......................................... Addendum - 8

     EEOC Compliance Manual, No. 915-008,
     Section 12 – Religious Discrimination,
     § 12-IV(A) ...................................................... Addendum - 11

     EEOC – Best Practices for Eradicating
     Religious Discrimination in the Workplace ... Addendum - 20

     EEOC – Questions and Answers: Religious
     Discrimination in the Workplace (excerpt) .... Addendum - 26

Certificate of Compliance and Digital Submission

Certificate of Service

Table of Authorities

Cases                                                                    Page(s)

*Adler v. Wal-Mart Stores, Inc.*,
    144 F.3d 664 (10th Cir. 1998) ................................................67

*Auer v. Robbins*,
    519 U.S. 452 (1997).................................................................39

*Brown v. Polk County, Iowa*,
    61 F.3d 650 (8th Cir. 1995) (en banc) ...................................48

*Davidson v. Am. Online, Inc.*,
    337 F.3d 1179 (10th Cir. 2003) .............................................56

*Dixon v. Hallmark Cos.*,
    627 F.3d 849 (11th Cir. 2010) ...................................30-32, 37

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    No.09-CV-602, Opinion and Order
    (N.D. Okla. July 13, 2011)................................................17-20

*EEOC v. GEO Group, Inc.*,
    616 F.3d 265 (3d Cir. 2010)............................................60, 61

*EEOC v. Ilona of Hungary, Inc.*,
    108 F.3d 1569 (7th Cir. 1998) .........................................29, 30

*Furnco Const. Corp. v. Waters*,
    438 U.S. 567 (1978)................................................................32

*Hellinger v. Eckerd Corp.*,
    67 F. Supp. 2d 1359 (S.D. Fla. Sept. 28, 1999)...............30, 32

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)................................................................32

(cont.)

iii

*McInnis v. Fairfield Cmtys., Inc.*,
    458 F.3d 1129 (10th Cir. 2006) ............................................67

*Mosier v. Maynard*,
    937 F.2d 1521 (10th Cir. 1991) ......................................26, 27

*Protos v. Volkswagen of Am., Inc.*,
    797 F.2d 129 (3d Cir. 1986)..................................................48

*Qwest Corp. v. Colo. Pub. Util. Comm'n*,
    656 F.3d 1093 (10th Cir. 2011) ............................................39

*Sauer v. Salt Lake County*,
    1 F.3d 1122 (10th Cir. 1993) ................................................35

*Shapolia v. Los Alamos Nat'l Labs.*,
    992 F.2d 1033 (10th Cir. 1993) ......................................24, 32

*Thomas v. Nat'l Ass'n of Letter Carriers*,
    225 F.3d 1149 (10th Cir. 2000) ....................17, 30, 34, 36, 41

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981)...............................................................26

*Toledo v. Nobel-Sysco, Inc.*,
    892 F.2d 1481 (10th Cir. 1989) ....................................passim

*Tooley v. Martin-Marietta Corp.*,
    648 F.2d 1239 (9th Cir. 1981) ..............................................48

*United States v. Ballard*,
    322 U.S. 78 (1944)................................................................26

*United States v. Call*,
    129 F.3d 1402 (10th Cir. 1997) ............................................65

(cont.)

*United States v. Esch*,
    832 F.2d 531 (10th Cir.1988) .........................................65, 66

*United States v. Neal*,
    718 F.2d 1505 (10th Cir.1983) ..............................................65

*United States v. Seeger*,
    380 U.S. 163 (1965)..............................................................26

*Wolfgang v. Mid-America Motorsports, Inc.*,
    111 F.3d 1515 (10th Cir.1997) ..............................................66

Statutes

42 U.S.C. § 12111(8) ........................................................................56

42 U.S.C. § 2000e(b) ........................................................................35

42 U.S.C. § 2000e(j) .....................................................................24, 56

42 U.S.C. § 2000e-2(a) .....................................................................24

Rules and Regulations

Fed. R. Evid. 403..............................................................................65

29 C.F.R. § 1605.2(c).......................................................................39

Other Authorities

EEOC – Best Practices for Eradicating Religious Discrimination
in the Workplace, *available at*
http://www.eeoc.gov/policy/docs/qanda_religion.html
(last visited Jan. 20, 2012) .........................................................38, 42

(cont.)

EEOC Compliance Manual, No. 915-008, Section 12 – Religious
Discrimination, (July 22, 2008), *available at*
http://www.eeoc.gov/policy/docs/religion.html
(last visited Jan. 20, 2012) ......................................................38, 42

EEOC – Questions and Answers: Religious Discrimination
in the Workplace, *available at*
http://www.eeoc.gov/policy/docs/qanda_religion.html
(last visited Jan. 20, 2012) ...........................................................38

Statement of Related Cases

There are no known prior or related appeals.

Statement of the Issues

1.  Whether the district court properly concluded that there was no genuine dispute that Elauf wore a headscarf due to a bona fide religious belief.

2.  Whether the district court properly concluded that there was no genuine dispute that Abercrombie was on notice that Elauf wore a headscarf because of her religious beliefs.[1]

3.  Whether the district court properly concluded that there was no genuine dispute that reasonably accommodating Elauf's religious practice would not have imposed an undue hardship on the conduct of Abercrombie's business.

4.  Whether, during the jury trial on damages, the district court properly concluded that Abercrombie could not cross-examine Elauf on the sincerity of her religious beliefs because that issue was irrelevant to her damages claim, and, even if it had some minimal relevance, any probative value was outweighed by its prejudicial effect.

---

[1] Defendant-Appellant Abercrombie & Fitch, Inc., d/b/a Abercrombie Kids, is referred to throughout this brief as "Abercrombie."

Statement of Facts

Samantha Elauf was born in Tulsa, Oklahoma, graduated from Union High School in Tulsa, and attended Tulsa Community College with plans to transfer to Oklahoma State University and earn a degree in Business Management.  Appellee's Supplemental Appendix ("Supp.App.") 9-11.  Elauf plans to use her degree to own and operate a clothing store that focuses on stylish, "fashion-forward" clothing.  Supp.App.10.

Elauf is also a lifelong practicing Muslim.  Elauf's parents are practicing Muslims, and she was raised Muslim.  Supp.App.10-11.  In the Islamic faith, the Quran is the sacred scripture—the word of God— just as the Bible is to Christians.  Supp.App.5.  The Quran provides that Muslim women should "lower their gaze and guard their modesty.  They should draw their veils over their bosoms and not display their beauty."  Supp.App.2.

Some Islam scholars interpret the Quran to require women to wear a hijab, or headscarf, in order to show their modesty.[2]

_____

[2] The terms "hijab" and "headscarf" are used interchangeably throughout this brief, as there is no material difference between the terms for purposes of this appeal.

Supp.App.2, 10-11, 21.  A hijab is an Islamic religious symbol.

Supp.App.21.  There is no single type of hijab that must be worn by a

devout Muslim woman; there are many different styles and colors of

hijabs or headscarves that are consistent with Islam.[3]  Supp.App.6.

Elauf began wearing a headscarf at age thirteen "to represent who

[she] was as far as [her] faith," and continues to wear one "as a

reminder of her faith."[4]  Supp.App.11, 13; *see also* Supp.App.183-84

(images of Elauf wearing her headscarf).  The obligation to wear a

headscarf becomes more of a requirement after puberty, because

"[t]hat's when your deeds are considered to be counted."  Supp.App.12.

Elauf wears a headscarf any time she is in public, and when she is with

her family at home and there is a male visitor.  Supp.App.11-12.

Several of Elauf's female relatives—also practicing Muslims—wear

---

[3] Abercrombie claims that a hijab is designed to be noticed.  Appellant's Brief ("AtBr.") 14.  However, none of Abercrombie's record cites support this assertion.  Moreover, while deposing the Commission's expert witness on Islam, Abercrombie's counsel stated that he was "retreat[ing] from saying [that hijabs are] designed to be noticed." Supp.App.3.

[4] Elauf was twenty years old at the time of her deposition. Supp.App.11.

3

headscarves, including her mother, an aunt, and several cousins. Supp.App.12.

In addition to wearing a headscarf, Elauf's religious practices include fasting (no eating, drinking, or medicine taken from sunrise to sunset) during Ramadan, the Islamic holy month; studying the Quran during Ramadan; praying by reading verses out of the Quran about two times a month; attending services at her mosque on religious holidays; and not doing "anything that would be considered not Islamic" such as drinking, partying, or gambling.  Supp.App.8, 13-14.  Elauf also observes her religion by wearing clothes that are not too tight but are still "normal," trying to cover the majority of her arms and wearing leggings or tights with skirts.  Supp.App.15.

Elauf worked for two different establishments at the Woodland Hills Mall in Tulsa.  From September 2006 through May 2008 Elauf worked at Limited Too, a clothing retailer, as a Sales Brand Rep. Supp.App.14, 23.  Elauf also worked in early 2008 at Fruit Fondue, selling fruit and chocolate.  Supp.App.17, 23.  Elauf wore her headscarf at both jobs.  Supp.App.14, 17.

On May 25, 2008, Elauf applied for an open "Model" position at
the Abercrombie Kids store at the Woodland Hills Mall.  Supp.App.16-
17.  A Model's duties include cleaning, organizing, and maintaining the
store; operating the cash register; opening and closing the store;
training new Models; greeting customers and helping them find the
right size clothing; and preventing shoplifting.  Supp.App.44; *see also*
Supp.App.57-58 (job description for "Model" position).  Wearing
Abercrombie's style of clothing is also considered part of the Model's job,
but Models "did more than just stand around and model the clothes."
Appellant's Appendix ("App.") 376-77; Supp.App.44.

In 2008, Abercrombie had a "Look Policy" governing the
appearance of employees in its stores.  Supp.App.68-69.  The policy
notes that while Abercrombie "realizes that your manner of dress and
grooming habits are highly personal and subject to your own tastes and
preferences," it wishes to "respect your individuality and still maintain
a consistent level of dress and grooming that represents what people
expect" from the company.  Supp.App.68.  The policy sets out a number
of specific appearance guidelines.  The policy prohibits any facial hair,
requires employees to dress in a manner similar to the company's

brand, and limits jewelry to that which is "simple and classic."

Supp.App.68-69.  Abercrombie interprets the policy to prohibit

headwear of any kind, despite the policy's only explicit restriction on

headwear being its prohibition on wearing "caps."  App.380;

Supp.App.68-69.

     Abercrombie permits exceptions to the policy, but any exceptions

must be presented to upper management and HR for approval.

Supp.App.76.  Since as early as 2006, Abercrombie has approved

numerous religious-practice-based exceptions to the Look Policy, from

permitting men to wear yarmulkes and facial hair to permitting women

to wear long skirts, leggings, and religious bracelets and jewelry.

Supp.App.89-91, 93-95, 97-100, 102-04, 113, 122, 129-30, 132-36, 145-

46, 151-53, 164, 166-68.

     Most importantly, on eight different occasions, Abercrombie has

permitted Models to wear headscarves for religious reasons.[5]

Supp.App.81; *see also* Supp.App.145, 151-54 (HR documentation

regarding some Models being permitted to wear headscarves).

---

[5] In 2008, Abercrombie employed between 70,000-100,000 Models
nationwide.  Supp.App.79.

Abercrombie has also permitted employees in other positions to wear headscarves for religious purposes.[6]  Supp.App.135, 144, 147-49.

When Elauf applied for the Model position, she was familiar with the Abercrombie Kids store, having shopped there previously. Supp.App.15.  Elauf had purchased and worn Abercrombie clothing. Supp.App.16.  Elauf's "best friend" Farisa Sepahvand worked at this store, and Elauf visited her during Elauf's breaks from work. Supp.App.180.

Prior to her interview at Abercrombie, Elauf discussed with Sepahvand the issue of Elauf's wearing a headscarf at Abercrombie. Supp.App.17-18.  Sepahvand testified that she raised the issue with Kalen McJilton, the Assistant Manager in charge of the store's "visual,"

---

[6]  In 2010, Abercrombie instructed its managers that "[i]f any applicant or associate requests an exception to the Look Policy for religious or disability reasons . . . please contact human resources immediately." Supp.App.81, 84-86.  This instruction resulted from Abercrombie's internal discussions in 2010 regarding permitting employees to wear headscarves for religious reasons.  Supp.App.85-86.  At that time, Abercrombie was permitting Models to wear headscarves as religious accommodations so long as the headscarf was in one of Abercrombie's core colors, such as Navy, only came down to the shoulders, and did not involve any face covering.  Supp.App.85.

or appearance, and who knew Elauf from her "coming in [the store] all the time." Supp.App.72, 181.

Noting that he had previously worked at Abercrombie with someone who was Jewish and wore a white yarmulke, McJilton told Sepahvand that he did not see any problem with Elauf wearing a headscarf, "especially if she didn't wear a headscarf that was black." Supp.App.181. Sepahvand then told Elauf that she would not be able to wear a black headscarf at Abercrombie, and that Abercrombie has a no-black-clothing policy for its employees. Supp.App.17, 181. Elauf "was fine with that." Supp.App.18.

On May 27, 2008, Elauf was interviewed by Heather Cooke, the Assistant Manager in charge of interviewing, hiring, and firing employees. Supp.App.17-18, 41-42, 71-72. At the time of the interview, Cooke was aware that Elauf is Muslim and wears a headscarf for religious reasons. Cooke was familiar with Elauf from her frequent visits to Sepahvand, from seeing Elauf at work in the mall, and also from Sepahvand's previously introducing Cooke to Elauf. Supp.App.46, 180. When Cooke had seen Elauf on previous occasions, she had observed Elauf wearing her headscarf. Supp.App.48. Cooke interpreted

Elauf's wearing the headscarf as signifying that Elauf was Muslim. Supp.App.48. Cooke "figured that was the religious reason why [Elauf] wore the headscarf, she was Muslim." Supp.App.48, 56.

At the interview, Elauf wore her headscarf. Cooke testified that the headscarf Elauf wore to the interview was similar to that worn by Elauf in two pictures in the record. Supp.App.48; *see also* Supp.App.183-84 (images of Elauf wearing her headscarf). While Elauf wore a black headscarf to the interview, Cooke made no mention of either the headscarf or its color to Elauf.[7] Supp.App.49.

During the interview, Cooke read Elauf the abbreviated version of the Look Policy that was provided in Abercrombie's interview guide. Supp.App.56; *see also* Supp.App.59-65 (interview guide). The interview guide did not refer to the Look Policy by name or mention any specific items that are not to be worn by employees, including headwear. Supp.App.45, 59-65. Cooke did not tell Elauf that she could not wear any headwear because Cooke had been instructed to stay on the script provided in the interview guide, and the interview guide did not address headwear. Supp.App.49.

_____

[7] It is uncontested that applicants are not required to be in compliance with the Look Policy at the time of the interview. Supp.App.80.

Cooke rated Elauf using the interview guide, which provides three assessment areas:  appearance and sense of style, outgoing and promotes diversity, and sophistication and aspiration.  Supp.App.48-49, 61, 63-65.  Each area is graded on a three-point scale, and an applicant with a total combined score of five or less was not to be hired. Supp.App.64.  Cooke scored Elauf at "two" on each element, for a total of six, and recommended that Abercrombie hire Elauf.  Supp.App.50-51.

Cooke thought Elauf was an active, energetic, outgoing, confident, happy and fun person with a positive attitude, wholesome, stylish, and pretty.  Supp.App.54-56.  Cooke believed Elauf would be a "really good" Model candidate because she was "excited about the company and the brand," had retail experience, and was outgoing.  Supp.App.51, 53. While Cooke scored Elauf highly enough to be hired on the spot, Cooke was concerned about ambiguity in Abercrombie's policy regarding headgear and black clothing and wanted to confirm that Elauf's headscarf was acceptable.  Supp.App.49, 51.  However, Cooke had no problem with Elauf wearing a headscarf at Abercrombie.  Supp.App.49.

Cooke contacted Randall Johnson, District Manager, to discuss Elauf's headscarf.  Supp.App.51.  Cooke told Johnson that Elauf "was

very pretty," that she wore a black headscarf, and that Abercrombie should hire her. Supp.App.51. Johnson stated that Cooke told him that Elauf was wearing "a hat, or headscarf," which, in Johnson's opinion, are "the same thing." Supp.App.73-74. Johnson told Cooke that Elauf was not compliant with the Look Policy and could not be hired.[8] Supp.App.75. Johnson stated that Cooke did not tell him why Elauf wore the headscarf, and did not recall if he asked Cooke whether Elauf could take off her headscarf or if he otherwise discussed with Cooke how Elauf could come into compliance with the Look Policy.[9] Supp.App.75,

---

[8] Johnson's testimony is inconsistent with the position Abercrombie took during the Commission's investigation of Elauf's charge of discrimination, wherein Abercrombie asserted that it was "Cooke [who] decided that Ms. Elauf was not qualified for a Model because both her head covering and the color of her covering violated the Look Policy." Supp.App.56.

[9] Cooke provided a quite different account of her exchange with Johnson. Cooke testified that when Johnson told her not to hire Elauf because of her headscarf, she informed him that Elauf wears a headscarf for religious reasons, and Johnson replied by telling Cooke that she still could not hire Elauf "because someone can come in and paint themselves green and say they were doing it for religious reasons, and we can't hire them." Supp.App.51. Cooke stated that she believed Elauf was Muslim, "which was a recognized religion . . . and that she was wearing [a headscarf] for religious reasons." Supp.App.51. Johnson again told Cooke not to hire Elauf. Supp.App.51. Cooke further testified that Johnson directed her to lower Elauf's interview score in the category of appearance and style from a "two" to a "one,"

77.  Cooke did not inform Elauf that she would not be hired. Supp.App.52.  A week after Elauf's interview, Sepahvand asked Cooke about Elauf, and Cooke replied that she was told not to hire Elauf because of her headscarf.  Supp.App.52.

In early 2011, Dr. Erich Joachimsthaler drafted a report on the effect of permitting exceptions to the Look Policy on Abercrombie's "brand."  App.95, 97; Supp.App.170.  Regarding this report, Joachimsthaler testified that he was asked "to look at what an off-brand experience does, and opine on the off-brand experience based on comprehensive research on the brand <u>and on sales performance</u>, comprehensive empirical research of off-brand experiences that is governed by the Look Policy," particularly regarding headscarves. Supp.App.174 (emphasis added).

Joachimsthaler opined that an employee wearing a headscarf at Abercrombie "<u>can</u> negatively impact the brand and <u>can</u> impact sales," but he would not state that such a harm "would" occur, because "[y]ou

---

thereby making Elauf's overall score "five" and rendering her ineligible for hire.  Supp.App.54; *see also* Supp.App.64 (Elauf's interview score sheet).

never know for sure."[10]  Supp.App.170 (emphasis added).  While

Joachimsthaler attempted to qualify this answer by asserting that more

certainty on this point could be provided by "comprehensive empirical

research," he admitted that he knew at the time of his report that

Abercrombie had been permitting employees to wear headscarves, that

he was unaware of any studies by Abercrombie on whether its sales had

been impacted by these exceptions, and that he did not undertake such

a study.  Supp.App.170, 173.

    Joachimsthaler added that Abercrombie's permitting employees to

wear headscarves could be either "a foolish thing or a smart thing to

do," as "it could be foolish for a brand but smart for business, for—for

doing additional sales."  Supp.App.171-72.  Joachimsthaler concluded

both that "one exemption from the Look Policy could result in a

breakdown of [Abercrombie's] control over the in-store brand

experience," and that Abercrombie's granting such exceptions would not

break down its control over the brand because when Abercrombie

---

[10] Joachimsthaler offered the same opinion regarding the effect of permitting male Jewish employees to wear yarmulkes—despite the fact that Abercrombie routinely does so, *see supra*, at 6, and that Abercrombie's Vice President for Human Resources, Stores, testified that her "HR team" "strongly felt" yarmulkes "did not distract from our styling."  Supp.App.82, 174.

"decides" to permit an exception "then they are in control."
Supp.App.173.

Deon Riley, Abercrombie's Group Vice President for Human
Resources, Stores, testified that other than the Joachimsthaler report,
Abercrombie had not studied how deviating from the Look Policy might
impact how customers view Abercrombie, and had not studied how
Abercrombie's having permitted numerous employees to wear
headscarves may have impacted how customers view "the Abercrombie
style." Supp.App.79, 83. When asked if allowing employees to wear
headscarves as religious accommodations has had any negative impact
on sales, Riley responded that she does not study "the impact on sales."
Supp.App.87.

Amy Yoakum, Abercrombie's Director of Stores, Human
Resources, testified that permitting Elauf to wear a headscarf would
have harmed Abercrombie because "if we accommodate every request
for accommodation that we receive, that could negatively impact that
store experience for our customers." Supp.App.175-76 (emphasis
added). Yoakum was unaware that before and after refusing to hire
Elauf, Abercrombie permitted employees to wear headscarves for

14

religious purposes.  Supp.App.176.  Yoakum was similarly unaware of and/or had not seen any measurement, study, or report by Abercrombie on the impact of these exceptions to the Look Policy, including any financial or other numerical impact.  Supp.App.177-78.

Yoakum stated that the basis for her opinion was "[her] own personal experience" where she has "walked into stores that have Look Policy exceptions, ones that we have dealt with, and the experience is different."  Supp.App.177.  Yoakum further testified that she believed the company's ability to enforce the Look Policy uniformly would be "negatively impacted"  because the customer's experience in each store would "differ."  Supp.App.177.

Chad Moorefield, Abercrombie's Director of Stores, testified that Abercrombie routinely audits its stores, rating them on presentation, operations, systems, and store experience.  Supp.App.28-30, 32-33.  In Moorefield's opinion, a drop in a store's overall audit score would have an impact on sales because "we believe that the customer's experiences and what people have when they come into our stores is what drives our business."  Supp.App.33-34.  However, Moorefield was not aware of any effort by Abercrombie to examine audit scores to determine if lower

scores correlated to a drop in a store's sales.  Supp.App.33.

Abercrombie also uses "Secret Shopper" reports to evaluate its stores, but Moorefield admitted that in trying to correlate a drop in sales with a lower Secret Shopper score in the "properly dressed" category (presumably corresponding to a violation of the Look Policy), "you're guessing essentially."  Supp.App.31, 34-36.  Moorefield has never done any type of statistical analysis to try to make such a determination.  Supp.App.36.

Moorefield added that Abercrombie has data on a multitude of factors relating to a store's operation.  Supp.App.37.  However, when asked if Abercrombie tries to draw any correlation between such data and the store's sales performance, and to isolate whether a drop in the "properly dressed" score correlates with a drop in sales, Moorefield stated that he "believed" that there was such a correlation but that he could not provide a specific example.  Supp.App.38.  Moorefield offered that he had concluded in some instances that poor enforcement of the Look Policy led to decreased sales, but he did not record that conclusion anywhere, could not provide any examples, did not describe the type of Look Policy violation(s) that led to this conclusion, and never did any

16

type of mathematical calculation in reaching that conclusion.
Supp.App.39.

<div align="center">District Court Ruling on Summary Judgment</div>

In its Opinion and Order granting summary judgment to the
Commission on liability, the court observed that to establish a prima
facie case, the Commission needed to show that Elauf had "a bona fide
religious belief that conflicts with an employment requirement," that
she "informed the employer of this belief," and that she "was not hired
for failing to comply with the employment requirement."  App.574
(citing *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155
(10th Cir. 2000)).  If the plaintiff makes this showing, the court
continued, the burden then shifts to the defendant to conclusively rebut
one or more elements of the plaintiff's prima facie case, show that it
offered a reasonable accommodation, or show that it was unable to
accommodate the employee's religious needs reasonably without undue
hardship.  App.574-75 (citing *Thomas*, 225 F.3d at 1156).

The court concluded that the Commission had established a prima
facie case through evidence that Elauf wears her headscarf "based on
her belief that the Quran requires her to do so, that this belief conflicts

<div align="center">17</div>

with Abercrombie's prohibition against headwear, that Abercrombie had notice she wore a head scarf because of her religious belief, and that it refused to hire her because the head scarf conflicted with its look policy." App.575 (footnote omitted).

The court rejected Abercrombie's assertions that Elauf's wearing of a headscarf was not based on a bona fide religious belief, noting Elauf's testimony that she considers her headscarf to be a representation of her faith, and "the record is devoid of evidence that *her* decision to don a head scarf at age 13 and continue to wear it to this time is based on anything *other* than her religious belief." App.575-76 (emphasis in original). The court also rejected Abercrombie's argument that Elauf did not sincerely hold her religious belief. The court observed that "the record is devoid of *any* evidence that Elauf's belief is animated by motives of deception or fraud," adding that the practice of Muslim women wearing headscarves "is neither new nor uncommon." App.579 (emphasis in original).

The court next rejected Abercrombie's argument that the "notice" element of the prima facie case was not satisfied because Elauf did not herself inform Abercrombie of her religious belief. App.579-80. The

court recognized that while the Tenth Circuit has not directly addressed this issue, other circuits have held that "the notice requirement is met when an employer has enough information to make it aware that there exists a conflict between the individual's religious practice or belief and a requirement for applying for or performing the job."  App.580 (citing cases).  The court concluded that, "faced with the issue of whether the employee must explicitly request an accommodation or whether it is enough that the employer has notice that an accommodation is needed, the Tenth Circuit would likely opt for the latter choice."  App.581.

The court observed that it was uncontested that Elauf wore her headscarf to her interview with Cooke, and that Cooke knew that Elauf wore her headscarf based on her religious belief.  App.581.  The court added that while a fact question may exist as to whether Cooke told Johnson that Elauf wore her headscarf for religious reasons, this question was immaterial "because the knowledge of Cooke—who had responsibility for hiring decisions in the Abercrombie Kids store—is attributable to Abercrombie."  App.581 & n.11.  The court further noted that "there could be no bilateral, interactive process of accommodation because, although Abercrombie was on notice that Elauf wore a

headscarf for religious reasons, it denied Elauf's application for employment without informing her that she was not being hired or telling her why." App.582 n.12.

Finally, the court rejected Abercrombie's undue hardship argument, observing that while several Abercrombie executives "testified they believe granting Elauf an exception to the Look Policy would negatively impact the brand, sales and compliance," "none have conducted any studies or cite specific examples to support this opinion." App.582.   The court noted that while Joachimsthaler "opined that the granting of even one exception to the Look Policy would negatively impact the brand," he "made no effort, however, to collect or analyze data to corroborate his opinion." App.582.  The court emphasized that Abercrombie has made "[e]ight or nine head scarf exceptions" but Joachimsthaler "completely failed to consider the impact, if any, of those exceptions." App.583.  The court concluded that Joachimsthaler's opinion was thus "too speculative to establish actual hardship." App.583 (citation omitted).

## Jury Verdict on Damages

During the trial on damages, the district court granted the
Commission's motion *in limine* to exclude evidence of Islamic religious
beliefs or practices unrelated to the wearing of a headscarf, as well as
others' interpretations of Islamic religious requirements including those
pertaining to the wearing of headscarves.  App.207-13 (motion); 683-87
(district court's ruling).  Abercrombie argued that in pursuing this line
of cross-examination "[w]e're not trying to attack [Elauf's] credibility or
anything else."  The court observed that Abercrombie was attempting to
introduce evidence on an issue (the sincerity of Elauf's religious belief)
that had already been resolved on summary judgment.  App.686.  The
court concluded that this type of evidence was irrelevant to the
quantum of harm Elauf suffered as a result of Abercrombie's
discriminatory action, and that even if it did have some minimal
relevance its probative value on damages was sufficiently outweighed
by its potential prejudicial effect to warrant exclusion.  App.687.

## Summary of the Argument

In granting the Commission's motion for summary judgment and
denying Abercrombie's motion, the district court properly concluded

21

that on this evidentiary record, there was no genuine issue as to any

fact material to whether Abercrombie discriminated against Elauf

because of her religion in violation of Title VII.  The court correctly

concluded that the evidence was unequivocal that Elauf had a bona fide

religious belief that conflicted with a job requirement for the Model

position, that Abercrombie was fully aware of the conflict, and that the

company failed to hire her because of the conflict without making even

the slightest effort to try and explore how it might resolve the conflict.

The court was also correct in its conclusion that despite having a

history of permitting employees, including Models, to wear headscarves

for religious purposes, Abercrombie's witnesses—including its expert

witness—completely failed to account for this fact and instead simply

speculated that Abercrombie would have suffered undue hardship had

it permitted Elauf to wear a headscarf while working as a Model.  As

the evidence showed there was no genuine dispute as to any element of

the Commission's prima facie case, and that Abercrombie's undue

hardship evidence failed to rise above the level of speculation—a level

long rejected by this Court as sufficient to establish undue hardship—

the district court did not err in granting summary judgment to the Commission.

Further, the court did not err in refusing to permit Abercrombie to cross-examine Elauf at the trial on damages with respect to sincerity of her religious beliefs. The court correctly determined that this would allow Abercrombie to essentially relitigate the merits of the EEOC's claim, that the line of questioning was irrelevant to the harm Elauf suffered, and that the probative value of any evidence produced through such questioning was substantially outweighed by the danger of unfair prejudice. The court's determination was not an abuse of discretion, much less harmful error.

For these reasons, the Commission respectfully requests that this Court affirm the district court's summary judgment ruling and uphold the jury's damages award.

<u>Argument</u>

I. The District Court Properly Concluded that No Reasonable Jury Could Find that Abercrombie Reasonably Accommodated Elauf's Religious Belief.

Title VII provides that it is an unlawful employment practice for an employer to "fail or refuse to hire or to discharge any individual, or

23

otherwise discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). The statute broadly defines the term "religion" to include "all aspects of religious observance and practice, as well as belief," but further provides that an employer does not violate the statute if it demonstrates that it "is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (attached at Addendum p.7).

The primary concern in Title VII religious accommodation cases is "an employer's intolerance of an employee's religious practice or an employee's inability to comply with a job requirement because of religious beliefs." *Shapolia v. Los Alamos Nat'l Labs.*, 992 F.2d 1033, 1037 (10th Cir. 1993). As this Court has observed, "acting to the detriment of an applicant or employee because of his religion *before* attempting accommodation is illegal." *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1487 (10th Cir. 1989) (emphasis and alteration in original).

24

In determining whether an employer has failed to reasonably accommodate a prospective employee's religious observance or practice, this Court applies a two-step approach. *Id.* at 1486. First, the plaintiff must make out a prima facie case of religious discrimination by establishing that she has "a bona fide religious belief that conflicts with an employment requirement"; she "informed the employer of this belief"; and she "was [not hired] for failure to comply with the conflicting employment requirement." *Id.* (citations omitted). Once a plaintiff meets this standard, the burden shifts to the defendant to establish that it was unable to provide such accommodation without suffering undue hardship. *Id.*

While Abercrombie challenges the first and second elements of the Commission's prima facie case, the record on summary judgment is sufficiently one-sided on these points to support the district court's grant of summary judgment to the Commission.

A.     There is no genuine dispute that Elauf wears a headscarf in public because of a sincerely-held, bona fide religious belief.

The Supreme Court has recognized that "the claim of the [individual] that his belief is an essential part of a religious faith must be given great weight" and "[t]he validity of what he believes cannot be

25

questioned." *United States v. Seeger*, 380 U.S. 163, 184 (1965). "'Men may believe what they cannot prove. They may not be put to the proof of their religious beliefs or doctrines.'" *Id.* (quoting *United States v. Ballard*, 322 U.S. 78, 86 (1944)). As this Court has further noticed, "[s]crutiny of the validity of particular beliefs largely is beyond our judicial function because 'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others.'" *Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir. 1991) (quoting in part *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981)).

The district court was presented with uncontradicted evidence that Elauf believed that her religion required her to wear a headscarf in public. It is uncontested that Elauf is a lifelong practicing Muslim, and that some Muslims interpret their religion to require women to wear a headscarf. Supp.App.2, 10-11, 21. Elauf began wearing a headscarf at age thirteen "to represent who [she] was as far as [her] faith" and "as a reminder of [her] faith." Supp.App.11, 13. Elauf believes that a female Muslim's obligation to wear a headscarf becomes more of a requirement after puberty, because "[t]hat's when your deeds are considered to be counted." Supp.App.12. Pursuant to her religious belief, Elauf wears a

headscarf any time she is in public, and also when she is with her family at home but there is a male visitor.  Supp.App.11-12; *see also* Supp.App.183-84 (images of Elauf wearing her headscarf).

Given this evidence that Elauf's belief that wearing a headscarf is an essential part of her religious faith, and the precedent warning against judicial scrutiny of the validity of an individual's religious beliefs, the district court properly resolved this question in favor of the Commission.

The district court's subsequent conclusion that it was beyond dispute that Elauf's religious belief was sincerely held was also supported by the evidence.  In determining whether an individual's beliefs are sincere, courts examine whether the belief at issue is "'truly held and religious in nature.'"  *Mosier*, 937 F.2d at 1526 (citation omitted).  Here, as recounted above, the evidence was uncontradicted that the reason that Elauf wore her headscarf was because of her belief that her religion required he to do so.  There was no evidence that Elauf wore her headscarf for some non-religious reason.[11]

---

[11] Abercrombie incorrectly asserts that the district court impermissibly made a credibility determination and "held as a matter of law that Elauf's beliefs were sincere, stating that 'it's difficult to

Abercrombie argues that the sincerity of Elauf's belief is in question because not all Muslim women wear headscarves and some women wear headscarves for secular reasons.  *See* AtBr.54.  However, the fact that some Muslim women may choose not to wear headscarves is irrelevant to whether *Elauf* sincerely believes that *she* must do so as a tenet of her faith.  As such, the practice of other Muslim women is irrelevant to the question of whether Elauf's practice of wearing a headscarf is a sincere expression of her own truly held religious belief.  The evidence is uncontradicted that Elauf does truly hold such a belief.

Abercrombie argues that the sincerity of Elauf's belief is questionable in light of the occasional nature of some of her other religious observances.  AtBr.54.  This is a non-sequitur.  As both common sense and precedent dictate, the proper focus under the

---

conceive why anyone would wear a hijab unless they had a sincere religious belief.'"  AtBr.54 (citing App.612).  This is incorrect.  What the district court actually said was "[w]ell, <u>some would argue</u> that it's difficult to conceive why anyone would wear a hijab unless they had a sincere religious belief that they must do so.  <u>Your response</u>?"  App.612 (emphasis added).  Thus, at that hearing, the only ruling the court made in regard to Elauf's religious belief was that it "was not convinced that Abercrombie has raised a genuine issue of material fact" on this point.  App.649-50.

sincerity inquiry is on the particular religious belief at issue, and <u>not</u> on <u>other</u> religious beliefs that the individual may or may not hold.

As this Court implicitly recognized in *Toledo*, the requirement that the individual have "a bona fide religious belief that conflicts with an employment requirement" naturally focuses the inquiry on the sincerity and bona fide nature of the religious belief that conflicts with the employment requirement, and not on other beliefs that are irrelevant to the sincerity analysis because they do not conflict with any employment requirements. *See* 892 F.2d at 1486. Thus, in *EEOC v. Ilona of Hungary, Inc.*, the Seventh Circuit rejected the defendant's argument that the individual's religious belief that conflicted with her employer's work requirements was not sincerely held because she was generally "not a religious person." 108 F.3d 1569, 1575 (7th Cir. 1998). The Court noted that the defendant's argument did "not address the Commission's prima facie case" because "the sincerity of [the individual's] religious beliefs is relevant to whether or not <u>the</u>

<u>observance or practice for which an accommodation was requested</u> will be considered 'religious' in nature."[12]  *Id.* (emphasis added).

Accordingly, Elauf's other religious beliefs, or lack thereof, have no bearing whatsoever on the sincerity with which she believes that she must wear a headscarf in public—the religious belief that conflicts with an Abercrombie work requirement.

B.     There is no genuine dispute that Abercrombie was on notice of Elauf's religious belief.

In order to establish a prima facie case of discrimination based on an employer's failure to reasonably accommodate an individual's religious belief, the plaintiff must show that the defendant had notice of the individual's religious belief.  *See, e.g.*, *Toledo*, 892 F.2d at 1486 (noting the individual must "inform[] the employer of this belief"); *Dixon v. Hallmark Cos.*, 627 F.3d 849, 856 (11th Cir. 2010) (holding that employer's "awareness" of the religious conflict "would satisfy the

---

[12] Abercrombie asserts that the evidence of Elauf's other religious practices goes to "credibility."  *See* AtBr at 53-54.  However, as noted above—and displayed by Abercrombie's lack of citation to any evidence suggesting that Elauf's <u>wearing of her headscarf</u> was not for a religious reason— Elauf's other religious practices have no bearing on whether Elauf <u>wears a headscarf</u> for a religious reason.  *See Ilona of Hung.*, 108 F.3d at 1575.

second prong"). "The notice requirement is meant in part to allow the company an opportunity to attempt to reasonably accommodate the plaintiff's needs." *Hellinger v. Eckerd Corp.*, 67 F. Supp. 2d 1359, 1363 (S.D. Fla. Sept. 28, 1999). This is consistent with this Court's recognition that Title VII's religious accommodation "statutory and regulatory framework . . . involves an interactive process that requires the participation of both the employer and the employee." *Thomas*, 225 F.3d at 1155.

While this Court typically describes the notice element in terms of the employee or applicant "inform[ing] the employer" of the religious belief, *see, e.g.*, *Toledo*, 892 F.2d at 1486, the critical fact is the *existence* of the notice itself, not *how* the employer came to have such notice. *See Dixon*, 627 F.3d at 856 (describing the notice element of the prima facie case as requiring evidence that the plaintiffs "informed" the employer of their religious belief, but holding that the employer's "awareness" of the religious belief was sufficient to satisfy this standard, even though the plaintiffs did not affirmatively "inform" the employer of their religious belief). Where there is evidence that the employer was on notice of the employee's or applicant's religious belief, such evidence is sufficient to

satisfy the notice element regardless of the source of that notice. *See id.*
at 856; *see also Hellinger*, 67 F. Supp. 2d at 1363. This, quite sensibly,
is because an employer "[is] not deprived of the opportunity to attempt
to accommodate the plaintiff's beliefs merely because the notice did not
come from the plaintiff." *Hellinger*, 67 F. Supp. 2d at 1363. As the
Eleventh Circuit observed, "'[i]t would be hyper-technical . . . to require
notice of the Plaintiff's religious beliefs to come only from the Plaintiff.'"
*Dixon*, 627 F.3d at 856 (omission in original) (quoting *Hellinger*, 67 F.
Supp. 2d at 1363).

This flexible, common-sense approach to notice is consistent with
this Court's recognition that "the elements of proof in employment
discrimination cases were not meant to be 'rigid, mechanized or
ritualistic.'" *Shapolia*, 992 F.2d at 1037 (quoting in part *Furnco Const.
Corp. v. Waters*, 438 U.S. 567, 577 (1978)). "'[T]he facts necessary will
vary in Title VII cases, and the . . . prima facie proof required from [the
plaintiff] is not necessarily applicable in every respect to differing
factual situations.'" *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411
U.S. 792, 802 n.13 (1973)). Accordingly, when the facts indicate that
notice of an individual's religious belief was provided by some means

other than the individual affirmatively "informing" the employer of the belief, the prima facie notice requirement should be flexibly interpreted to conform to such factual situations.

There are strong policy reasons supporting this approach. Limiting Title VII's protection to individuals who affirmatively inform employers of their religious beliefs would have the absurd result of permitting employers to refuse to even consider accommodating an individual's known religious beliefs simply because the employer learned of the religious belief from some other source.

Moreover, a rigid, hypertechnical approach to the notice requirement would have the perverse effect of discouraging employers from engaging in an interactive process with individuals whom the employer believes have religious beliefs that conflict with work requirements.  Employers would avoid such discussions out of concern that, should the individual reinforce the employer's prior awareness of the religious belief by "informing" the employer of the belief during such a discussion, the employer would then—as a result of this "informing"— be obligated to consider reasonable accommodation options for the individual, but would not be so obligated if they simply left the matter

unaddressed despite their awareness of the religious belief. This would plainly subvert the interactive process that plays such an important role in Title VII's statutory and regulatory framework. *See Thomas*, 225 F.3d at 1155.

Of course, this is not to say that employers are required to inquire of applicants or employees as to whether there are any religious beliefs that need to be accommodated, absent some reasonable indication to the employer that an accommodation may be needed. However, where, as here, an employer is aware that a conflict exists between an individual's religious belief and a work requirement, it is nonsensical to exempt the employer from Title VII's reasonable accommodation requirement simply because the <u>source</u> of the employer's knowledge was not the individual's own affirmative statement to the employer.

For all these reasons, the district court properly interpreted the notice requirement flexibly, rather than rigidly and hypertechnically, to only require evidence that the employer was aware of the religious belief and conflict, regardless of how that information was imparted to the employer. The court also correctly concluded that there was no

genuine dispute as to whether Abercrombie had notice of Elauf's religious practice of wearing her headscarf in public.

Cooke, the Abercrombie official who interviewed Elauf, testified that she was aware that Elauf was Muslim and that she wore her headscarf for religious reasons.[13]  Supp.App.48, 56.  Cooke had seen Elauf on numerous occasions prior to interviewing her, and had observed her wearing her headscarf.  Supp.App.46, 48, 180.  When Cooke interviewed Elauf, Elauf wore a headscarf to the interview.  Supp.App.48-49.  Cooke "figured that was the religious reason why [Elauf] wore the headscarf, she was Muslim."  Supp.App.48, 56.  On this record, there is no question that Abercrombie, through Cooke, was on notice that Elauf wore a headscarf because she is Muslim.

Abercrombie raises several arguments to the contrary, but none have any merit.  First, Abercrombie asserts the same type of argument

---

[13] Abercrombie has not contested that Cooke was an agent of Abercrombie such that her awareness of Elauf's religious belief is fully attributable to Abercrombie.  *See* 42 U.S.C. § 2000e(b) (defining "employer" to include "any agent" of the employer) (attached at Addendum p.6); *Sauer v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993) ("'[A]n individual qualifies as an 'employer' under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing, or conditions of employment.'") (citation omitted).

rejected in *Dixon*—that the Commission cannot establish notice because its awareness of her religious belief did not come from Elauf herself affirmatively "informing" Abercrombie of that belief. AtBr.21. As described above, it is irrelevant for purposes of the notice element how the employer gained its awareness of the individual's religious belief— all that matters is that the employer had notice of that belief. *See supra*, at 30-34.

Abercrombie asserts that in *Thomas*, this court "established" that an applicant or employee "must *inform* the employer of a religious belief . . . in order to establish a prima facie case." AtBr.21-22 (emphasis in original). This is incorrect. In *Thomas* this Court was <u>not</u> faced with the question of whether to establish a prima facie case, the plaintiff had to produce evidence that the employer's awareness of her religious belief came from her and not some other source. *See* 225 F.3d at 1154-55 (making no mention of this issue, and noting that it was uncontested that the plaintiff had established a prima facie case). *Thomas* repeated the elements of a prima facie case previously described in *Toledo*, which, as with *Thomas*, did not address whether the only permissible source of the employer's awareness of the subject religious belief was

the employee or applicant herself. *See id.*; *Toledo*, 892 F.2d at 1486 (making no mention of any dispute regarding whether the plaintiff himself was required to affirmatively notify the employer of his religious belief). Similarly, none of the other circuits' decisions cited by Abercrombie hold that if the employer's awareness of the religious belief came from some source other than the plaintiff herself, the plaintiff cannot establish a prima facie case.[14] *See* AtBr.22-23 & n.10 (citing cases).

Abercrombie similarly asserts that the Commission's Compliance Manual and other policy guidances "place the burden on the employee to inform the employer of a religious belief that conflicts with an

---

[14] Abercrombie's disregard for the actual holdings of these decisions is further displayed by its incorrect description of *Dixon* as "consider[ing] the question" and ruling that "an applicant or employee must *inform* the employer" of the religious belief in order to establish a prima facie case. *See* AtBr.22 (emphasis added by Abercrombie). To be sure, in *Dixon* the court described the notice element of the prima facie case just as this Court has in *Thomas*, *Toledo*, and other decisions, as requiring evidence that the aggrieved individual "informed" the employer of his or her belief. *Dixon*, 627 F.3d at 856. Nevertheless, the Court did not limit satisfaction of the notice element to situations where the individual with the religious belief affirmatively "informed" the employer of the religious belief. The Court noted there was "ample evidence" the plaintiffs' supervisor was otherwise aware of the plaintiffs' religious belief, and held the supervisor's "awareness" of the religious belief sufficient to establish notice. *Id.*

employment requirement." AtBr.23-24 (citations omitted).  However,

just as with *Toledo* and *Thomas*, the Commission's policy documents do

not address the situation where there is evidence that the employer was

aware of the applicant's religious belief without the applicant herself so

"informing" it.  *See* EEOC Compliance Manual, No. 915-008, Section 12

– Religious Discrimination, at 12-IV(A) (July 22, 2008) (attached at

Addendum pp.14-19), *available at*

http://www.eeoc.gov/policy/docs/religion.html (last visited Jan. 20, 2012)

(no discussion of whether notice requirement is satisfied when employer

has notice of the individual's religious belief from source other than the

applicant herself so informing the employer); EEOC – Questions and

Answers: Religious Discrimination in the Workplace, at 6-7 (attached at

Addendum p.28), *available at*

http://www.eeoc.gov/policy/docs/qanda_religion.html (last visited Jan.

20, 2012) (same); EEOC – Best Practices for Eradicating Religious

Discrimination in the Workplace (attached at Addendum pp.21-25),

*available at* http://www.eeoc.gov/policy/docs/qanda_religion.html (last

visited Jan. 20, 2012) (same).  As such, none of these policy documents

indicates that an employer is excused from its obligation to provide

38

reasonable accommodation for an applicant's religious belief that conflicts with a work requirement simply because someone other than the applicant herself informed the employer of the belief.

The Commission's regulations also discuss the notice requirement in the context of the individual "notif[ying]" the employer. 29 C.F.R. § 1605.2(c) (attached at Addendum p.10). However, as with the aforementioned policy documents, the regulations do not address the situation where the employer is otherwise aware of the individual's religious belief, and accordingly do not preclude a plaintiff from satisfying the notice requirement under such circumstances. These policy documents and regulations do not elevate form over substance and require this Court to take a nonsensical approach to the notice requirement.[15]

Abercrombie further asserts that the district court's approach is contrary to law, the "purpose of the 'notice' requirement," and "good

---

[15] Since this interpretation by the Commission of its own regulations is neither plainly erroneous nor inconsistent with these regulations, and there is no indication that this interpretation does not reflect the Commission's fair and considered judgment on the matter, this interpretation is "controlling" and entitled to deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Qwest Corp. v. Colo. Pub. Util. Comm'n*, 656 F.3d 1093, 1098 (10th Cir. 2011).

policy." AtBr.25. This, Abercrombie posits, is because this approach will "require employers to inquire into the details of an applicant's religion if they have any reason to believe that the applicant has a religious belief." *Id.* To the contrary, the court's approach presents no such difficulties and is fully consistent with Title VII, its purposes, and public policy.

Abercrombie predicts the district court's approach would compel employers to be "clairvoyant experts" on a wide range of religious practices, able to discern at a glance whether an individual has a religious belief in need of reasonable accommodation; force employers to either "question applicants about their religion," or make "assumptions based on stereotypes of protected classifications"; and permit an applicant to "ambush" an employer by attending an interview wearing a "potentially religious symbol" but remaining silent when presented with information about job duties. AtBr.27-33.

The law already anticipates that employers may not be aware of an individual's specific religious beliefs or how to resolve any conflicts between such beliefs and work requirements. It does not require employers to affirmatively broach the issue of religious beliefs with

every applicant or employee, regardless of whether the employer has reason to believe that the individual may have a religious belief that conflicts with a work requirement. The employer's obligation is to attempt reasonable accommodation (where no undue hardship would result) when it has notice—be it from an affirmative statement by the individual, or some other source—of an individual's religious belief that conflicts with a work requirement.

This is why the law requires employers to engage in an interactive process with employees or applicants with religious beliefs that conflict with work requirements, once they are on notice of such religious beliefs—to determine what reasonable accommodation, if any, may be provided in order to eliminate the conflict. *See Thomas*, 225 F.3d at 1155 (discussing the interactive process). It is inherent in the notion of an interactive process that the employer may not adequately understand the individual's religious belief, and that through such a process, the employer and the individual can discuss the religious belief at issue and possible accommodation options.

This approach also encourages employers to avoid stereotyping and unnecessary inquiries into an individual's religious beliefs. For

example, if an employer is presented with a situation in which it believes an applicant may have a religious belief that conflicts with a work requirement, it can simply inform the applicant that it will make reasonable efforts to accommodate employees' religious practices, describe the relevant job duties, and then ask the applicant if she believes she can perform those duties. *See generally* EEOC – Best Practices for Eradicating Religious Discrimination in the Workplace, Reasonable Accommodation of Religious Beliefs and Practices, Employer Best Practices (attached at Addendum pp.21-24), available at [http://www.eeoc.gov/policy/docs/best_practices_religion.html](http://www.eeoc.gov/policy/docs/best_practices_religion.html) (last visited Jan. 20, 2012); EEOC Compliance Manual, No. 915-008, Section 12 – Religious Discrimination, at 12-IV(A) (July 22, 2008) (attached at Addendum pp.14-19), *available at* [http://www.eeoc.gov/policy/docs/religion.html](http://www.eeoc.gov/policy/docs/religion.html) (last visited Jan. 20, 2012).   By so acting, employers can engage in just the type of narrowly-tailored interactive process intended under Title VII, and avoid making decisions based on stereotypes or assumptions about an individual's religious beliefs.[16]

---

[16] There is no merit to Abercrombie's claim that adopting the district

Abercrombie points to a number of instances where, it contends, the district court failed to examine the evidence in the light most favorable to the company.  AtBr.33-38.  However, Abercrombie fails to identify how any of these contested factual conclusions are "material" to the case.  *See id.*  Nevertheless, none of these assertions indicate the district court's ruling was incorrect.

For example, Abercrombie argues that there is evidence that Elauf was aware of the Look Policy, suggesting that at the time of her interview she was aware that headscarves were not permitted under that policy.  AtBr.34.  However, there is no evidence—and Abercrombie does not even argue—that Elauf was aware that the Look Policy forbade headwear.  At the interview Cooke only read Elauf the abbreviated version of the Look Policy provided in the company's interview guide, which does not mention any items that an employee may not wear at work, including headgear, and there is no evidence

court's approach will unleash a torrent of litigation regarding the assumptions of the employer.  *See* AtBr.33.  That the employer had notice of the individual's religious belief is always a fact to be proved in Title VII religious accommodation cases, and the paucity of appellate decisions addressing the type of notice circumstances present in this case strongly suggests that there is no such impending flood of litigation.

that Cooke explained the Look Policy to Elauf as prohibiting headscarves. Supp.App.45, 49, 56, 61-62. Nor is there any evidence that prior to her interview, any other individual informed Elauf that she could not wear a headscarf while working at Abercrombie.

Relatedly, Abercrombie asserts that the court was required to conclude that Sepahvand did not discuss Elauf's headscarf with Cooke prior to the interview. AtBr.34-35. Abercrombie ignores, however, Sepahvand's uncontradicted testimony that she discussed Elauf's headscarf with McJilton, another Assistant Manager at Abercrombie, that McJilton told Sepahvand that Elauf's headscarf would be fine so long as it was not black, and that Sepahvand then provided Elauf this information. Supp.App.181. Elauf similarly testified that Sepahvand told her that wearing a headscarf would be allowed at Abercrombie so long as it was not black. Supp.App.17. While it is true that Sepahvand testified that she discussed this with McJilton (Supp.App.181), and Elauf testified that Sepahvand said she discussed this with Cooke (Supp.App.17-18), this dispute is immaterial. There is no dispute that Elauf was informed by Sepahvand, prior to the interview, that her wearing a headscarf was acceptable to Abercrombie management.

Accordingly, there is no evidence suggesting that Elauf had any reason
to believe that her headscarf had not already been approved by
Abercrombie, or that Elauf had any reason to ask any questions about
her headscarf at the interview.

Abercrombie claims that because Cooke testified that she
"assume[d]" Elauf was Muslim and that her headscarf was worn for
religious reasons, and did not actually "know" these facts, the court was
required to conclude that Cooke did not "know" Elauf's religion.
AtBr.35-36. It is uncontested that Cooke correctly interpreted Elauf's
wearing a headscarf as indicating that she is Muslim and wore the
headscarf for a religious purpose. As such, even if the district court had
stated only that Cooke "assumed" Elauf was Muslim and wore a
headscarf because of her religious belief because Elauf's headscarf
"signif[ied]" to Cooke that Elauf was Muslim—Cooke's testimony on this
point, Supp.App.48, 56—the court would still be correct that it was
uncontested that Abercrombie was on sufficient notice of Elauf's
religious belief.

Abercrombie also asserts that the official who decided not to hire
Elauf—Johnson—knew nothing of Elauf's religion or that she wore a

headscarf for religious reasons.  AtBr.37.  This proposition is
immaterial.  It is uncontested that Cooke was aware of Elauf's religion
and that she wore her headscarf for religious reasons.  Regardless of
whether it was Cooke or Johnson who failed to take the necessary steps
to consider reasonable accommodation of Elauf's religious belief, it is
uncontested that Abercrombie was aware of Elauf's religious practice
and failed to even consider any possible accommodation options.

Abercrombie claims that the district court erred in concluding that
the interactive process failed because Abercrombie failed to initiate it.
*See* AtBr.36.  However, it is well established that the burden of
initiating the accommodation process is on the employer.  *Toledo*, 892
F.2d at 1488-90.  It is uncontested that Cooke was aware of Elauf's
religious belief and its conflict with the Look Policy, but failed to pass
this information along to Johnson or HR as required so the company
could explore accommodation options.[17]

---

[17] Abercrombie also faults the district court for stating that Cooke
contacted Johnson because she was uncertain whether Elauf would
need an accommodation, and because Cooke "never testified about an
'accommodation.'"  AtBr.36.  Abercrombie misses the point.  Regardless
of whether Cooke used the word "accommodation" with Johnson, it is
uncontested that Cooke was aware that Elauf wore a headscarf for
religious reasons, that Johnson told Cooke not to hire Elauf because of

II.     **The District Court Properly Concluded that No Reasonable Jury Could Conclude that Abercrombie Would Suffer an Undue Hardship if It Permitted Elauf to Wear a Headscarf At Work.**

Once a plaintiff presents sufficient evidence to establish a prima facie case of an employer's failure to reasonably accommodate a religious belief, the burden shifts to the defendant to prove that it was unable to provide such accommodation without suffering undue hardship on the conduct of its business. *Toledo*, 892 F.2d at 1486. If, as happened here, the employer makes no effort to accommodate an individual's religious beliefs before taking action against her, liability attaches unless the employer "shows that no accommodation could have been made without undue hardship." *Id.* at 1490; *see also id.* at 1492 (concluding that the employer's failure to show that "accommodation of [the employee's] religious practices without undue hardship was impossible" resulted in liability). "Absent this showing, failure to attempt some reasonable accommodation would breach the employer's duty to initiate accommodation of religious practices." *Id.* at 1490.

---

her headscarf, and that neither official took the proper steps for HR to consider whether Elauf's religious belief could be reasonably accommodated.

Determining whether a particular accommodation would cause an undue hardship is a case-by-case factual inquiry. *Id.* (citing *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134 (3d Cir. 1986)). While the employer is not required to incur more than a *de minimis* hardship, "[a]ny proffered hardship . . . must be actual; '[a]n employer . . . cannot rely merely on speculation'" to meet its burden of proof. *Id.* at 1492. As this Court approvingly described another circuit's explanation of this burden, "'a claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships . . . [and t]he magnitude as well as the fact of hardship must be determined by examination of the facts of each case.'" *Id.* (quoting *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981)). Similarly, the Eighth Circuit, sitting en banc, recognized that "[a]ny hardship asserted, furthermore, must be 'real' rather than 'speculative,' 'merely conceivable,' or 'hypothetical.' An employer 'stands on weak ground when advancing hypothetical hardships in a factual vacuum. 'Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts.'" *Brown v. Polk County, Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (en banc) (citations omitted).

48

It is uncontested that Abercrombie failed to even consider whether it could reasonably accommodate Elauf's religious belief before deciding not to hire her.  Johnson, the District Manager, testified that the manner by which Abercrombie approaches reasonable accommodation of individuals' religious beliefs is by referring the matter to HR to make the accommodation decision, and that he has never referred any such matter—including Elauf's situation—to HR.  Supp.App.76-77.  Nor, according to Abercrombie, did Cooke refer the religious conflict issue to either Johnson or HR, despite Cooke's being aware of Elauf's religious belief and the conflict it posed with the Look Policy.  As a result, Abercrombie can only survive summary judgment by presenting evidence that it would be impossible for it to reasonably accommodate Elauf's religious belief without suffering undue hardship.  *Toledo*, 892 F.2d at 1490.  As the district court correctly recognized, given the purely hypothetical and speculative nature of Abercrombie's undue hardship evidence, Abercrombie failed to meet this burden.

First, it must be noted that over the last few years Abercrombie has provided employees with exactly the reasonable accommodation sought by Elauf—permission to wear a headscarf for religious reasons

while performing the Model position—without any indication that any harm resulted.  *See supra*, at 6-7 (exceptions), 12-17 (Abercrombie's witness testimony regarding undue hardship).  If Abercrombie's assertion of undue hardship were correct, these multiple Look Policy exceptions would reveal exactly how detrimental to the conduct of its business such exceptions truly are.  Yet Abercrombie has not identified a single adverse effect it has actually suffered from any of these instances—either to its sales, to its "brand," or otherwise.  *See* AtBr.38-52.

Given Abercrombie's inability to identify a single harm it has actually suffered by permitting a tiny fraction of its Models to wear headscarves as reasonable accommodations—eight out of 70,000-100,000, Supp.App.79, 81—it is not surprising that Abercrombie's witnesses were unable to identify any nonspeculative or nonhypothetical harm that would result from similarly accommodating Elauf's religious belief.

Abercrombie's expert witness, Joachimsthaler, opined that an employee wearing a headscarf "<u>can</u> negatively impact the brand and <u>can</u> impact sales," but would not go so far as to state that such a harm

50

"would" in fact occur, because "[y]ou never know for sure."

Supp.App.170 (emphasis added). Joachimsthaler added that such

certainty could be gained from "comprehensive empirical research"—in

fact, this is exactly what Abercrombie asked him to perform,

"comprehensive empirical research" on the potential impact "on sales

performance" of employees wearing headscarves—yet he was <u>still</u>

uncertain in his conclusion. Supp.App.170, 174.

Joachimsthaler was supposed to examine the impact of permitting

employees to wear headscarves on Abercrombie's sales performance.

Supp.App.174. Yet he admitted that he knew Abercrombie had been

permitting employees to wear headscarves, that he was unaware of any

studies on whether Abercrombie's sales had been impacted by these

exceptions, and that he himself did not undertake any such study.[18]

Supp.App.170, 173.

Joachimsthaler's other opinions were no less speculative.

Joachimsthaler testified that Abercrombie's permitting employees to

---

[18] Abercrombie claims the district court incorrectly characterized
Joachimsthaler's testimony as speculative because he did not analyze
data to corroborate his opinion. AtBr.49. As stated above, however,
Joachimsthaler did not in fact study any data relating to the effect on
sales, brand, or otherwise on Abercrombie's actual experience in
permitting employees to wear headscarves.

wear headscarves could be either "a foolish thing or a smart thing to do," as "it could be foolish for a brand but smart for business, for—for doing additional sales." Supp.App.171-72. Joachimsthaler further asserted both that "one exemption from the Look Policy could result in a breakdown of [Abercrombie's] control over the in-store brand experience," and that Abercrombie's granting such exceptions would not break down the company's control over the brand "[b]ecause . . . they are in control." Supp.App.173.

Abercrombie's management officials were just as speculative. Yoakum, Abercrombie's Director of Stores, Human Resources, testified that permitting Elauf to wear a headscarf would have caused undue hardship because "if we accommodate every request for accommodation that we receive, that could negatively impact that store experience for our customers." Supp.App.175-76 (emphasis added). Despite being Abercrombie's Director of Stores, Human Resources, Yoakum was unaware that Abercrombie had been permitting employees to wear headscarves for religious purposes, and was similarly unaware of and/or had not seen any measurement, study, or report by Abercrombie on any adverse impact from these exceptions. Supp.App.176-78.

The basis for Yoakum's opinion was simply "[her] own personal experience" where she has "walked into stores that have Look Policy exceptions, ones that we have dealt with, and the experience is different." Supp.App.177. Yoakum did not describe, however, whether the Look Policy exceptions she experienced were analogous to permitting Elauf to wear a headscarf, if the exceptions she witnessed caused any actual harm to Abercrombie, or if Abercrombie's actual practice of permitting Models to wear headscarves had caused the harm she speculated. Similarly, Riley, Abercrombie's Group Vice President for Human Resources, Stores, testified that other than the Joachimsthaler report, Abercrombie had not studied how deviating from the Look Policy might impact how customers view Abercrombie. Supp.App.79, 83.

Moorefield, Abercrombie's Director of Stores, testified that while Abercrombie conducts audits of its stores, he was not aware of any effort by Abercrombie to examine the audit scores to see if they correlated with a store's lower sales. Supp.App.33. Moorefield further testified that Abercrombie uses "Secret Shopper" reports to evaluate its stores, but admitted that in trying to correlate a drop in sales with a

53

lower score in the "properly dressed" category (presumably corresponding to a violation of the Look Policy), "you're guessing essentially."  Supp.App.31, 34-36.  Moorefield added that he has never done any type of statistical analysis to try and make such a determination.  Supp.App.36.

Moorefield stated that Abercrombie has data on numerous factors relating to a store's operation.  Supp.App.37.  However, when asked if Abercrombie tries to draw a correlation between all this data and the store's sales performance, and to isolate whether a drop in the "properly dressed" score causes a drop in sales, Moorefield could only opine that he "believed" that there was such a correlation and could not provide any specific examples.  Supp.App.38.  Moorefield also stated that while he had concluded in some instances that poor enforcement of the Look Policy led to decreased sales, he did not record that conclusion anywhere, could not provide any examples, did not describe the type of Look Policy violation that led to this conclusion (such as whether the violation he witnessed was analogous to wearing a headscarf), and never did any type of mathematical calculation in reaching that conclusion.  Supp.App.39.

Viewing all of this evidence in the light most favorable to Abercrombie, no reasonable jury could conclude that providing Elauf with a reasonable accommodation would have caused it to suffer an undue hardship. Despite having every opportunity to present evidence of its actual practice of permitting Models and other employees to wear headscarves as reasonable accommodations for their religious beliefs, Abercrombie instead relied only on speculative, hypothetical opinions. As such, Abercrombie has failed to satisfy this Court's well-established requirement that evidence of undue hardship rise above the level of the speculative and theoretical and into the realm of the actual.

Abercrombie argues that permitting exceptions to the Look Policy would "eliminate" an "essential function" of the Model position. AtBr.41-42. This argument is both legally and factually infirm. First, the legal basis for this "essential function" argument is completely inapplicable to Title VII religious accommodation cases. Abercrombie's argument is based on the Americans with Disabilities Act's ("ADA") unique statutory provision that limits its protections in large part to individuals who are able to perform a job's "essential functions" with or without reasonable accommodation. *See* AtBr.41-42 (citing exclusively

to ADA decisions and regulations); 42 U.S.C. § 12111(8) (attached at
Addendum p.3) (defining the term "qualified individual" as someone
"who, with or without reasonable accommodation, can perform the
essential functions of the employment position").  The ADA does not
require employers to eliminate a job's "essential function" as a
reasonable accommodation.  *Davidson v. Am. Online, Inc.*, 337 F.3d
1179, 1190, 1192 (10th Cir. 2003).

There is no corresponding concept of "essential functions" under
Title VII, either in the context of defining who is covered by the statute
or in regard to an employer's obligation to provide reasonable
accommodation for an applicant's or employee's religious practice
absent undue hardship.  *See* 42 U.S.C. § 2000e(j) (attached at
Addendum p.7) (defining the term "religion").  The only consideration
under Title VII relevant here is its requirement that the employer
demonstrate that it is unable to reasonably accommodate an
individual's religious belief without suffering undue hardship on the
conduct of its business, and that the employer make such a
demonstration through presentation of evidence that shows that the
undue hardship is actual, not speculative, hypothetical, or theoretical.

Title VII does <u>not</u> carve out a category of job duties that are entitled to special treatment, as does the ADA with its term "essential functions." Under Title VII an employer could be required to eliminate an "essential function" if doing so would not result in an undue hardship. As such, Abercrombie's ADA-based "essential function" argument is legally irrelevant.

Abercrombie next asserts that its witnesses' testimony "demonstrated" and "established" that permitting an exception to the Look Policy damages its brand and business.  AtBr.43-45.  However, as described above, these witnesses' testimony was devoid of any indication that harm would have <u>actually</u> resulted had Abercrombie hired Elauf and permitted her to wear her headscarf at work, and lacks any consideration of Abercrombie's actual practice of having provided exactly such a reasonable accommodation to other employees.[19]  *See supra*, at 49-55.

---

[19] Curiously, Abercrombie asserts that permitting exceptions to the Look Policy would be akin to a "clothing retailer allow[ing] a fashion model to wear an off-brand headscarf in a television commercial."  AtBr.45. Abercrombie is ignoring that the Look Policy explicitly <u>permits</u> Models to wear non-Abercrombie clothing at work, so long as such clothing is "not clearly that of a competitor" and is otherwise consistent with the Abercrombie "style."  *See* Supp.App.68-69 (Look Policy).

Abercrombie also asserts that the Commission "acknowledged that deviations from the Look Policy damage Abercrombie's brand," but this is incorrect.  As Abercrombie identifies in its brief, this supposed "acknowledgement" is attributed to the Commission's statement in the June 29, 2011, motion hearing that "we accept the <u>general principle</u> that in marketing one deviation from the brand <u>could</u> harm the company, <u>could</u> harm the brand."  AtBr.45 (quoting App.668) (emphasis added).  As is clear from this quotation, the Commission was only agreeing to the general principle that brand damage is possible in such situations—not that it was a certainty, and certainly not that it would have happened here.

Abercrombie asserts that it would lose the ability to "uniformly enforce" its Look Policy if it were required to permit Elauf to wear a headscarf at work, because noncompliance with the policy interferes with its ability to enforce the policy, compromising its control of the brand.  AtBr.46.  As an example, it asserts that because it permitted one employee to wear a yarmulke at work, other employees in other stores "believe[d] that Abercrombie should allow further exceptions to the Look Policy."  *Id.*  Even if true, this is hardly a harm suffered by

Abercrombie—that employees simply <u>believed</u> it should permit exceptions to the policy.  Moreover, highlighting the inconsequential nature of this alleged harm is the fact that the company produced some eighty pages of documented requests for Look Policy exceptions (granted and denied), yet has presented no evidence that granting those exceptions (including several for non-religious purposes) in any way, shape or form diluted its ability to enforce the policy.  *See* Supp.App.88-168 (HR's Look Policy exception records).  Abercrombie's argument here is also in apparent disregard of Joachimsthaler's testimony that granting exceptions would <u>not</u> break down Abercrombie's control over the brand because when it decides to permit exceptions "they [Abercrombie] are in control."  Supp.App.173.

Abercrombie claims Moorefield and Yoakum cited "specific examples" of Look Policy noncompliance damaging its brand, AtBr.48, but this, too, is incorrect.  Abercrombie ignores Moorefield's statement on this point:  "Do I have a specific answer or example?  No." Supp.App.38.  Similarly, Yoakum's general statement that she has "walked into stores that have Look Policy exceptions . . . and the

59

experience is different," AtBr.48, is hardly a specific example of a
particular Look Policy exception damaging the company's brand.

Abercrombie further asserts that other courts have considered
such speculative, general personal opinions as sufficient to establish
undue hardship.  AtBr.39.  However, the one case cited by
Abercrombie—*EEOC v. GEO Group, Inc.*, 616 F.3d 265 (3d Cir. 2010)—
is directly at odds with this Court's Title VII jurisprudence.  As
Abercrombie admits, the court in *GEO* found summary judgment for the
defendant was appropriate on undue hardship grounds based on
speculative evidence.  *See* AtBr.39; *GEO*, 616 F.3d at 278 (Tashima, J.,
dissenting) (characterizing the relevant witness testimony as "highly
speculative").  This, however, is exactly the type of evidence this Court
has held <u>cannot</u> satisfy the employer's undue hardship burden.[20]  *See*
*Toledo*, 892 F.2d at 1492 (speculation insufficient to show undue
hardship).  Furthermore, *GEO* permitted the employer—a private

_____

[20] While Abercrombie cites *GEO* for the proposition that "some courts
have found undue hardship where the harm was speculative," AtBr.39,
Abercrombie fails to acknowledge this Court's rejection in *Toledo* of
speculation as sufficient to show undue hardship, except in the rarest of
cases where the religious belief is so "completely incompatible" with the
job that it would be futile for the employer to attempt to resolve the
conflict, *see* 892 F.3d at 1489.  This is not such a case, and Abercrombie
has not argued otherwise.

company running a prison—to be more speculative in its conclusions about the possible safety ramifications of the accommodation sought, given not only the safety element at issue in that case but also the unique nature of the prison environment.  616 F.3d at 267, 274-75. Neither of these unusual, unique considerations is at issue in the present case.

Abercrombie also argues that it is not required to show "economic harm" in order to prove undue hardship.  AtBr.39.  The Commission does not disagree.  However, Abercrombie has not presented evidence that even the slightest of harm—economic or otherwise—would have resulted from its permitting Elauf to wear a headscarf at work.

Abercrombie similarly claims the district court erroneously required it to prove undue hardship "in economic terms and with exactitude" and through a "formal empirical study," AtBr.49-50, because the court faulted Abercrombie's witnesses for failing to account for the fact that it has repeatedly provided the reasonable accommodation that Elauf would need, and their failure to present any evidence whatsoever regarding the harm, if any, that resulted from those repeated accommodations.  This is hardly requiring a showing of

61

economic harm with "exactitude" or on the basis of formal empirical study.  Rather, the court properly recognized that Abercrombie's witness testimony failed to account for Abercrombie's history of repeatedly providing the very accommodation it now claims would visit undue hardship on the conduct of its business.

Abercrombie asserts that it made these other exceptions to avoid litigation and "in spite of the associated harm."  AtBr.50-51.  However, the reason Abercrombie granted these exceptions is irrelevant to whether the exceptions in fact resulted in undue hardship to the company—a proposition in support of which Abercrombie offers no evidence.  Additionally, while Abercrombie states that it was undisputed that these other exceptions were allowed "in spite of the associated harm," AtBr.51, the Commission has consistently argued that there is no evidence that any actual harm has resulted, or would result, from permitting such exceptions.

Abercrombie is also incorrect in claiming that the district court "punished Abercrombie for making exceptions," and this will dissuade employers from granting requests for accommodation out of fear that granting one accommodation will bar the employer from asserting

undue hardship in any other case. AtBr.51-52. This is simply nonsensical. To the contrary, when an employer provides a reasonable accommodation and incurs an undue hardship as a result, such evidence of actual harm would potentially support its position in a similar case, not necessarily undermine it.

Abercrombie also asserts that the other headscarf accommodations it provided were "approved only after Abercrombie determined that the accommodation would not distract from the brand," and that Elauf was not "similarly situated" to those individuals. AtBr.52. These assertions are meritless. First, Riley, the Abercrombie official attributed with making the former assertion, did not so testify. At the cited page, Riley actually testified that HR officials who "initially field[] a call" from a manager regarding a possible reasonable accommodation issue have the authority to authorize an accommodation "as long as it's not going to distract from the brand." App.69. Riley was not asked, and did not testify, about the individuals who have been permitted to wear headscarves. *See id.*

Second, Abercrombie has offered no evidence that Elauf was not similarly situated to the eight other Models who were permitted to wear

headscarves as religious accommodations.  AtBr.52.  The record

evidence—that Abercrombie permitted eight other Models to wear

headscarves as reasonable accommodations for their religious beliefs,

just as Elauf needed to be reasonably accommodated—supports exactly

the contrary conclusion, that there was no meaningful difference

between the reasonable accommodation Elauf needed and the

reasonable accommodation the eight other Models were provided,

apparently without undue hardship.

III.    The District Court Properly Excluded from the Damages Trial
        Evidence Challenging the Sincerity with Which Elauf Held Her
        Religious Beliefs.

During the damages trial, the district court granted the

Commission's motion *in limine* to exclude testimony, evidence, or

argument regarding Islamic religious beliefs or practices unrelated to

the wearing of a headscarf, as well as other individuals' interpretations

of Islamic religious requirements including those pertaining to the

wearing of headscarves.  App.207-13 (motion); 683-87 (district court's

ruling).  The court observed that Abercrombie was attempting to

introduce evidence on an issue (namely, the sincerity of Elauf's

religious beliefs) that had already been resolved on summary judgment.

*See* App.683-87.  The court concluded that this evidence was irrelevant to the amount of harm Elauf suffered as a result of Abercrombie's discriminatory action, and that, even if it did have some minimal relevance its probative value on damages was sufficiently outweighed by its prejudicial effect to warrant exclusion.  App.687.  The court's preclusion of this line of cross-examination was appropriate under the circumstances and well within its discretion.

"Under Rule 403, the district court may exclude evidence if its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .'" *United States v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997) (quoting in part Fed. R. Evid. 403).  As this court has long, and frequently, recognized, "[t]he trial court has broad discretion to determine whether prejudice inherent in otherwise relevant evidence outweighs its probative value." *United States v. Esch*, 832 F.2d 531, 535 (10th Cir.1988) (citing *United States v. Neal*, 718 F.2d 1505, 1509-10 (10th Cir.1983)).  In addition, "[t]he determination of whether evidence is relevant lies 'within the sound discretion of the trial court, and the court's determination will not be disturbed absent a clear showing of an abuse of that discretion.'"

65

*Esch*, 832 F.2d at 535 (quoting in part *Neal*, 718 F.2d at 1510).

Therefore, this Court will not reverse a district court's decision to

exclude certain evidence absent a "'definite and firm conviction that the

lower court made a clear error of judgment or exceeded the bounds of

permissible choice in the circumstances.'" *Id.* (quoting *Wolfgang v. Mid-

America Motorsports, Inc.*, 111 F.3d 1515, 1526 (10th Cir.1997)).

   Here, there is no indication that the district court made a clear

error of judgment or exceeded the bounds of permissible choice in the

circumstances when it precluded this line of cross-examination during

the damages trial.  The district court rejected Abercrombie's argument

that the level of Elauf's devotion to her faith was sufficiently probative

on the question of whether she suffered emotional harm (and how much

harm) as a result of Abercrombie's refusing to hire her because of her

religious belief.

   Abercrombie refused to hire Elauf because she wears a headscarf

in observance of her religion.  Under these circumstances, the level of

her devotion to other tenets of her religion was irrelevant to the harm

she suffered as a result of Abercrombie's actions.  Moreover, permitting

Abercrombie to attempt to impugn Elauf's religious devotion and

suggest that she did not have a bona fide religious belief could have

substantially prejudiced Elauf by casting her in an unfavorable light

before the jury, on the basis of a substantive question that was already

resolved in favor of the Commission.  Under these circumstances, it is

hard to imagine that Abercrombie sought to cross-examine Elauf on the

depth of her religious devotion for any other reason.  Accordingly, the

court acted fully within its discretion in excluding this line of cross-

examination.

Abercrombie has not argued to the contrary on appeal.  The

company has offered no argument that the court's weighing of the

potential harm as greater than the probative value was somehow an

abuse of discretion.  *See* AtBr.54-56.  In fact, this portion of its brief

makes no mention of the touchstone elements of a challenge to a court's

Rule 403 ruling, such as "probative value," "substantially outweighed,"

"unfair prejudice," or, perhaps most importantly, "abuse of discretion."

*See* AtBr.55-57; *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664,

679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening

brief are waived.").  Nor has Abercrombie explained how, if the court did

err as claimed, such error was anything but harmless.  *See McInnis v.*

*Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1142 (10th Cir. 2006) ("Even

assuming the district court abused its discretion in excluding evidence,

we must also determine whether the exclusion was harmless error

because 'we will not set aside a jury verdict unless the error

prejudicially affects a substantial right of a party.'") (citation omitted).

Instead, Abercrombie argues that it should have been permitted to

introduce this evidence because it is the province of the jury to

determine witness credibility and the company therefore should have

been permitted to challenge Elauf's credibility on the question of her

level of devotion to her religion.  AtBr.55-57.  Abercrombie argues that

"juries are entitled to evaluate the credibility of a plaintiff and draw

inferences upon which to base an award of damages for emotional

distress," citing no fewer than five cases in support of the unremarkable

proposition that juries may take the credibility of a victim into account

when determining damages.  *See* AtBr.55-57 (citing cases).  But simply

because evidence may go to the credibility of a witness does not divest a

court of discretion to preclude the evidence for some other reason.

Furthermore, Abercrombie's argument on appeal is directly

contrary to the position it took in the district court—that it was <u>not</u>

seeking to present this evidence in order to challenge the credibility of Elauf.  At trial, Abercrombie specifically and unequivocally argued that in pursuing this line of cross-examination "[w]e're not trying to attack her credibility or anything else."  App.686.  Notwithstanding the complete and total inconsistency between what Abercrombie argued to the district court and what it now argues on appeal, Abercrombie has failed to identify how the district court's exercise of its discretion on this issue constituted a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.

## Conclusion

For the aforementioned reasons, the Commission respectfully requests that this Court affirm the district court's summary judgment ruling and uphold the jury's damages award.

## Statement Regarding Oral Argument

The Commission believes that oral argument would assist this Court in its examination of the fact-intensive questions presented in this appeal.

Respectfully submitted,

P. DAVID LOPEZ
General Counsel

CAROLYN L. WHEELER
Acting Associate General Counsel

DANIEL T. VAIL
Acting Assistant General Counsel

s/ James M. Tucker
JAMES M. TUCKER
Attorney

U.S. EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
131 M St. NE, Rm. 5NW10P
Washington, D.C. 20507
(202) 663-4870
James.Tucker@EEOC.gov

Addendum

42 U.S.C. § 12111(8)

**1**  2  3  4  ▶
(4 screens)

42 U.S.C.A. § 12111

United States Code Annotated Currentness
  Title 42. The Public Health and Welfare
    ⬐▤ Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      ⬐▤ Subchapter I. Employment (Refs & Annos)
        ➡ **§ 12111. Definitions**


As used in this subchapter:

(1) Commission

The term "Commission" means the Equal Employment Opportunity Commission established by section 2000e-4 of this title.

(2) Covered entity

The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.

(3) Direct threat

The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.

(4) Employee

The term "employee" means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

(5) Employer

  (A) In general

The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

  (B) Exceptions

The term "employer" does not include--

    **(i)** the United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or

    **(ii)** a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of Title 26.

(6) Illegal use of drugs

**Addendum - 3**

(A) In general

The term "illegal use of drugs" means the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act [21 U.S.C.A. § 801 et seq.]. Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

(B) Drugs

The term "drug" means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act [21 U.S.C.A. § 812].

(7) Person, etc.

The terms "person", "labor organization", "employment agency", "commerce", and "industry affecting commerce", shall have the same meaning given such terms in section 2000e of this title.

(8) Qualified individual

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9) Reasonable accommodation

The term "reasonable accommodation" may include--

**(A)** making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

**(B)** job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

(10) Undue hardship

(A) In general

The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

(B) Factors to be considered

In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include--

**(i)** the nature and cost of the accommodation needed under this chapter;

**(ii)** the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

**(iii)** the overall financial resources of the covered entity; the overall size of the business of a

**Addendum - 4**

42 U.S.C. §§ 2000e(b), (j)

**1**    2    3    4    5    6    7    8    9    10    ❯    ❯❘
                                                    (11 screens)

42 U.S.C.A. § 2000e

United States Code Annotated Currentness
   Title 42. The Public Health and Welfare
      📄 Chapter 21. Civil Rights (Refs & Annos)
         📄 Subchapter VI. Equal Employment Opportunities (Refs & Annos)
            ➡️ **§ 2000e. Definitions**

For the purposes of this subchapter--

   **(a)** The term "person" includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers.

   **(b)** The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

   **(c)** The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

   **(d)** The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

   **(e)** A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization--

      **(1)** is the certified representative of employees under the provisions of the National Labor Relations Act, as amended [29 U.S.C.A. § 151 et seq.], or the Railway Labor Act, as amended [45 U.S.C.A. § 151 et seq.];

      **(2)** although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

**(3)** has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

**(4)** has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

**(5)** is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

**(f)** The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

**(g)** The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

**(h)** The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 [29 U.S.C.A. § 401 et seq.], and further includes any governmental industry, business, or activity.

**(i)** The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.].

**(j)** The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

**(k)** The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided*, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

**(l)** The term "complaining party" means the Commission, the Attorney General, or a person who may bring an action or proceeding under this subchapter.

**(m)** The term "demonstrates" means meets the burdens of production and persuasion.

**Addendum - 7**

29 C.F.R. § 1605.2(c)

Appellate Case: 11-5110     Document: 01018780807     Date Filed: 01/20/2012     Page: 86

# Code of Federal Regulations

---

## Title 29 - Labor

---

Volume: 4
Date: 2011-07-01
Original Date: 2011-07-01
Title: PART 1605 - GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION
Context: Title 29 - Labor. Subtitle B - Regulations Relating to Labor (Continued). CHAPTER XIV - EQUAL EMPLOYMENT OPPORTUNITY COMMISSION.

---

Pt. 1605

### PART 1605—GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION

Sec.

| | |
|---|---|
| 1605.1 | "Religious" nature of a practice or belief. |
| 1605.2 | Reasonable accommodation without undue hardship as required by section 701(j) of title VII of the Civil Rights Act of 1964. |
| 1605.3 | Selection practices. |

#### Appendix A to §§ 1605.2 and 1605.3—Background Information

**Authority:** Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq.

**Source:** 45 FR 72612, Oct. 31, 1980, unless otherwise noted.

### § 1605.1 "Religious" nature of a practice or belief.

In most cases whether or not a practice or belief is religious is not at issue. However, in those cases in which the issue does exist, the Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. This standard was developed in *United States* v. *Seeger,* 380 U.S. 163 (1965) and *Welsh* v. *United States,* 398 U.S. 333 (1970). The Commission has consistently applied this standard in its decisions. [1] The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee. The phrase "religious practice" as used in these Guidelines includes both religious observances and practices, as stated in section 701(j), 42 U.S.C. 2000e(j).

Footnote(s):

[1] See CD 76-104 (1976), CCH ¶ 6500; CD 71-2620 (1971), CCH ¶ 6283; CD 71-779 (1970), CCH ¶ 6180.

### § 1605.2 Reasonable accommodation without undue hardship as required by section 701(j) of title VII of the Civil Rights Act of 1964.

(a) *Purpose of this section.* This section clarifies the obligation imposed by title VII of the Civil Rights Act of 1964, as amended, (sections 701(j), 703 and 717) to accommodate the religious

Appellate Case: 11-5110    Document: 01018780807    Date Filed: 01/20/2012    Page: 87

practices of employees and prospective employees. This section does not address other obligations under title VII not to discriminate on grounds of religion, nor other provisions of title VII. This section is not intended to limit any additional obligations to accommodate religious practices which may exist pursuant to constitutional, or other statutory provisions; neither is it intended to provide guidance for statutes which require accommodation on bases other than religion such as section 503 of the Rehabilitation Act of 1973. The legal principles which have been developed with respect to discrimination prohibited by title VII on the bases of race, color, sex, and national origin also apply to religious discrimination in all circumstances other than where an accommodation is required.

(b) *Duty to accommodate.* (1) Section 701(j) makes it an unlawful employment practice under section 703(a)(1) for an employer to fail to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business. [2]

---

Footnote(s):

[2] See *Trans World Airlines, Inc.* v. *Hardison,* 432 U.S. 63, 74 (1977).

---

(2) Section 701(j) in conjunction with section 703(c), imposes an obligation on a labor organization to reasonably accommodate the religious practices of an employee or prospective employee, unless the labor organization demonstrates that accommodation would result in undue hardship.

(3) Section 1605.2 is primarily directed to obligations of employers or labor organizations, which are the entities covered by title VII that will most often be required to make an accommodation. However, the principles of § 1605.2 also apply when an accommodation can be required of other entities covered by title VII, such as employment agencies (section 703(b)) or joint labor-management committees controlling apprenticeship or other training or retraining (section 703 (d)). (See, for example, § 1605.3(a) "Scheduling of Tests or Other Selection Procedures.")

(c) *Reasonable accommodation.* (1) After an employee or prospective employee notifies the employer or labor organization of his or her need for a religious accommodation, the employer or labor organization has an obligation to reasonably accommodate the individual's religious practices. A refusal to accommodate is justified only when an employer or labor organization can demonstrate that an undue hardship would in fact result from each available alternative method of accommodation. A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship.

(2) When there is more than one method of accommodation available which would not cause undue hardship, the Commission will determine whether the accommodation offered is reasonable by examining:

(i) The alternatives for accommodation considered by the employer or labor organization; and

(ii) The alternatives for accommodation, if any, actually offered to the individual requiring accommodation. Some alternatives for accommodating religious practices might disadvantage the individual with respect to his or her employment opportunites, such as compensation, terms, conditions, or privileges of employment. Therefore, when there is more than one means of accommodation which would not cause undue hardship, the employer or labor organization must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities.

(d) *Alternatives for accommodating religious practices.* (1) Employees and prospective employees most frequently request an accommodation because their religious practices conflict with their work schedules. The following subsections are some means of accommodating the conflict between work schedules and religious practices which the Commission believes that employers and labor organizations should consider as part of the obligation to accommodate and which the Commission will consider in investigating a charge. These are not intended to be all-

**Addendum - 10**

EEOC Compliance Manual,
No. 915-008, Section 12 –
Religious Discrimination
(July 22, 2008)
(excerpt)

Appellate Case: 11-5110     Document: 01018780807     Date Filed: 01/20/2012     Page: 89

| | | Number 915.003 |
|---|---|---|
| EEOC | DIRECTIVES TRANSMITTAL | |
| | | 7/22/2008 |

**SUBJECT:** EEOC COMPLIANCE MANUAL

**PURPOSE:** This transmittal covers the issuance of Section 12 of the new Compliance Manual on "Religious Discrimination". The section provides guidance and instructions for investigating and analyzing charges alleging discrimination based on religion.

**EFFECTIVE DATE:** Upon receipt

**DISTRIBUTION:** EEOC Compliance Manual holders

**OBSOLETE DATA:** This Section of the Compliance Manual replaces Section 628: *Religious Accommodation*, EEOC Compliance Manual, Volume II and its Appendices: Appendix A, *Policy Statement on Ansonia Board of Education v. Philbrook and Religious Accommodation*; Appendix B, *Policy Guidance On 'New Age' Training Programs Which Conflict With Employees' Religious Beliefs*; and Appendix C, *Religious Objections to Unionism*. It also replaces the following policy documents: *Religious Organizations that Pay Women Less than Men in Accordance with Religious Beliefs*; *Religious Organization Exemption Under Title VII of the Civil Rights Act of 1964, as amended*; and *Policy Statement on Goldman v. Weinberger (Accommodation of the Wearing of Religious Dress)*.

The Commission's Guidelines on Discrimination Because of Religion, 29 C.F.R. Part 1605, remain in effect.



_____/s/_____
Naomi C. Earp
Chair

# SECTION 12:  RELIGIOUS DISCRIMINATION

*Printable version (PDF)*

OVERVIEW

12-I  COVERAGE

    *NOTE TO EEOC INVESTIGATORS*

A. Definitions

    1. Religion

    2. Sincerely Held

    3. Employer Inquiries into Religious Nature or Sincerity of Belief

    *NOTE TO EEOC INVESTIGATORS*

B. Covered Entities

C. Exceptions

    1. Religious Organizations

**Addendum - 12**

2. Ministerial Exception

12-II EMPLOYMENT DECISIONS

A. General

1. Recruitment, Hiring, and Promotion

2. Discipline and Discharge

3. Compensation and Other Terms, Conditions, or Privileges of Employment

B. Customer Preference

C. Security Requirements

D. Bona Fide Occupational Qualification

*Employer Best Practices*

12 - III HARASSMENT

A. Prohibited Conduct

1. Religious Coercion That Constitutes a Tangible Employment Action

2. Hostile Work Environment

a. Based on Religion

b. Unwelcome

c. Severe or Pervasive

B. Employer Liability

1. Harassment by Supervisors or Managers

2. Harassment by Co-Workers

3. Harassment by Non-Employees

C. Special Considerations for Employers When Balancing Anti-Harassment and Accommodation Obligations With Respect to Religious Expression

*Employer Best Practices*

*Employee Best Practices*

12 - IV REASONABLE ACCOMMODATION

A. Religious Accommodation

1. Notice of the Conflict Between Religion and Work

2. Discussion of Request

3. What is a "Reasonable" Accommodation?

B. Undue Hardship

1. Case-by-Case Determination

2. More than "*De Minimis*" Cost

3. Seniority Systems and Collectively Bargained Rights

4. Co-worker Complaints

**Addendum - 13**

Appellate Case: 11-5110     Document: 01018780807     Date Filed: 01/20/2012     Page: 91

- Employers should have a well-publicized and consistently applied anti-harassment policy that: (1) covers religious harassment; (2) clearly explains what is prohibited; (3) describes procedures for bringing harassment to management's attention; and, (4) contains an assurance that complainants will be protected against retaliation. The procedures should include a complaint mechanism that includes multiple avenues for complaint; prompt, thorough, and impartial investigations; and prompt and appropriate corrective action.

- Employers should allow religious expression among employees to the same extent that they allow other types of personal expression that are not harassing or disruptive.

- Once an employer is on notice that an employee objects to religious conduct that is directed at him or her, the employer should take steps to end the conduct because even conduct that the employer does not regard as abusive can become sufficiently severe or pervasive to affect the conditions of employment if allowed to persist in the face of the employee's objection.

- If harassment is perpetrated by a non-employee assigned by a contractor, the supervisor or other appropriate individual in the chain of command should initiate a meeting with the contractor regarding the harassment and demand that it cease, that appropriate disciplinary action be taken if it continues, and/or that a different individual be assigned by the contractor.

- To prevent conflicts from escalating to the level of a Title VII violation, employers should immediately intervene when they become aware of objectively abusive or insulting conduct, even absent a complaint.

- Employers should encourage managers to intervene proactively and discuss with subordinates whether particular religious expression is welcome if the manager believes the expression might be construed as harassing to a reasonable person.

- While supervisors are permitted to engage in certain religious expression, they should avoid expression that might – due to their supervisory authority – reasonably be perceived by subordinates as coercive, even when not so intended.

### · Employee Best Practices ·

- Employees who are the recipients of unwelcome religious conduct should inform the individual engaging in the conduct that they wish it to stop. If the conduct does not stop, employees should report it to their supervisor or other appropriate company official in accordance with the procedures established in the company's anti-harassment policy.

- Employees who do not wish to personally confront an individual who is directing unwelcome religious or anti-religious conduct towards them should report the conduct to their supervisor or other appropriate company official in accordance with the company's anti-harassment policy.

## 12-IV REASONABLE ACCOMMODATION

**Addendum - 14**

Appellate Case: 11-5110    Document: 01018780807    Date Filed: 01/20/2012    Page: 92

> **Overview:** Title VII requires an employer, once on notice, to reasonably accommodate an employee whose sincerely held religious belief, practice, or observance conflicts with a work requirement, unless providing the accommodation would create an undue hardship.[116] However, the Title VII "undue hardship" defense is defined very differently than the "undue hardship" defense for disability accommodation under the Americans with Disabilities Act (ADA). Under Title VII, the undue hardship defense to providing religious accommodation requires a showing that the proposed accommodation in a particular case poses a "more than de minimis" cost or burden, which is a far lower standard for an employer to meet than undue hardship under the ADA, which is defined in that statute as "significant difficulty or expense."[117]

A religious accommodation claim is distinct from a disparate treatment claim, in which the question is whether employees are treated equally. An individual alleging denial of religious accommodation is seeking an adjustment to a neutral work rule that infringes on the employee's ability to practice his religion. The accommodation requirement is "plainly intended to relieve individuals of the burden of choosing between their jobs and their religious convictions, where such relief will not unduly burden others."[118]

## A. Religious Accommodation

A reasonable religious accommodation is any adjustment to the work environment that will allow the employee to comply with his or her religious beliefs. However, it is subject to the limit of more than *de minimis* cost or burden. The need for religious accommodation most frequently arises where an individual's religious beliefs, observances, or practices conflict with a specific task or requirement of the job or the application process. The employer's duty to accommodate will usually entail making a special exception from, or adjustment to, the particular requirement so that the employee or applicant will be able to practice his or her religion. Accommodation requests often relate to work schedules, dress and grooming, or religious expression or practice while at work.

### 1. Notice of the Conflict Between Religion and Work

An applicant or employee who seeks religious accommodation must make the employer aware both of the need for accommodation and that it is being requested due to a conflict between religion and work. The employee is obligated to explain the religious nature of the belief or practice at issue, and cannot assume that the employer will already know or understand it.[119] Similarly, the employer should not assume that a request is invalid simply because it is based on religious beliefs or practices with which the employer is unfamiliar, but should ask the employee to explain the religious nature of the practice and the way in which it conflicts with a work requirement.

No "magic words" are required to place an employer on notice of an applicant's or employee's conflict between religious needs and a work requirement. To request an accommodation, an individual may use plain language and need not mention any particular terms such as "Title VII" or "religious accommodation." However, the applicant or employee must provide enough information to make the employer aware that there exists a conflict between the individual's religious practice or belief and a requirement for applying for or performing the job.[120]

<div align="center">

**EXAMPLE 29**
**Failure to Advise Employer That Request Is Due to**
**Religious Practice or Belief**

</div>

Jim agreed to take his employer's drug test but was terminated because he refused to sign the accompanying consent form. After his termination, Jim filed a charge

alleging that the employer failed to accommodate his religious objection to swearing an oath.  Until it received notice of the charge, the employer did not know that Jim's refusal to sign the form was based on his religious beliefs.  Because the employer was not notified of the conflict at the time Jim refused to sign the form, or at any time prior to Jim's termination, it did not have an opportunity to offer to accommodate him.  The employer has not violated Title VII. [121]

### 2. Discussion of Request

While an employer is not required by Title VII to conduct a discussion with an employee before denying the employee's accommodation request, as a practical matter it can be important to do so.  Both the employer and the employee have roles to play in resolving an accommodation request.  In addition to placing the employer on notice of the need for accommodation, the employee should cooperate with the employer's efforts to determine whether a reasonable accommodation can be granted.  Once the employer becomes aware of the employee's religious conflict, the employer should obtain promptly whatever additional information is needed to determine whether an accommodation is available that would eliminate the religious conflict without posing an undue hardship on the operation of the employer's business. [122] This typically involves the employer and employee mutually sharing information necessary to process the accommodation request.  Employer–employee cooperation and flexibility are key to the search for a reasonable accommodation.  If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective.  If the employer requests additional information reasonably needed to evaluate the request, the employee should provide it.

Failure to confer with the employee is not an independent violation of Title VII but, as a practical matter, such failure can have adverse legal consequences for both an employee and an employer.  For example, in some cases where an employer has made no effort to act on an accommodation request, courts have found that the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation would actually have posed an undue hardship. [123] Likewise, courts have ruled against employees who refused to cooperate with an employer's requests for reasonable information when, as a result, the employer was deprived of the information necessary to resolve the accommodation request.  For example, if an employee requested a schedule change to accommodate daily prayers, the employer might need to ask for information about the religious observance, such as time and duration of the daily prayers, in order to determine if accommodation can be granted without posing an undue hardship on the operation of the employer's business. [124] Moreover, even if the employer does not grant the employee's preferred accommodation but instead provides an alternative accommodation, the employee must cooperate by attempting to meet his religious needs through the employer's proposed accommodation if possible. [125]

Where the accommodation request itself does not provide enough information to enable the employer to make a determination, and the employer has a bona fide doubt as to the basis for the accommodation request, it is entitled to make a limited inquiry into the facts and circumstances of the employee's claim that the belief or practice at issue is religious and sincerely held, and that the belief or practice gives rise to the need for the accommodation.  *See* "Sincerely Held" and "Employer Inquiries into Religious Nature or Sincerity of Belief," *supra* §§ I-A-2 and I-A-3. [126] Whether an employer has a reasonable basis for seeking to verify the employee's stated beliefs will depend on the facts of a particular case.

**EXAMPLE 30**
**Sincerity of Religious Belief Questioned**

**Addendum - 16**

Bob, who had been a dues-paying member of the CDF union for fourteen years, had a work-related dispute with a union official and one week later asserted that union activities were contrary to his religion and that he could no longer pay union dues.  The union doubted whether Bob's request was based on a sincerely held religious belief, given that it appeared to be precipitated by an unrelated dispute with the union, and he had not sought this accommodation in his prior fourteen years of employment.  In this situation, the union can require him to provide additional information to support his assertion that he sincerely holds a religious conviction that precludes him from belonging to – or financially supporting – a union.[127]

When an employer requests additional information, employees should provide information that addresses the employer's reasonable doubts.  That information need not, however, take any specific form.  For example, written materials or the employee's own first-hand explanation may be sufficient to alleviate the employer's doubts about the sincerity or religious nature of the employee's professed belief such that third-party verification is unnecessary.  Further, since idiosyncratic beliefs can be sincerely held and religious, even when third-party verification is needed, it does not have to come from a church official or member, but rather could be provided by others who are aware of the employee's religious practice or belief.[128]

An employee who fails to cooperate with an employer's reasonable request for verification of the sincerity or religious nature of a professed belief risks losing any subsequent claim that the employer improperly denied an accommodation.  By the same token, employers who unreasonably request unnecessary or excessive corroborating evidence risk being held liable for denying a reasonable accommodation request, and having their actions challenged as retaliatory or as part of a pattern of harassment.

It also is important to remember that even if an employer concludes that an individual's professed belief is sincerely held and religious, it is only required to grant those requests for accommodation that do not pose an undue hardship on the conduct of its business.

### EXAMPLE 31
### Clarifying a Request

Diane requests that her employer schedule her for "fewer hours" so that she can "attend church more frequently."  The employer denies the request because it is not clear what schedule Diane is requesting or whether the change is sought due to a religious belief or practice.  While Diane's request lacked sufficient detail for the employer to make a final decision, it was sufficient to constitute a religious accommodation request.  Rather than denying the request outright, the employer should have obtained the information from Diane that it needed to make a decision.  The employer could have inquired of Diane precisely what schedule change was sought and for what purpose, and how her current schedule conflicted with her religious practices or beliefs.  Diane would then have had an obligation to provide sufficient information to permit her employer to make a reasonable assessment of whether her request was based on a sincerely held religious belief, the precise conflict that existed between her work schedule and church schedule, and whether granting the accommodation would pose more than a *de minimis*

**Addendum - 17**

burden on the employer's business.

### 3. What is a "Reasonable" Accommodation?

Although an employer never has to provide an accommodation that would pose an undue hardship, *see infra* § IV-B, the accommodation that is provided must be a reasonable one. An accommodation is not "reasonable" if it merely lessens rather than eliminates the conflict between religion and work, provided eliminating the conflict would not impose an undue hardship.[129] Eliminating the conflict between a work rule and an employee's religious belief, practice, or observance means accommodating the employee without unnecessarily disadvantaging the employee's terms, conditions, or privileges of employment.[130]

Where there is more than one reasonable accommodation that would not pose an undue hardship, the employer is not obliged to provide the accommodation preferred by the employee.[131] However, an employer's proposed accommodation will not be "reasonable" if a more favorable accommodation is provided to other employees for non-religious purposes,[132] or, for example, if it requires the employee to accept a reduction in pay rate or some other loss of a benefit or privilege of employment and there is an alternative accommodation that does not do so.[133]

Ultimately, reasonableness is a fact-specific determination. "The reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum. Instead, it must be determined on a case–by–case basis; what may be a reasonable accommodation for one employee may not be reasonable for another . . . . 'The term 'reasonable accommodation' is a relative term and cannot be given a hard and fast meaning; each case . . . necessarily depends upon its own facts and circumstances, and comes down to a determination of 'reasonableness' under the unique circumstances of the individual employer-employee relationship.'"[134]

### EXAMPLE 32
### Employer Violates Title VII if it Offers Only Partial Accommodation Where Full Accommodation Would Not Pose an Undue Hardship

Rachel, who worked as a ticket agent at a sports arena, asked not to be scheduled for any Friday night or Saturday shifts, to permit her to observe the Jewish Sabbath from sunset on Friday through sunset on Saturday. The arena wanted to give Rachel only every other Saturday off. The arena's proposed accommodation is not reasonable because it does not fully eliminate the religious conflict. The arena may deny the accommodation request only if giving Rachel every Saturday off poses an undue hardship for the arena.[135]

### EXAMPLE 33
### Employer Not Obligated To Provide Employee's Preferred Accommodation

Tina, a newly hired part-time store cashier whose sincerely held religious belief is that she should refrain from work on Sunday as part of her Sabbath observance, asked her supervisor never to schedule her to work on Sundays. Tina specifically asked to be scheduled to work Saturdays instead. In response, her employer offered to allow her to work on

**Addendum - 18**

Appellate Case: 11-5110      Document: 01018780807      Date Filed: 01/20/2012     Page: 96

Thursday, which she found inconvenient because she takes a college class on that day.  Even if Tina preferred a different schedule, the employer is not required to grant Tina's preferred accommodation.[136]

**EXAMPLE 34**
**Accommodation By Transfer Where Accommodation in Current Position Would Pose Undue Hardship**

Yvonne, a member of the Pentecostal faith, was employed as a nurse at a hospital. When she was assigned to the Labor and Delivery Unit, she advised the nurse manager that her faith forbids her from participating "directly or indirectly in ending a life," and that this proscription prevents her from assisting with abortions. She asked the hospital to accommodate her religious beliefs by allowing her to trade assignments with other nurses in the Labor and Delivery Unit as needed.  The hospital concluded that it could not accommodate Yvonne within the Labor and Delivery Unit because there were not enough staff members able and willing to trade with her.  The hospital instead offered to permit Yvonne to transfer, without a reduction in pay or benefits, to a vacant nursing position in the Newborn Intensive Care Unit, which did not perform any such procedures.  The hospital's solution complies with Title VII.  The hospital is not required to grant Yvonne's preferred accommodation where it has offered a reasonable alternative solution that eliminates the conflict between work and a religious practice or belief under its existing policies and procedures.[137] If there had been no other position to which she could transfer, the employer would have been entitled to terminate her since it would pose an undue hardship to accommodate her in the Labor and Delivery Unit.

Title VII is violated by an employer's failure to accommodate even if to avoid adverse consequences an employee continues to work after his accommodation request is denied.  "An employee does not cease to be discriminated against because he temporarily gives up his religious practice and submits to the employment policy."[138] Thus, the fact that an employee acquiesces to the employer's work rule, continuing to work without an accommodation after the employer has denied the request, should not defeat the employee's legal claim.[139]

In addition, the obligation to provide reasonable accommodation absent undue hardship is a continuing obligation.  Employers should be aware that an employee's religious beliefs and practices may evolve over time, and that this may result in requests for additional or different accommodations.[140] Similarly, the employer has the right to discontinue a previously granted accommodation that is no longer utilized for religious purposes or poses an undue hardship.

## B.  Undue Hardship

An employer can refuse to provide a reasonable accommodation if it would pose an undue hardship.  Undue hardship may be shown if the accommodation would impose "more than *de minimis* cost" on the operation of the employer's business.[141] The concept of "more than *de minimis* cost" is discussed below in sub-section 2.  Although the employer's showing of undue hardship under Title VII is easier than under the ADA, the burden of persuasion is still on the employer.[142] If an employee's

**Addendum - 19**

# EEOC – Best Practices for Eradicating Religious Discrimination in the Workplace

*The U.S. Equal Employment Opportunity Commission*

# Best Practices for Eradicating Religious Discrimination in the Workplace

## Disparate Treatment Based on Religion

### Employer Best Practices

- Employers can reduce the risk of discriminatory employment decisions by establishing written objective criteria for evaluating candidates for hire or promotion and applying those criteria consistently to all candidates.

- In conducting job interviews, employers can ensure nondiscriminatory treatment by asking the same questions of all applicants for a particular job or category of job and inquiring about matters directly related to the position in question.

- Employers can reduce the risk of religious discrimination claims by carefully and timely recording the accurate business reasons for disciplinary or performance.related actions and sharing these reasons with the affected employees.

- When management decisions require the exercise of subjective judgment, employers can reduce the risk of discriminatory decisions by providing training to inexperienced managers and encouraging them to consult with more experienced managers or human resources personnel when addressing difficult issues.

- If an employer is confronted with customer biases, e.g., an adverse reaction to being served by an employee due to religious garb, the employer should consider engaging with and educating the customers regarding any misperceptions they may have and/or the equal employment opportunity laws.

## Religious Harassment

### Employer Best Practices

- Employers should have a well-publicized and consistently applied anti-harassment policy that: (1) covers religious harassment; (2) clearly explains what is prohibited; (3) describes procedures for bringing harassment to management's attention; and, (4) contains an assurance that complainants will be protected against retaliation. The procedures should include a complaint mechanism that includes multiple avenues for complaint; prompt, thorough, and impartial investigations; and prompt and appropriate corrective action.

- Employers should allow religious expression among employees to the same extent that they allow other types of personal expression that are not harassing or disruptive.

- Once an employer is on notice that an employee objects to religious conduct that is directed at him or her, the employer should take steps to end the conduct because even conduct that the employer does not regard as abusive can become sufficiently severe or pervasive to affect the conditions of employment if allowed to persist in the face of the employee's objection.

- If harassment is perpetrated by a non-employee assigned by a contractor, the supervisor

**Addendum - 21**

or other appropriate individual in the chain of command should initiate a meeting with the contractor regarding the harassment and demand that it cease, that appropriate disciplinary action be taken if it continues, and/or that a different individual be assigned by the contractor.

- To prevent conflicts from escalating to the level of a Title VII violation, employers should immediately intervene when they become aware of objectively abusive or insulting conduct, even absent a complaint.

- Employers should encourage managers to intervene proactively and discuss with subordinates whether particular religious expression is welcome if the manager believes the expression might be construed as harassing to a reasonable person.

- While supervisors are permitted to engage in certain religious expression, they should avoid expression that might – due to their supervisory authority – reasonably be perceived by subordinates as coercive, even when not so intended.

## Employee Best Practices

- Employees who are the recipients of unwelcome religious conduct should inform the individual engaging in the conduct that they wish it to stop. If the conduct does not stop, employees should report it to their supervisor or other appropriate company official in accordance with the procedures established in the company's anti-harassment policy.

- Employees who do not wish to personally confront an individual who is directing unwelcome religious or anti-religious conduct towards them should report the conduct to their supervisor or other appropriate company official in accordance with the company's anti-harassment policy.

# Reasonable Accommodation of Religious Beliefs and Practices

## Employer Best Practices

### Reasonable Accommodation - Generally

- Employers should inform employees that they will make reasonable efforts to accommodate the employees' religious practices.

- Employers should train managers and supervisors on how to recognize religious accommodation requests from employees.

- Employers should consider developing internal procedures for processing religious accommodation requests.

- Employers should individually assess each request and avoid assumptions or stereotypes about what constitutes a religious belief or practice or what type of accommodation is appropriate.

- Employers and employees should confer fully and promptly to the extent needed to share any necessary information about the employee's religious needs and the available accommodation options.

- An employer is not required to provide an employee's preferred accommodation if there is more than one effective alternative to choose from. An employer should, however, consider the employee's proposed method of accommodation, and if it is denied, explain to the employee why his proposed accommodation is not being granted.

- Managers and supervisors should be trained to consider alternative available accommodations if the particular accommodation requested would pose an undue

**Addendum - 22**

Appellate Case: 11-5110      Document: 01018780807      Date Filed: 01/20/2012      Page: 100

hardship.

- When faced with a request for a religious accommodation which cannot be promptly implemented, an employer should consider offering alternative methods of accommodation on a temporary basis, while a permanent accommodation is being explored. In this situation, an employer should also keep the employee apprised of the status of the employer's efforts to implement a permanent accommodation.

**Undue Hardship — Generally**

- The de minimis undue hardship standard refers to the legal requirement. As with all aspects of employee relations, employers can go beyond the requirements of the law and should be flexible in evaluating whether or not an accommodation is feasible.

- An employer should not assume that an accommodation will conflict with the terms of a seniority system or CBA without first checking if there are any exceptions for religious accommodation or other avenues to allow accommodation consistent with the seniority system or CBA.

- An employer should not automatically reject a request for religious accommodation just because the accommodation will interfere with the existing seniority system or terms of a CBA. Although an employer may not upset co-workers' settled expectations, an employer is free to seek a voluntary modification to a CBA in order to accommodate an employee's religious needs.

- Employers should train managers to be aware that, if the requested accommodation would violate the CBA or seniority system, they should confer with the employee to determine if an alternative accommodation is available.

- Employers should ensure that managers are aware that reasonable accommodation may require making exceptions to policies or procedures that are not part of a CBA or seniority system, where it would not infringe on other employees' legitimate expectations.

**Schedule Changes**

- Employers should work with employees who need an adjustment to their work schedule to accommodate their religious practices.

- Notwithstanding that the legal standard for undue hardship is "more than de minimis," employers may of course choose voluntarily to incur whatever additional operational or financial costs they deem appropriate to accommodate an employee's religious need for scheduling flexibility.

- Employers should consider adopting flexible leave and scheduling policies and procedures that will often allow employees to meet their religious and other personal needs. Such policies can reduce individual requests for exceptions. For example, some employers have policies allowing alternative work schedules and/or a certain number of "floating" holidays for each employee. While such policies may not cover every eventuality and some individual accommodations may still be needed, the number of such individual accommodations may be substantially reduced.

**Voluntary Substitutes or Swaps**

- An employer should facilitate and encourage voluntary substitutions and swaps with employees of substantially similar qualifications by publicizing its policy permitting such arrangements, promoting an atmosphere in which substitutes are favorably regarded, and providing a central file, bulletin board, group e-mail, or other means to help an employee with a religious conflict find a volunteer to substitute or swap.

**Addendum - 23**

Appellate Case: 11-5110    Document: 01018780807    Date Filed: 01/20/2012    Page: 101

**Change of Job Assignments and Lateral Transfers**

- An employer should consider a lateral transfer when no accommodation which would keep the employee in his or her position is possible absent undue hardship. However, an employer should only resort to transfer, whether lateral or otherwise, after fully exploring accommodations that would permit the employee to remain in his position.

- Where a lateral transfer is unavailable, an employer should not assume that an employee would not be interested in a lower-paying position if that position would enable the employee to abide by his or her religious beliefs. If there is no accommodation available that would permit the employee to remain in his current position or an equivalent one, the employer should offer the available position as an accommodation and permit the employee to decide whether or not to take it.

**Modifying Workplace Practices, Policies, and Procedures**

- Employers should make efforts to accommodate an employee's desire to wear a yarmulke, hijab, or other religious garb. If the employer is concerned about uniform appearance in a position which involves interaction with the public, it may be appropriate to consider whether the employee's religious views would permit him to resolve the religious conflict by, for example, wearing the item of religious garb in the company uniform color(s).

- Managers and employees should be trained not to engage in stereotyping based on religious dress and grooming practices and should not assume that atypical dress will create an undue hardship.

- Employers should be flexible and creative regarding work schedules, work duties, and selection procedures to the extent practicable.

- Employers should be sensitive to the risk of unintentionally pressuring or coercing employees to attend social gatherings after the employees have indicated a religious objection to attending.

**Permitting Prayer, Proselytizing, and Other Forms of Religious Expression**

- Employers should train managers to gauge the actual disruption posed by religious expression in the workplace, rather than merely speculating that disruption may result. Employers should also train managers to identify alternative accommodations that might be offered to avoid actual disruption (e.g., designating an unused or private location in the workplace where a prayer session or Bible study meeting can occur if it is disrupting other workers).

- Employers should incorporate a discussion of religious expression, and the need for all employees to be sensitive to the beliefs or non-beliefs of others, into any anti-harassment training provided to managers and employees.

## Employee Best Practices

- Employees should advise their supervisors or managers of the nature of the conflict between their religious needs and the work rules.

- Employees should provide enough information to enable the employer to understand what accommodation is needed, and why it is necessitated by a religious practice or belief.

- Employees who seek to proselytize in the workplace should cease doing so with respect to any individual who indicates that the communications are unwelcome.

**Addendum - 24**

Appellate Case: 11-5110     Document: 01018780807     Date Filed: 01/20/2012     Page: 102

# Retaliation

## Employer Best Practices

- Employers can reduce the risk of retaliation claims by training managers and supervisors to be aware of their anti-retaliation obligations under Title VII, including specific actions that may constitute retaliation.

- Employers can help reduce the risk of retaliation claims by carefully and timely recording the accurate business reasons for disciplinary or performance related actions and sharing these reasons with the employee.

---

*This page was last modified on July 23, 2008.*

 return to home page

EEOC – Questions and Answers:
Religious Discrimination
in the Workplace
(excerpt)

Appellate Case: 11-5110     Document: 01018780807     Date Filed: 01/20/2012     Page: 104

*The U.S. Equal Employment Opportunity Commission*

# Questions and Answers: Religious Discrimination in the Workplace

Title VII of the Civil Rights Act of 1964 prohibits employers with at least 15 employees, as well as employment agencies and unions, from discriminating in employment based on race, color, religion, sex, and national origin. It also prohibits retaliation against persons who complain of discrimination or participate in an EEO investigation. With respect to religion, Title VII prohibits:

- treating applicants or employees differently based on their religious beliefs or practices – or lack thereof – in any aspect of employment, including recruitment, hiring, assignments, discipline, promotion, and benefits (disparate treatment);

- subjecting employees to harassment because of their religious beliefs or practices – or lack thereof – or because of the religious practices or beliefs of people with whom they associate (e.g., relatives, friends, etc.);

- denying a requested reasonable accommodation of an applicant's or employee's sincerely held religious beliefs or practices – or lack thereof – if an accommodation will not impose more than a *de minimis* cost or burden on business operations; [1] and,

- retaliating against an applicant or employee who has engaged in protected activity, including participation (e.g., filing an EEO charge or testifying as a witness in someone else's EEO matter), or opposition to religious discrimination (e.g., complaining to human resources department about alleged religious discrimination).

The following questions and answers were adapted from EEOC's Compliance Manual Section on Religious Discrimination, available at http://www.eeoc.gov/policy/docs/religion.html, which contains more detailed guidance, legal citations, case examples, and best practices. It is designed to be a practical resource for employers, employees, practitioners, and EEOC enforcement staff on Title VII's prohibition against religious discrimination, and provides guidance on how to balance the needs of individuals in a diverse religious climate.

## 1. What is "religion" under Title VII?

Title VII protects all aspects of religious observance and practice as well as belief and defines religion very broadly for purposes of determining what the law covers. For purposes of Title VII, religion includes not only traditional, organized religions such as Christianity, Judaism, Islam, Hinduism, and Buddhism, but also religious beliefs that are new, uncommon, not part of a formal church or sect, only subscribed to by a small number of people, or that seem illogical or unreasonable to others. An employee's belief or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it. Title VII's protections also extend to those who are discriminated against or need accommodation because they profess no religious beliefs.

Religious beliefs include theistic beliefs (i.e. those that include a belief in God) as well as non-theistic "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." Although courts generally resolve doubts about particular beliefs in favor of finding that they are religious, beliefs are not protected merely because they are strongly held. Rather, religion typically concerns "ultimate ideas" about "life, purpose, and death." Social, political, or economic philosophies, as well as mere personal preferences, are not "religious" beliefs protected by Title VII.

**Addendum - 27**

Appellate Case: 11-5110     Document: 01018780807     Date Filed: 01/20/2012     Page: 105

The extent to which the expression is directed at a particular employee is relevant to determining whether or when it could reasonably be perceived to be severe or pervasive by that employee. For example, although it is conceivable that an employee may allege that he is offended by a colleague's wearing of religious garb, expressing one's religion by wearing religious garb is not religious harassment. It merely expresses an individual's religious affiliation and does not demean other religious views. As such, it is not objectively hostile. Nor is it directed at any particular individual. Similarly, workplace displays of religious artifacts or posters that do not demean other religious views generally would not constitute religious harassment.

**5. When is an employer liable for religious harassment?**

An employer is always liable for a supervisor's harassment if it results in a tangible employment action. However, if it does not, the employer may be able to avoid liability or limit damages by showing that: (a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. An employer is liable for harassment by co-workers where it knew or should have known about the harassment, and failed to take prompt and appropriate corrective action. An employer is liable for harassment by non-employees where it knew or should have known about the harassment, could control the harasser's conduct or otherwise protect the employee, and failed to take prompt and appropriate corrective action.

**6. When does Title VII require an employer to accommodate an applicant or employee's religious belief, practice, or observance?**

Title VII requires an employer, once on notice that a religious accommodation is needed, to reasonably accommodate an employee whose sincerely held religious belief, practice, or observance conflicts with a work requirement, unless doing so would pose an undue hardship. Under Title VII, the undue hardship defense to providing religious accommodation requires a showing that the proposed accommodation in a particular case poses a "more than de minimis" cost or burden. Note that this is a lower standard for an employer to meet than undue hardship under the Americans with Disabilities Act (ADA) which is defined in that statute as "significant difficulty or expense."

**7. How does an employer learn that accommodation may be needed?**

An applicant or employee who seeks religious accommodation must make the employer aware both of the need for accommodation and that it is being requested due to a conflict between religion and work.

Employer-employee cooperation and flexibility are key to the search for a reasonable accommodation. If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective. If the employer requests additional information reasonably needed to evaluate the request, the employee should provide it. For example, if an employee has requested a schedule change to accommodate daily prayers, the employer may need to ask for information about the religious observance, such as time and duration of the daily prayers, in order to determine whether accommodation can be granted without posing an undue hardship on the operation of the employer's business. Moreover, even if the employer does not grant the employee's preferred accommodation, but instead provides an alternative accommodation, the employee must cooperate by attempting to meet his religious needs through the employer's proposed accommodation if possible.

**8. Does an employer have to grant every request for accommodation of a religious belief or practice?**

No. Title VII requires employers to accommodate only those religious beliefs that are religious and "sincerely held," and that can be accommodated without an undue hardship. Although there is usually no reason to question whether the practice at issue is religious or sincerely held, if the employer has a

**Addendum - 28**

<u>Certificate of Compliance and Digital Submission</u>

I hereby certify that this brief complies with the type-volume requirements set forth in Federal Rules of Appellate Procedure 32(a)(7)(B). This brief contains 13,281 words, from the Statement of Related Cases through the Conclusion, as determined by the Microsoft Word 2003 word processing program, with 14-point proportionally spaced type for text and 14-point proportionally spaced type for footnotes.

I further certify that all required privacy redactions (in this document, none) have been made to this document, that this ECF submission is an exact copy of the brief filed in hard copy with the Court, and that this digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Trend Micro OfficeScan, and, according to that program, is free of viruses.

<div style="margin-left: 40%;">
<u>s/ James M. Tucker</u><br>
JAMES M. TUCKER<br>
Attorney<br>
U.S. EQUAL EMPLOYMENT<br>
  OPPORTUNITY COMMISSION<br>
131 M St. NE, Rm. 5NW10P<br>
Washington, D.C. 20507<br>
(202) 663-4870<br>
James.Tucker@EEOC.gov
</div>

<u>Certificate of Service</u>

I hereby certify that on January 20, 2012, this document was electronically served on the counsel listed below via the Court's ECF Notice of Docket Activity system at their electronic addresses of record:

Knueve, Mark A., Esq.
maknueve@vorys.com

Clark, Daniel J., Esq.
djclark@vorys.com

Fungsang, Joseph C., Esq.
jfungsang@vorys.com

Brightmire, Jon E., Esq.
jbrightmire@dsda.com

I further certify that on this same date, seven hard copies of the foregoing brief were submitted to the Clerk of Court, United States Court of Appeals for the Tenth Circuit, Byron White U.S. Courthouse, 1823 Stout St., Denver, CO 80257.

s/ James M. Tucker
JAMES M. TUCKER
Attorney
U.S. EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
131 M St. NE, Rm. 5NW10P
Washington, D.C. 20507
(202) 663-4870
James.Tucker@EEOC.gov