FILED
United States Court of Appeals
Tenth Circuit

October 1, 2013

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff-Appellee,

v.

ABERCROMBIE & FITCH STORES,
INC., an Ohio corporation, d/b/a
Abercrombie Kids,

      Defendant-Appellant.

No. 11-5110

---

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:09-CV-00602-GKF-FHM)**

---

Mark A. Knueve of Vorys, Sater, Seymour and Pease LLP, Columbus, Ohio
(Daniel J. Clark and Joseph C. Fungsang of Vorys, Sater, Seymour and Pease
LLP, Columbus, Ohio, and Jon E. Brightmire of Doerner, Saunders, Daniel &
Anderson LLP, Tulsa, Oklahoma, with him on the briefs) for Defendant-
Appellant.

James M. Tucker (P. David Lopez, General Counsel, Carolyn L. Wheeler, Acting
Associate General Counsel, Daniel T. Vail, Acting Assistant General Counsel,
with him on the brief), of U.S. Equal Employment Opportunity Commission,
Washington, D.C., for Plaintiff-Appellee.

---

Before **KELLY**, **EBEL**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Abercrombie & Fitch ("Abercrombie") appeals from the district court's grant of summary judgment in favor of the Equal Employment Opportunity Commission ("EEOC") and the court's denial of summary judgment in favor of Abercrombie, on the EEOC's claim that Abercrombie failed to provide a reasonable religious accommodation for a prospective employee, Samantha Elauf, in contravention of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.  Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment to the EEOC.  Abercrombie is entitled to summary judgment as a matter of law because there is no genuine dispute of material fact that Ms. Elauf never informed Abercrombie prior to its hiring decision that she wore her headscarf or "hijab"[1] for religious reasons and that she needed an accommodation for that practice, due to a conflict between the practice and Abercrombie's clothing policy.  Accordingly, we remand the case to the district court with instructions to vacate its judgment and enter judgment in favor of Abercrombie, and for further proceedings consistent with this opinion.

---

[1]    A leading scholar of Islam, who was the EEOC's expert in this case, John L. Esposito, Ph.D., has defined a "hijab" as the "veil or head covering worn by Muslim women in public."  John L. Esposito, *Islam: The Straight Path* 310 (4th ed. 2011).  In their briefing, the parties use the terms "headscarf" and "hijab" interchangeably, and so do we.

# I

# A

Abercrombie is a retail clothing company that operates stores across the United States under a variety of brand names, including Abercrombie & Fitch, abercrombie ("Abercrombie Kids"), and Hollister. Abercrombie requires employees in its stores to comply with a "Look Policy."[2] That policy is intended to promote and showcase the Abercrombie brand, which "exemplifies a classic East Coast collegiate style of clothing." Aplt. Opening Br. at 5. The Look Policy applies to every Abercrombie employee. Under the circumstances of this case, however, our central concern is the policy's application to sales-floor employees, whom Abercrombie referred to as "Model[s]." Aplt. App. at 372 (Dep. of Chad Moorefield, taken Mar. 16, 2011). Employees must dress in clothing that is consistent with the kinds of clothing that Abercrombie sells in its stores. Notably, the policy prohibits employees from wearing black clothing and "caps," although the policy does not explicate the meaning of the term "cap." Aplee. Supp. App. at 69 (Abercrombie Store Associate Handbook, dated Sept. 2006). An employee is subject to "disciplinary action . . . up to and including termination" for failure to comply with the Look Policy. *Id.*

---

[2]     Our inquiry is focused on the Look Policy as it was set forth in the Store Associate Handbook (revised Sept. 2006). This was the policy applicable in 2008 when the events relevant here took place. Consequently, we do not consider any changes that Abercrombie may have made to the Look Policy since then.

Abercrombie contends that its Look Policy is critical to the health and vitality of its "preppy" and "casual" brand. *See* Aplt. Opening Br. at 5 (quoting Aplt. App. at 375; *id.* at 63 (Dep. of Kalen McJilton, taken Jan. 20, 2011)) (internal quotation marks omitted). This is so, Abercrombie maintains, because it does very little advertising through traditional media outlets (e.g., print publications or television); instead, it relies on its in-store experience to promote its products. Consequently, Abercrombie expends a great deal of effort to ensure that its target customers receive a holistically brand-based, sensory experience. *See, e.g.*, Aplt. App. at 70 (Dep. of Deon Riley, taken Mar. 17, 2011) ("Abercrombie has made a name because of the brand. It's a fact that you walk into an environment, and it's not just the smell or the sound, it's the way the merchandise is set up. It's the lighting. Most of all, it's the stylish clothing . . . ."). The "main part" of a Model's job is to "represent [Abercrombie's] clothing[,] first and foremost." *Id.* at 376. To Abercrombie, a Model who violates the Look Policy by wearing inconsistent clothing "inaccurately represents the brand, causes consumer confusion, fails to perform an essential function of the position, and ultimately damages the brand." Aplt. Opening Br. at 8.

The interviewing process plays an important role in furthering Abercrombie's objective of ensuring that employees adhere to its Look Policy. Managers assess applicants on appearance and style during the interview. They are supposed to inform applicants of various aspects of the job, including the

4

Look Policy.  New Models typically receive a copy of the policy in an employee handbook and sign an acknowledgment that they have received it, when they start work.

Abercrombie instructs its store managers not to assume facts about prospective employees in job interviews and, significantly, not to ask applicants about their religion.  If a question arises during the interview regarding application of the Look Policy, or if a prospective employee requests a deviation from the policy (for example, based on an inflexible religious practice), the store manager is instructed to contact Abercrombie's corporate human resources department ("HR"), or his or her direct supervisor.  HR managers may grant accommodations if doing so would not harm the brand.

## B

Samantha Elauf claims to be a practicing Muslim.[3]  In mid-2008, Ms. Elauf, then seventeen-years old, applied for a Model position at the Abercrombie Kids store in the Woodland Hills Mall in Tulsa, Oklahoma.  She had previously purchased and worn Abercrombie clothes.

Prior to her interview, Ms. Elauf discussed with a friend who worked at Abercrombie's Woodland Hills location, Farisa Sepahvand, whether wearing a

---

[3]     The parties dispute whether Ms. Elauf possesses a bona fide, sincerely held religious belief in Islam.  This dispute, however, is not material to our resolution of this case; therefore, we need not (and do not) address it.

hijab to work would be permissible. Ms. Elauf has worn a hijab since she was

thirteen and testified that she does so for religious reasons. The Quran—the

"sacred scripture" of the Islamic faith, Aplee. Supp. App. at 5 (Dep. of John L.

Esposito, taken Feb. 22, 2011)—counsels women to protect their modesty, and

some religious scholars "believe that the Qu[]ran does require an hijab" to be

worn by Muslim women, "but there are many who disagree with that

interpretation," *id.* at 2. As the EEOC's expert, Dr. Esposito, testified, although

some Muslim women wear hijabs for religious reasons, those are not the only

reasons that Muslim women wear hijabs; for example, some do so for cultural

reasons or in order to demonstrate a personal rejection of certain aspects of

Western-style dress.[4] Dr. Esposito testified that, in understanding the reasons

why people maintain certain styles of dress, "it really is, the question is, what is

---

[4]    Relevant to this point, in his scholarly writing, Dr. Esposito observes:

> The religious situation of American Muslims can be especially difficult for the younger generation. Many have parents, raised in overseas Muslim societies, who *equate cultural practices and norms with the principles of Islam*. Their children face the challenge of both fitting into American societies and retaining their Islamic identity, of *distinguishing between what is mandated by religion and the "foreign" cultural baggage of their parents*.

Esposito, *supra*, at 291 (emphases added); *cf. id.* at 74 ("Yet [Muslims] continue to face issues of identity and faith as a religious minority. . . . As with many other religious and ethnic groups that preceded them, Muslim communities face issues of assimilation or integration, diversity, and pluralism.").

their motivation."  Aplt. App. at 292; *see id.* at 472 (noting, as to why a hijab is worn, "it really depends on the woman").

In responding to Ms. Elauf's inquiry about wearing a headscarf, Ms. Sepahvand testified that she had raised the issue with assistant manager Kalen McJilton, who knew Ms. Elauf from her prior visits to the store.  Noting that he had previously worked at Abercrombie with someone who wore a white yarmulke, Mr. McJilton suggested that he did not see any problem with Ms. Elauf wearing a headscarf, "especially if she didn't wear a headscarf that was black."  Aplee. Supp. App. at 181 (Dep. of Farisa Sepahvand, taken Mar. 31, 2011) (internal quotation marks omitted).  Ms. Sepahvand then communicated to Ms. Elauf that, although a headscarf would be permitted, because of Abercrombie's no-black-clothing policy, she would not be able to wear a black one.  Ms. Elauf seemed agreeable to that restriction.

Ms. Elauf met with assistant manager Heather Cooke to interview for the Model position.  Ms. Cooke was already familiar with Ms. Elauf, having observed her in the Abercrombie store chatting with Ms. Sepahvand and working elsewhere in the Woodland Hills Mall.  Ms. Cooke had seen Ms. Elauf wearing a headscarf prior to the interview.  Ms. Cooke "did not know" Ms. Elauf's religion, but she "assumed that she was Muslim," Aplt. App. at 365 (Dep. of Heather Cooke, taken Jan. 19, 2011), and "figured that was the religious reason why she wore her head scarf," Aplee. Supp. App. at 48.  In the interview, Ms. Cooke did not ask Ms.

Elauf if she was a Muslim.

Ms. Elauf was familiar with the type of clothing Abercrombie sold and knew that Models were required to wear similar clothing. During the interview, Ms. Elauf wore an Abercrombie-like T-shirt and jeans. She also wore a headscarf (i.e., hijab); it was black. According to Ms. Elauf, Ms. Cooke never mentioned the Look Policy by name but she did describe some of the dress requirements for Abercrombie employees, and informed Ms. Elauf that she would have to wear clothing similar to that sold by Abercrombie and, specifically, that she could not wear heavy makeup or nail polish.

During the course of the interview, Ms. Elauf never informed Ms. Cooke that she was Muslim, never brought up the subject of her headscarf, and never indicated that she wore the headscarf for religious reasons and that she felt obliged to do so, and thus would need an accommodation to address the conflict between her religious practice and Abercrombie's clothing policy. Indeed, the topic of her headscarf never came up one way or the other. For example, Ms. Cooke did not tell Ms. Elauf that she "wouldn't be able to wear [her headscarf] or anything like that." Aplt. App. at 55 (Dep. of Samantha Elauf, taken Jan. 4, 2011). After offering a description of the dress requirements, Ms. Cooke asked Ms. Elauf at the end of the interview if she had any questions. Ms. Elauf did not ask any.

Ms. Cooke assessed Ms. Elauf's candidacy using Abercrombie's official

8

interview guide. The guide requires the interviewer to consider the applicant's "appearance & sense of style," whether the applicant is "outgoing & promotes diversity," and whether he or she has "sophistication & aspiration." Aplee. Supp. App. at 61 (Model Group Interview Guide, dated June 26, 2008). Each category is assessed on a three-point scale, and an applicant with a score in "appearance" of less than two, or a total combined score of five or less, is not recommended for hire. Ms. Cooke initially scored Ms. Elauf at a two in each category, for a total of six, which is a score that "meets expectations" and amounts to a "recommend[ation]" that Abercrombie hire her. *See id.* at 64.

Although Ms. Cooke believed Ms. Elauf was a good candidate for the job, she was unsure whether it would be a problem for her to wear a headscarf as an Abercrombie Model, and whether the headscarf could be black in color. Ms. Cooke ordinarily did not seek approval from a senior manager in evaluating or hiring new Models, but in this case she did.

Ms. Cooke's direct supervisor was unable to answer her question about Ms. Elauf's headscarf, so Ms. Cooke consulted with Randall Johnson, her district manager. Mr. Johnson said that Ms. Elauf should not be hired because she wore a headscarf—a clothing item that was inconsistent with the Look Policy. Notwithstanding Ms. Cooke's contrary deposition testimony, Mr. Johnson denied being told by Ms. Cooke that Ms. Elauf was a Muslim and that she wore her headscarf for religious reasons.

Ms. Cooke testified that Mr. Johnson told her to change Ms. Elauf's interview score on the appearance section from a two to a one, thereby bringing her overall score down to a five and ensuring that she would not be recommended for hire. With this understanding, Ms. Cooke threw away the original interview sheet and changed Ms. Elauf's score, thus implementing Mr. Johnson's alleged instructions. Ms. Cooke did not extend a job offer to Ms. Elauf. A few days after the interview, Ms. Elauf learned from Ms. Sepahvand that she had not been hired because of her headscarf.

## C

The EEOC filed the instant action against Abercrombie on September 17, 2009, alleging violations of Title VII, on the grounds that Abercrombie "refused to hire Ms. Elauf because she wears a hijab" and "failed to accommodate her religious beliefs by making an exception to the Look Policy." Dist. Ct. Doc. No. 2, at 2 (EEOC Compl., filed Sept. 17, 2009). It sought injunctive relief, back pay, and damages.

Abercrombie disputed the EEOC's allegations and argued that Ms. Elauf failed to inform it of a conflict between the Look Policy and her religious practices. It further argued that the proposed accommodation—allowing Ms. Elauf to wear the headscarf—would have imposed an undue hardship on the company. Furthermore, it challenged Ms. Elauf's assertion that she possessed a bona fide, sincerely held religious belief, forming the basis for her purported

conflict with the Look Policy.

The parties filed cross-motions for summary judgment on issues concerning liability.  In addressing the motions and the religion-accommodation claim, the district court applied the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the court concluded that the EEOC had established a prima facie case through evidence that Ms. Elauf had a bona fide, sincerely held religious belief and a related practice that conflicts with the Look Policy.  Specifically, the court found that Ms. Elauf wore her "head scarf based on her belief that the Quran requires her to do so" and "this belief conflicts with Abercrombie's prohibition against headwear."  Aplt. App. at 575 (Op. & Order, filed July 13, 2011).  Further, it reasoned that "Abercrombie had notice [that] she wore a head scarf because of her religious belief[,] and that it refused to hire her because the head scarf conflicted with its Look Policy."  *Id.*

The district court rejected Abercrombie's argument that the notice element of the EEOC's prima facie case was not satisfied because Ms. Elauf did not personally inform Abercrombie that she wore her hijab for religious reasons and would need an accommodation for it, because she was obliged to do so.  The court reasoned that, while the Tenth Circuit had not directly addressed this issue, "[c]ourts in other circuits have held that the notice requirement is met when an employer has enough information to make it aware [that] there exists a conflict between the individual's religious practice or belief and a requirement for

11

applying for or performing the job." *Id.* at 580. It further stated that, "faced with the issue of whether the employee must explicitly request an accommodation or whether it is enough that the employer has notice [that] an accommodation is needed[,] the Tenth Circuit would likely opt for the latter choice." *Id.* at 581 (footnote omitted).

Applying its formulation of the notice requirement, the district court observed that "it is undisputed that Elauf wore her head scarf at the interview with assistant store manager Heather Cooke, and Cooke *knew* she wore the head scarf based on her religious belief." *Id.* (emphasis added). It added that, while a fact question may yet exist as to whether Ms. Cooke told Mr. Johnson that Ms. Elauf wore her headscarf because of her religion, that question was immaterial "because the knowledge of Cooke—who had responsibility for hiring decisions at the Abercrombie Kids store—is attributable to Abercrombie." *Id.* at 581 n.11. The district court stated that "there could be no bilateral, interactive process of accommodation because, although Abercrombie was on notice that Elauf wore a head scarf for religious reasons, it denied [her] application for employment without informing her [that] she was not being hired or telling her why." *Id.* at 582 n.12.

The district court also rejected Abercrombie's contention that, even if the EEOC had established its prima facie case, Abercrombie had demonstrated that it would suffer undue hardship. The court observed that, despite speculative

testimony to the contrary, Abercrombie had provided no "studies or . . . specific examples" to support its opinion that granting Ms. Elauf an exception "would negatively impact the brand, sales[,] and compliance [with the Look Policy]." *Id.* at 582. In that vein, it emphasized that Abercrombie had made numerous exceptions to the Look Policy over the past ten or so years—most significantly, "[e]ight or nine head scarf exceptions." *Id.* at 583.

The parties went to trial on damages. The jury awarded the EEOC $20,000 in compensatory damages. The EEOC's request for prospective injunctive relief was denied. This timely appeal followed.

## II

In summary, we conclude that the district court erred in denying summary judgment to Abercrombie.[5] More specifically, we hold that, under the governing

---

[5]     While "the denial of a summary-judgment motion is ordinarily not an appealable order [in itself], it can be reviewed when 'it is coupled with a *grant* of summary judgment to the opposing party.'" *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1306 n.1 (10th Cir. 2008) (emphasis added) (quoting *Yaffe Cos. v. Great Am. Ins. Co.*, 499 F.3d 1182, 1184 (10th Cir. 2007)); *see Thom v. Am. Standard, Inc.*, 666 F.3d 968, 972–73 (6th Cir. 2012). Abercrombie moved for summary judgment before the district court on the same grounds as it raises now on appeal and the parties engaged in an exhaustive round of briefing before the district court. The record is fully developed and the issues are amenable to dispositive resolution. *See, e.g.*, *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 465 (7th Cir. 1997) ("The reason that appellate courts, when reversing a grant of summary judgment, typically do not direct the district court to enter summary judgment in favor of the appellant is because a genuine issue of material fact remains. But, in instances in which the facts and law establish that the appellant is entitled to judgment as a matter of law, we are free to direct the district court to enter

(continued...)

substantive law, Abercrombie is entitled to summary judgment because there is no genuine dispute of material fact regarding this key point: Ms. Elauf never informed Abercrombie prior to its hiring decision that her practice of wearing a hijab was based on her religious beliefs and (because she felt religiously obliged to wear it) that she would need an accommodation for the practice, because of a conflict between it and Abercrombie's clothing policy. Furthermore, it follows ineluctably from the logic and reasoning of our decision that, in granting partial summary judgment to the EEOC, the district court erred.

### A

Our review of a district court's summary judgment ruling is de novo; we "apply[] the same standard as the district court." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011). "[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). In assessing a motion for summary judgment, "[w]e view the facts, and all reasonable inferences those facts

_____

[5](...continued)
judgment in appellant's favor." (quoting *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 544 (7th Cir. 1996)) (internal quotation marks omitted)); *see also McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251, 253 (10th Cir. 1993) ("Where we reverse a summary judgment order in favor of one party, . . . we will review the denial of the other party's cross-motion for summary judgment under the same standards applied by the district court so long as it is clear that the party opposing the cross-motion had an opportunity to dispute the material facts.").

support, in the light most favorable to the nonmoving party." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011).

Succinctly put, we must "examine the record to determine whether any genuine issue of material fact [i]s in dispute; if not, we determine . . . [the correct application of the] substantive law . . . , and in so doing we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1246 (10th Cir. 2010) (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998)) (internal quotation marks omitted); *see Morris*, 666 F.3d at 660; *City of Herriman v. Bell*, 590 F.3d 1176, 1180–81 (10th Cir. 2010). As pertinent here, we construe the facts in the light most favorable to the EEOC.

## B

### 1

To properly assess Ms. Elauf's Title VII religion-accommodation claim, we must first understand the meaning that the term "religion" takes on in the Title VII context. Under Title VII it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1154 (10th Cir. 2000) (second omission in original) (quoting 42 U.S.C. § 2000e-2(a)(1)) (internal quotation marks omitted). "The term 'religion'

15

includes all aspects of religious observance and practice, as well as belief . . . ."

42 U.S.C. § 2000e(j).

As the EEOC has recognized, "[r]eligion is very broadly defined under

Title VII." EEOC Compliance Manual § 12-I(A) (emphasis omitted), *available at*

http://www.eeoc.gov/policy/docs/religion.html; *see also Bushouse v. Local Union*

*2209, United Auto., Aerospace, & Agric. Implement Workers*, 164 F. Supp. 2d

1066, 1076 n.15 (N.D. Ind. 2001) (noting that Title VII has a "broad definition of

'religious belief'"). "Religion includes not only traditional, organized religions

such as Christianity, Judaism, Islam, Hinduism, and Buddhism, but also religious

beliefs that are new, uncommon, not part of a formal church or sect, only

subscribed to by a small number of people, or that seem illogical or unreasonable

to others." EEOC Compliance Manual § 12-I(A)(1). However, while recognizing

a broad concept of religion, the EEOC acknowledges that the substantive content

of religious beliefs is distinctive:

> Religious beliefs include theistic beliefs as well as non-theistic
> moral or ethical beliefs as to what is right and wrong which are
> sincerely held with the strength of traditional religious views.
> Although courts generally resolve doubts about particular beliefs
> in favor of finding that they are religious, beliefs are not
> protected merely because they are strongly held. Rather, *religion
> typically concerns ultimate ideas about life, purpose, and death*.

*Id.* (footnotes omitted) (emphasis added) (quoting 29 C.F.R. § 1605.1 (internal

quotation marks omitted); *United States v. Meyers*, 906 F. Supp. 1494, 1502 (D.

16

Wyo. 1995) (internal quotation marks omitted), *aff'd*, 95 F.3d 1475 (10th Cir.

1996)); *see also* 3 Lex K. Larson, *Employment Discrimination* § 54.05[4], at 54-

13 (2d ed. 2013) ("[A] definition of religion often invoked by the courts is a

belief based on a theory of 'man's nature or his place in the Universe' or a belief

that 'relates to a Supreme Being.'").  Consequently, "[s]ocial, political, or

economic philosophies, as well as mere personal preferences, are not 'religious'

beliefs protected by Title VII."  EEOC Compliance Manual § 12-I(A)(1).

In the EEOC's view, religion is a uniquely personal and individual matter.

This view was shaped in no small part by how courts have defined religion for

purposes of the First Amendment and other related contexts.  *See id.* at § 12-I(A)

nn.18–28 and accompanying text (relying heavily on case law from the First

Amendment and other contexts to define "religion" for Title VII's purposes); *see

also* 29 C.F.R. § 1605.1 (setting forth the EEOC's definition of "religious

practices" and noting that it is in accordance with the standard developed by the

Supreme Court in *United States v. Seeger*, 380 U.S. 163 (1965), and *Welsh v.

United States*, 398 U.S. 333 (1970)); *cf. EEOC v. Union Independiente de la

Autoridad de Acueductos y Alcantarillados de P.R.*, 279 F.3d 49, 56 (1st Cir.

2002) (relying on First Amendment jurisprudence to define "religion" for

purposes of Title VII); *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir.

1978) (relying on *Seeger* and *Welsh* to interpret "religious" for purposes of Title

VII).

In these First Amendment-related contexts, courts consistently focus on the *individual's* belief system rather than the beliefs of a religious group with which the individual may (or may not) be associated. *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989) ("[W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization."); *[Eddie] Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 715–16 (1981) ("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."); *Seeger*, 380 U.S. at 173, 185 (interpreting the phrase "religious training and belief" in a conscientious-objection statute to require courts "to decide whether the beliefs professed by a registrant . . . are, *in his own scheme of things*, religious" (emphasis added)); *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir. 1991) (holding that a Seventh Day Adventist prisoner's religious belief that he must adhere to a vegetarian diet, if sincerely held, was entitled to protection under the First Amendment even though the district court found that not all Seventh Day Adventists are vegetarian and that the "faith does not *require*" such a diet); *see also* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1235 (4th ed. 2011) ("[R]eligion is inherently personal

18

. . . and an individual might have a sincere religious belief that departs from the dogma of his or her religion.  In fact, for this reason, the [Supreme] Court has said [in the First Amendment context] that the dominant views in a faith are not determinative in assessing whether a particular belief is religious.").

Apparently guided by such authorities, the EEOC's Compliance Manual notes:

> [A] person's religious beliefs need not be confined in either source or content to traditional or parochial concepts of religion. A belief is religious for Title VII purposes if it is religious in *the person's own scheme of things*, *i.e.*, it is a sincere and meaningful belief that occupies *in the life of its possessor* a place parallel to that filled by . . . God.  An employee's belief or practice can be religious under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or *if few – or no – other people adhere to it.*

EEOC Compliance Manual § 12-I(A)(1) (omission in original) (emphases added) (footnotes omitted) (quoting *[Eddie] Thomas*, 450 U.S. at 716 (internal quotation marks omitted); *Redmond*, 574 F.2d at 901 n.12 (internal quotation marks omitted); *Seeger*, 380 U.S. at 176 (internal quotation marks omitted)); *see also* EEOC, *Questions and Answers: Religious Discrimination in the Workplace* [hereinafter *EEOC Q & A*], *available at* http://www.eeoc.gov/policy/docs/qanda_religion.html ("An employer also should not assume that an employee is insincere simply because some of his or her practices deviate from the commonly followed tenets of his or her religion.").

Therefore, determining "[w]hether a practice is religious depends on *the employee's motivation*. The same practice might be engaged in by one person for religious reasons and by another person for purely secular reasons."[6] EEOC Compliance Manual § 12-I(A)(1) (emphasis added). Indeed, the EEOC recognizes that the motivation of employees may change over time; they may engage in a practice for religious reasons during one phase of their lives and for secular reasons during another. *See EEOC Q & A*, *supra* ("[A]n individual's beliefs – or degree of adherence – may change over time, and therefore an employee's newly adopted or inconsistently observed religious practice may nevertheless be sincerely held.").

These general principles have significant implications for the enforcement of Title VII's proscription against religious discrimination. A couple of points are worth underscoring. First, an applicant or employee may engage in practices that are associated with a particular religion, but do so for cultural or other reasons that are not grounded in that religion. *Cf.* Larson, *supra*, § 54.04, at 54-7 (noting that "one person's political view may well be another's religious

---

[6]       The EEOC Compliance Manual, citing our decision in *LaFevers*, provides the following example: "[O]ne employee might observe certain dietary restrictions for religious reasons while another employee adheres to the very same dietary restrictions but for secular (*e.g.*, health or environmental) reasons." EEOC Compliance Manual § 12-I(A)(1); *cf. LaFevers*, 936 F.2d at 1119 (recognizing that a Seventh Day Adventist can have a sincere religious belief that he must adhere to a vegetarian diet even though other Seventh Day Adventists do not feel similarly obligated).

conviction"). If so, an employer's discrimination against that individual for engaging in that practice—though possibly reprehensible and worthy of condemnation—would not contravene Title VII's religion-discrimination provisions. That is true of course because, despite the practice's customary association with religion, the applicant's or employee's motivation for engaging in the practice would not be religious.

Second, because religious beliefs have a distinctive content related to ultimate ideas about life, purpose, and death, logically, even if an applicant or employee claims to be acting for "religious" reasons, if those reasons actually do not pertain to such ultimate ideas, then that person's conduct would fall outside the protective ambit of Title VII—*viz.*, the conduct would not truly relate to religious matters. *See* EEOC Compliance Manual § 12-I(A)(1), Ex. 6. ("Personal Preference That is Not a Religious Belief");[7] *see also Reed v. Great Lakes Cos.*,

---

[7]     The EEOC has offered the following relevant example:

Sylvia wears several tattoos and has recently had her nose and eyebrows pierced. A newly hired manager implements a dress code that requires that employees have no visible piercings or tattoos. Sylvia says that her tattoos and piercings are religious because they reflect her belief in body art as self-expression and should be accommodated. However, the evidence demonstrates that her tattoos and piercings are not related to any religious belief system. For example, they do not function as a symbol of any religious belief, and do not relate to any "ultimate concerns" such as life, purpose, death, humanity's place in the universe, or right and wrong, and they are not part of a moral or ethical belief

(continued...)

330 F.3d 931, 935 (7th Cir. 2003) ("[A]n employee is not permitted to redefine a purely personal preference or aversion as a religious belief."); *Vetter v. Farmland Indus., Inc.*, 120 F.3d 749, 751 (8th Cir. 1997) ("An employer need not accommodate a purely personal preference . . . ." (internal quotation marks omitted)); *cf. Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972) (discussing in the free exercise context the necessity of distinguishing between choices that are "philosophical and personal rather than [ones that are] religious"); *United States v. Meyers*, 95 F.3d 1475, 1483–84 (10th Cir. 1996) (determining, for purposes of the Religious Freedom Restoration Act, whether a belief qualifies as a "religious belief" by assessing, *inter alia*, whether the belief "address[es] fundamental questions about life, purpose, and death"); *id.* at 1484 (agreeing with the district court's conclusion that the defendant's beliefs were not religious in nature despite their being "deeply [held]" and "sincere[]" because they were "derived entirely from his secular beliefs," and collecting cases).

**2**

The EEOC has presented a religion-discrimination claim based upon Abercrombie's alleged failure to accommodate Ms. Elauf's conflicting religious

---

[7](...continued)
system.  Therefore, her belief is a personal preference that is not religious in nature.

EEOC Compliance Manual § 12-I(A)(1), Ex. 6.

22

practice of wearing a hijab.  Title VII's implementing regulations "impose[] an

obligation on the employer 'to reasonably accommodate the religious practices of

an employee or prospective employee, unless the employer demonstrates that

accommodation would result in undue hardship on the conduct of its business.'"

*Thomas*, 225 F.3d at 1155 (quoting 29 C.F.R. § 1605.2(b)(1), (2)); *accord* 42

U.S.C. § 2000e(j); 29 C.F.R. § 1605.2(b)(1); *see Trans World Airlines v.*

*Hardison*, 432 U.S. 63, 74 (1977) ("The intent and effect of [Title VII's]

definition [of 'religion'] was to make it an unlawful employment practice . . . for

an employer not to make reasonable accommodations, short of undue hardship,

for the religious practices of his employees and prospective employees."); *see*

*also Sanchez-Rodriguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 8 (1st Cir.

2012); *Walden v. Ctrs. for Disease Control and Prevention*, 669 F.3d 1277,

1292–93 (11th Cir. 2012) (Seymour, J., sitting by designation).

Religion-accommodation claims are a subset of the types of religion-

discrimination claims that an applicant or employee may present under Title VII.

*See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) ("A

claim for religious discrimination under Title VII can be asserted under several

different theories, including disparate treatment and failure to accommodate.");

*Chalmers v. Tulon Co.*, 101 F.3d 1012, 1018 (4th Cir. 1996) ("[A]n employee is

not limited to the disparate treatment theory to establish a discrimination claim.

An employee can also bring suit based on the theory that the employer

23

discriminated against her by failing to accommodate her religious conduct."

(emphasis omitted)); *see also EEOC Q & A*, *supra* (describing the kinds of

religious discrimination that "Title VII prohibits").  The EEOC has described the

specific nature of the claim as follows:

> A religious accommodation claim is distinct from a disparate
> treatment claim, in which the question is whether employees are
> treated equally.  An individual alleging denial of religious
> accommodation is seeking an adjustment to a neutral work rule
> that infringes on the employee's ability to practice his religion.
> The accommodation requirement is "plainly intended to relieve
> individuals of the burden of choosing between their jobs and
> their religious convictions . . . ."

EEOC Compliance Manual § 12-IV (quoting *Protos v. Volkswagen of Am., Inc.*,

797 F.2d 129, 136 (3d Cir. 1986)).

　　　The reasonable-accommodation principle is implicated only when there is a

*conflict* between an employee's religious practice and the employer's neutral

policy; only then does a need to accommodate arise.  *See id.* § 12-IV(A)(1)

(noting the need for the employer to be on notice "both of the need for

accommodation and that [the accommodation] is being requested *due to a conflict*

*between religion and work*" (emphasis added)).  For there actually to be a

conflict, logic dictates that an applicant or employee must consider the religious

practice to be an inflexible one—that is, a practice that is required by his or her

religious belief system.

It is only in such a situation that applicants or employees would be placed in the position that Title VII was designed to protect them from—the spot where they must choose between their religious convictions and their job. *See Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682–83 (9th Cir. 1998) (granting summary judgment to the employer on the employee's Title VII religion-accommodation claim because there was no "conflict between [the employee's] religious belief and employment duties" since her religious belief, as she described it, only required her to go on a pilgrimage "at some time" rather than at the specific time she preferred to go); *cf. Reed*, 330 F.3d at 935 (holding that the employee failed to make a prima facie showing on his Title VII religion-accommodation claim because, *inter alia*, he "refuse[d] to indicate at what points [his] faith intersect[ed] the requirements of his job").  In other words, even if applicants or employees engage in a practice for religious reasons, so long as they do not feel obliged to adhere to the practice (that is, do not consider the practice to be inflexible), then there is no actual conflict, nor a consequent need for the employer to provide a reasonable accommodation.  *Cf. Turner v. Boy Scouts of Am., Inc.*, No. CIV-09-180-C, 2009 WL 2567962, at *2 (W.D. Okla. Aug. 17, 2009) ("[A]lthough Plaintiff informed [his employer] he was meeting with his pastor, there is no evidence in the record suggesting that Plaintiff informed [his employer] that his religious beliefs *required a meeting* with his pastor at that time or that the meeting was anything other than a personal preference." (emphasis

added)).

Notably, however, the EEOC discourages employers from making inquiries in the first instance regarding the religious beliefs or practices of applicants (and presumably employees) because "an applicant's religious affiliation or beliefs . . . are generally viewed as non job-related and problematic under federal law." EEOC, *Pre-Employment Inquiries and Religious Affiliation or Beliefs* [hereinafter *EEOC Pre-Employment Inquiries*], *available at* http://www.eeoc.gov/laws/practices/inquiries_religious.cfm; *see also Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 597 (W.D. Pa. 2009) (noting that questioning applicants concerning their religious beliefs could, "under some circumstances, permit an inference to be drawn that an employer engaged in improper religion-based discrimination"); EEOC, *Best Practices for Eradicating Religious Discrimination in the Workplace* [hereinafter *EEOC Best Practices*], *available at* http://www.eeoc.gov/policy/docs/best_practices_religion.html ("In conducting job interviews, employers can ensure nondiscriminatory treatment by . . . inquiring about matters directly related to the position in question."). Furthermore, in the religion-accommodation context, the EEOC has specifically cautioned employers to "avoid assumptions or stereotypes about what constitutes a religious belief or practice or what type of accommodation is appropriate." *EEOC Best Practices*, *supra*; *see id.* (noting that "[m]anagers and employees should be trained not to engage in stereotyping based on religious dress and

26

grooming practices").

Thus, it is only *after* an employer is put on notice of the need for a religious accommodation that the EEOC's policy materials encourage it to actively engage in a dialogue with applicants or employees concerning their conflicting religious practice and possible accommodations that the employer might provide for it.  *Cf.* Larson, *supra*, § 56.05, at 56-21 ("Indeed, it would seem unreasonable to require an employer to accommodate the religious practices of an employee when the employer is *unaware* of the *need* to do so." (emphases added)).  In this regard, the EEOC has counseled: "Once the employer becomes aware of the employee's religious conflict, the employer should obtain promptly whatever additional information is needed to determine whether an accommodation is available that would eliminate the religious conflict without posing an undue hardship on the operation of the employer's business."  EEOC Compliance Manual § 12-IV(A)(2); *see Thomas*, 225 F.3d at 1155 (noting that religious accommodation "involves an interactive process that requires participation by both the employer and the employee"); *EEOC Q & A*, *supra* (commenting that "once on notice that a religious accommodation is needed" an employer is obliged under Title VII "to reasonably accommodate an employee"); *EEOC Best Practices*, *supra* (noting among "[e]mployer [b]est [p]ractices" that "[m]anagers and supervisors should be trained to consider alternative[,] available accommodations if the particular accommodation *requested* would pose an undue

hardship" (emphasis added)); *see also EEOC Q & A*, *supra* ("[I]f the employer has a bona fide doubt about the basis for the accommodation request, it is entitled to make a limited inquiry into the facts and circumstances of the employee's claim that the belief or practice at issue is religious and sincerely held, and gives rise to the need for the accommodation.").

### 3

In religion-accommodation cases, we apply a version of *McDonnell Douglas*'s burden-shifting approach. *See Thomas*, 225 F.3d at 1155; *see also Dixon v. Hallmark Cos.*, 627 F.3d 849, 855 (11th Cir. 2010). Specifically, to survive summary judgment on such a claim, "the employee initially bears the burden of production with respect to a prima facie case." *Thomas*, 225 F.3d at 1155. The prima facie case requires the employee to "show that (1) he or she had a bona fide religious belief that conflicts with an employment requirement; (2) he or she *informed his or her employer of this belief*; and (3) he or she was fired [or not hired] for failure to comply with the conflicting employment requirement." *Id.* (emphasis added); *accord Dixon*, 627 F.3d at 855.

If the employee makes out a prima facie case, "[t]he burden then shifts to the employer to (1) conclusively rebut one or more elements of the . . . prima facie case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable reasonably to accommodate the employee's religious needs without

undue hardship." *Thomas*, 225 F.3d at 1156 (footnote omitted).  An

accommodation is not reasonable if it would require the employer "to bear more

than a de minimis cost." *Trans World Airlines*, 432 U.S. at 84; *see Bruff v. N.

Miss. Health Servs., Inc.*, 244 F.3d 495, 500 (5th Cir. 2001); *Lee v. ABF Freight

Sys., Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994); *Toledo v. Nobel-Sysco, Inc.*, 892

F.2d 1481, 1492 (10th Cir. 1989).  And, "if an employer has provided a

reasonable accommodation, we need not examine whether alternative

accommodations not offered would have resulted in undue hardship." *EEOC v.

Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008); *see Thomas*,

225 F.3d at 1156 n.7 ("The employer does not have to demonstrate that the

particular accommodation requested by the employee would result in an undue

hardship.").

We conclude that Abercrombie is entitled to summary judgment because

the EEOC cannot establish the second element of its prima facie case.  As

discussed below, under the controlling law, the EEOC cannot establish this

element because there is no genuine dispute of material fact that Ms. Elauf never

informed Abercrombie before its hiring decision that her practice of wearing a

hijab was based upon her religious beliefs and that she needed an accommodation

for that practice, due to a conflict between it and Abercrombie's clothing policy.

## C

In reaching our conclusion that Abercrombie is entitled to summary judgment, we resolve a question vigorously contested by the parties: specifically, whether, in order to establish a prima facie case under Title VII's religion-accommodation theory, a plaintiff ordinarily must establish that he or she initially informed the employer that the plaintiff adheres to a particular practice for religious reasons and that he or she needs an accommodation for that practice, due to a conflict between the practice and the employer's neutral work rule. We answer that question in the affirmative. Consequently, because Ms. Elauf did not inform Abercrombie prior to its hiring decision that she engaged in the conflicting practice of wearing a hijab for religious reasons and that she needed an accommodation for it, the EEOC cannot establish its prima facie case.

Our conclusion naturally rests, first, on our own express articulation of the plaintiff's prima facie burden, which is bolstered by a similar linguistic formulation of that burden found in rulings of several of our sister circuits. Second, we are fortified in our conclusion because the concepts of religion and interactive accommodation—as they are given substance in the Title VII context—virtually oblige us, as a logical matter, to insist that ordinarily the applicant or employee must initially provide the employer with explicit notice of the conflicting religious practice and the need for an accommodation for it, in

order to have an actionable claim for denial of such an accommodation. Third, we discern support for our conclusion in the plain terms of the EEOC's own regulatory pronouncements on the notice obligations of applicants or employees in the religion-accommodation setting. Lastly, we are bolstered in our position by the fact that our reading of the statute's notice requirement is entirely consistent with the approach toward notice that the courts have taken, for purposes of assessing an employer's duty to accommodate, in the undisputedly analogous context of disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213.

The EEOC has vigorously contested this possible outcome. As the district court put it, "The EEOC urges a less restrictive approach, asserting that although Abercrombie is required to have had notice that Elauf needed an accommodation, the notice need not have been strictly in the form of Elauf verbally requesting such an accommodation." Aplt. App. at 580. More specifically, the EEOC has succinctly made the point before us: "The employer's obligation is to attempt reasonable accommodation (where no undue hardship would result) when it has notice—be it from an affirmative statement by the individual, *or some other source*—of an individual's religious belief that conflicts with a work requirement." Aplee. Br. at 41 (emphasis added); *see also id.* at 32–33 ("[W]hen the facts indicate that notice of an individual's religious belief was provided by some means other than the individual affirmatively 'informing' the employer of

31

the belief, the prima facie notice requirement should be flexibly interpreted to conform to such factual situations.").  For the reasons discussed below, we are unpersuaded by the EEOC's position.

**1**

**a**

First of all, we construe our precedent (by its plain terms) as placing the burden on applicants or employees to initially inform employers of the religious nature of their conflicting practice and of the need for an accommodation.  *See, e.g.*, *Thomas*, 225 F.3d at 1155 (noting that the employee (or prospective employee) must establish that "he or she informed his or her employer of this [religious] belief" that conflicts with the employer's work requirement); *accord Toledo*, 892 F.2d at 1486.

Insofar as the plain language of our precedent leaves room for doubt on the question, construing it to require the applicant or employee to initially inform the employer of the conflicting religious practice and the need for an accommodation aligns our court with a substantial body of circuit precedent that we find persuasive.  *See, e.g.*, *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 319 (3d Cir. 2008) (outlining a prima facie showing that obliges the employee to demonstrate that "she told the employer about the conflict" between her religious belief and the employer's work rule); *Reed*, 330 F.3d at 935 ("Title

VII imposes a duty on the employer but also a reciprocal duty on the employee to give fair warning of the employment practices that will interfere with his religion and that he therefore wants waived or adjusted."); *Chalmers*, 101 F.3d at 1019 ("As [the plaintiff] recognizes, a prima facie case under the accommodation theory requires evidence that she informed her employer that her religious needs conflicted with an employment requirement and asked the employer to accommodate her religious needs."); *Johnson v. Angelica Uniform Grp., Inc.*, 762 F.2d 671, 673 (8th Cir. 1985) (noting that under the second element of the religion-accommodation prima facie case, the plaintiff must establish that "he has informed his employer about the conflict" between his religious belief and the employer's work requirement); *cf. Xodus v. Wackenhut Corp.*, 619 F.3d 683, 685 (7th Cir. 2010) (noting that the plaintiff "had to prove" during a bench trial "that he brought his religious practice to the company's attention"). And our view of the notice requirement also has been endorsed by respected secondary authority. *See* Larson, *supra*, § 55.01, at 55-3 ("One must begin with the well-known *McDonnell Douglas* description of the plaintiff's prima facie case, though, with religious discrimination, an important addition to the prima facie case is *the requirement* that the plaintiff communicate his or her bona fide religious belief to the employer." (emphasis added) (footnote omitted)); *id.* § 56.05, at 56-21 ("Note that in establishing a prima facie case an employee is required to notify an employer of the need for accommodation.").

**b**

The EEOC seeks to escape the effect of our decisions in *Toledo* and

*Thomas*—which, on their face, seem to require an employee (or prospective

employee) to establish that "he or she informed his or her employer of this

[religious] belief" that conflicts with the employer's work requirement. *Thomas*,

225 F.3d at 1155; *accord Toledo*, 892 F.2d at 1486. The EEOC maintains that

these cases "did not address whether the only permissible source of the

employer's awareness of the subject religious belief was the employee or

applicant herself." Aplee. Br. at 36–37; *see id.* at 36 ("In *Thomas* this Court was

*not* faced with the question of whether to establish a prima facie case, the plaintiff

had to produce evidence that the employer's awareness of her religious belief

came from her and not some other source."). The district court agreed that our

precedent, and notably *Thomas*, did not resolve this notice question. *See* Aplt.

App. at 580 (citing *Thomas* and noting that "the Tenth Circuit has not addressed

the question of whether notice must be explicitly requested by the employee").

Even under the linguistic formulation of the second element of the prima facie

case found in *Toledo* and *Thomas*, reasons the EEOC, "the critical fact is the

*existence* of the notice itself, not *how* the employer came to have such notice."

Aplee. Br. at 31.

As support for its broader view of the notice requirement, the EEOC relies

34

on the Eleventh Circuit's decision in *Dixon*, 627 F.3d 849, and the district court's decision in *Hellinger v. Eckerd Corp.*, 67 F. Supp. 2d 1359 (S.D. Fla. 1999). *See* Aplee. Br. at 30–31. The district court in the instant case reached a similar conclusion regarding the notice requirement. *See* Aplt. App. at 581 ("[F]aced with the issue of whether the employee must explicitly request an accommodation or whether it is enough that the employer has notice [that] an accommodation is needed[,] the Tenth Circuit would likely opt for the latter choice." (footnote omitted)). In doing so, it cited the same authorities as the EEOC, and additional ones. *See id.* at 580–81 (citing, in addition, *Brown v. Polk Cnty.*, 61 F.3d 650, 654 (8th Cir. 1995) (en banc)); *Heller v. Ebb Auto Co.*, 8 F.3d 1433, 1439 (9th Cir. 1993)). However, as a general matter, we are not persuaded by the EEOC's position.

To begin, we are not convinced that we are at liberty to disregard the plain terms of our *Toledo* and *Thomas* decisions, which place the prima facie burden on the plaintiff to establish that the applicant or employee has initially informed the employer of the conflicting religious practice and the need for an accommodation. Moreover, even if the plain language of our precedent left the resolution of the question unclear, construing that language to require the applicant or employee to initially inform the employer of the conflicting religious practice and the need for accommodation aligns our court with a substantial body of circuit precedent. And, for the reasons that we explicate in Part II.C.2–4, *infra*, we believe that

35

these authorities embody the sounder legal view.

Furthermore, even were we to assume that *Toledo* and *Thomas* would permit a plaintiff to establish a prima facie case without demonstrating that the applicant or employee was the source of the employer's notice of the need for a religious accommodation, the EEOC could not prevail here. That is because such notice would need to be based on an employer's particularized, *actual* knowledge of the key facts that trigger its duty to accommodate. And, as explicated below, there is no genuine dispute of material fact that no Abercrombie agent responsible for, or involved in, the hiring process had such *actual* knowledge—*from any source*—that Ms. Elauf's practice of wearing a hijab stemmed from her religious beliefs and that she needed an accommodation for it.[8]

---

[8]    Under Title VII, an employer is defined to include "any agent," 42 U.S.C. § 2000e(b), and, in varying degrees, an employer may be held responsible for the conduct of its agents. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) ("We therefore decline the parties' invitation to issue a definitive rule on employer liability, but we do agree with the EEOC that Congress wanted courts to look to agency principles for guidance in this area."). In the Title VII disparate-treatment context, ordinarily the identity of the person acting as the employer's decision-maker in the particular employment decision is a significant fact—although not necessarily a determinative one. *See Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) ("In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*." (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)) (internal quotation marks omitted)); *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006) ("In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who *lacks decisionmaking power*, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger

(continued...)

The authorities that the EEOC and the district court have relied upon

clearly have predicated their notice holdings on the employer's particularized,

---

⁸(...continued)
a discriminatory employment action." (emphasis added)); *cf. Conroy v. Vilsack*,
707 F.3d 1163, 1173 n.3 (10th Cir. 2013) (noting that the plaintiff "does not
articulate a cat's paw theory of liability"). The district court determined that Ms.
Cooke "had responsibility for hiring decisions at the Abercrombie" store where
Ms. Elauf sought employment. Aplt. App. at 581 n.11. Abercrombie argues to
the contrary; it asserts that the decision-maker was Mr. Johnson, noting that "both
Cooke and Johnson identified Johnson as the decision-maker." Aplt. Opening Br.
at 16 n.7. In *Thomas*, we recognized that, although we employ the *McDonnell
Douglas* framework in the religion-accommodation context—as we do in the
disparate-treatment context—the nature of the inquiry is distinct. *See* 225 F.3d at
1155 n.6 (noting that "the burden-shifting mechanism" of *McDonnell Douglas* is
employed "not to probe the subjective intent of the employer" but rather to permit
courts in the summary judgment context to "determine whether the various parties
have advanced sufficient evidence to meet their respective traditional burdens to
prove or disprove the reasonableness of the accommodations offered or not
offered" (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 n.12 (10th
Cir. 1999) (en banc)) (internal quotation marks omitted)). Whether the identity of
the decision-maker is also a significant fact in the religion-accommodation
context is a question that we need not endeavor to answer here. *Cf. Kimbro v. Atl.
Richfield Co.*, 889 F.2d 869, 874 (9th Cir. 1989) (analyzing a Washington State
disability statute requiring employers "to make a reasonable accommodation" and
noting "we believe that the district court erred in finding that [the employer's]
management's lack of personal knowledge of [the employee's] migraine condition
insulates the company from liability; [the employer] was in fact on notice of [the
employee's] condition as a result of [the employee's] supervisor's full awareness
of his condition and thus must be held responsible for any failure to attempt a
reasonable accommodation"). It is undisputed that Ms. Cooke and Mr. Johnson
were agents of Abercrombie; that fact suffices for our purposes. If, as we
demonstrate *infra*, there is no genuine dispute of material fact that no
Abercrombie agent responsible for, or involved in, the hiring process—that is,
Ms. Cooke and Mr. Johnson—possessed particularized, actual knowledge, from
any source, that Ms. Elauf's practice of wearing a hijab stemmed from her
religious beliefs and that she needed an accommodation for it, it ineluctably
follows that no Abercrombie decision-maker (whether Ms. Cooke or Mr. Johnson,
or both) possessed this requisite knowledge.

actual knowledge.  We need not (and do not) endorse their specific holdings and,

in particular, their conclusions about how much actual knowledge is sufficient to

put an employer on notice of the need to accommodate; yet, there is no doubt that

these cases settled for nothing less than some significant measure of

particularized, actual knowledge.

In *Dixon*, for example, the plaintiffs "presented evidence that they are

sincere, committed Christians who oppose efforts to remove God from public

places." 627 F.3d at 855.  In rejecting the employer's contention that the

plaintiffs had never advised them of their need for a religious accommodation, the

Eleventh Circuit stated:

> [The employer] knew that the [plaintiffs] were dedicated
> Christians who had previously opposed policies prohibiting the
> public display of religious items. . . . [The employer] argues that
> the [plaintiffs] never expressly told [their supervisor] that they
> did not want to take down their artwork because they opposed
> efforts to remove God from public places.  However, we
> conclude that if [the supervisor] was aware of the tension
> between her order and the [plaintiffs'] religious beliefs—and
> there is ample evidence that she was—her awareness would
> satisfy the second prong.

*Id.* at 855–56.  In other words, in concluding that the plaintiffs had satisfied the

second element of their prima facie case related to notice, the Eleventh Circuit

determined that the employer had actual knowledge of the religious beliefs of the

particular plaintiffs and of the actual conflict between those beliefs and the

employer's work rules.  As to the latter point, based upon the plaintiffs' prior

affirmative and open opposition to the employer's policies regarding the display of religious items, the employer had actual knowledge that the plaintiffs' beliefs about the removal of God from public places were inflexible and not simply a personal preference.

The district court in *Hellinger* (the other case upon which the EEOC relies) put an even finer point on the actual-knowledge issue. The plaintiff there was "an Orthodox Jew" who "applied for a part-time position with [the employer] as a pharmacist." 67 F. Supp. 2d at 1361. "Although Plaintiff cannot sell condoms due to his religious beliefs, he did not list any religious restrictions on his application or make any request for an accommodation. Nor did he inform [the employer's hiring agent] about his religious beliefs or restrictions at the time he dropped off his application." *Id.*

It was undisputed that the employer's hiring agent was "informed" by another of its employees, who was listed as "one of the Plaintiff's references," "that the Plaintiff refused to sell condoms due to his religious beliefs" and that the hiring agent, consequently, "decided not to pursue the Plaintiff's application for employment." *Id.* Nevertheless, the employer "argue[d] that the Plaintiff cannot establish a *prima facie* case of religious discrimination because the Plaintiff did not inform the Defendant of his religious restriction or his need for accommodation." *Id.* at 1360. The district court would have none of that

argument.  Although the district court cautioned that it was "not plac[ing] the burden of inquiry on the employer," *id.* at 1364, it held "that the Plaintiff sets forth a *prima facie* case of religious discrimination because [the employer] had actual knowledge of the Plaintiff's religious beliefs and decided not to pursue the Plaintiff's employment application based on that information," *id.* at 1360.

Furthermore, the additional authorities that the district court relied upon in the instant case are of the same or similar effect in that they insist on nothing less than the employer's particularized, actual knowledge to satisfy the second element of the prima facie case.  *See Brown*, 61 F.3d at 654 ("[W]e reject the defendants' argument that because [the plaintiff] never explicitly asked for accommodation for his religious activities, he may not claim the protections of Title VII. . . .  Because the first reprimand related directly to religious activities by [the plaintiff], we agree with the district court that the defendants were well aware of the potential for conflict between their expectations and [the plaintiff's] religious activities."); *Heller*, 8 F.3d at 1436, 1439 (holding that the plaintiff established the second element of his prima facie case for failure to accommodate his "religious practice of attending the ceremony in which his wife and children were converted to Judaism," where the plaintiff's supervisor "knew" that he was Jewish, "knew" that his "wife was studying for conversion," and "when [the plaintiff] requested the time off, he informed the [supervisor] why he needed to miss work").

40

In other words, even were we to assume that an employer may be put on notice from a source other than applicants or employees, that source would need to provide the employer with sufficient information such that the employer would have actual knowledge that the conflicting practice of the *particular* applicants or employees is based upon their religious beliefs and that they need an accommodation for it.  Thus, even under this broader view of the notice requirement, a plaintiff—that is, an applicant or employee—should not be able to impose liability on an employer for failing to accommodate his or her religious practice on the ground that the employer should have guessed, surmised, or figured out from the surrounding circumstances, that the practice was based upon his or her religion and that the plaintiff needed an accommodation for it. Accordingly, even were we to adopt the EEOC's position, as supported by its authorities, the employer's notice would need to be based upon its particularized, actual knowledge of the key facts that trigger its duty to provide a reasonable religious accommodation—that is, based upon actual knowledge that the conflicting practice of the *particular* applicant or employee stems from his or her religion and that the applicant or employee needs an accommodation for it (because the practice is an inflexible one).

The EEOC cannot make this showing here: there is no genuine dispute of material fact that no Abercrombie agent responsible for, or involved in, the hiring process had particularized, actual knowledge—*from any source*—that Ms. Elauf's

practice of wearing a hijab stemmed from her religious beliefs and that she needed an accommodation for it.  Therefore, the EEOC cannot prevail.

In particular, we conclude that the record offers absolutely no support for the district court's determination that Ms. "Cooke *knew* [that Ms. Elauf] wore the head scarf based on her religious belief."  Aplt. App. at 581 (emphasis added). The EEOC also is clearly mistaken on this point.  *See* Aplee. Br. at 46 ("It is uncontested that Cooke was aware of Elauf's religious belief and its conflict with the Look Policy . . . .").  At best, when viewed in the light most favorable to the EEOC, the record indicates that Ms. Cooke *assumed* that Ms. Elauf wore her hijab for religious reasons and felt religiously obliged to so—thus creating a conflict with Abercrombie's clothing policy.

More specifically, Ms. Cooke testified as follows: that she had seen Ms. Elauf wearing a headscarf prior to the interview, but "did not know" Ms. Elauf's religion, Aplt. App. at 365; that she "*assumed* that she was Muslim," *id.* (emphasis added), and "*figured* that was the religious reason why she wore her head scarf," Aplee. Supp. App. at 48 (emphasis added), and she assumed that, if Ms Elauf were hired by Abercrombie as a Model, she would continue to wear her headscarf, *see id.* at 46 (answering "Yes, I did." to the question, "And you assumed if [Ms. Elauf] worked at Abercrombie, she would still be wearing [a headscarf]?").

42

In the interview, Ms. Cooke did not ask Ms. Elauf if she was a Muslim. And for reasons that we have explored at length, *see* Part II.B.1, *supra*, given Title VII's conception of religion as a uniquely personal and individual matter, Ms. Cooke's knowledge that Ms. Elauf elected to wear a hijab would be far from sufficient information to provide her with the requisite notice that would trigger an employer's duty to accommodate. *See Wilkerson*, 522 F.3d at 319 ("[S]imply announcing one's belief in a certain religion, or even wearing a symbol of that religion (i.e., a cross or Star of David) does not notify the employer of *the particular beliefs and observances* that the employee holds in connection with her religious affiliation." (emphasis added)); *Reed*, 330 F.3d at 935–36 ("A person's religion is not like his sex or race—something obvious at a glance. Even if he wears a religious symbol, such as a cross or a yarmulka, this may not pinpoint *his particular beliefs and observances* . . . ." (emphasis added)); *see also* Aplt. App. at 292 (indicating that the EEOC's expert offered, as an explanation for why people maintain certain styles of dress, "it really is, the question is, what is their motivation"). In sum, Ms. Cooke's testimony does not even come close to establishing that Ms. Cooke possessed particularized, actual knowledge that Ms. Elauf (and not some hypothetical Muslim female) wore a hijab because of *her* Islamic faith and felt religiously obliged to do so, and thus would require a religious accommodation in order to address the conflict with Abercrombie's

clothing policy.[9]

Moreover, even construing the facts (as we must) in the light most favorable to the EEOC, the fact that Ms. Cooke called Mr. Johnson to discuss the possibility of an accommodation does nothing to rectify this fundamental evidentiary deficiency in the EEOC's case. Ms. Cooke's conduct following the interview was all based on her admitted *assumption* regarding Ms. Elauf's religious beliefs and required practices. *See* Aplt. App. at 76–77 ("I was unsure

───────────────────

[9]        The EEOC suggests that, even if Ms. Cooke's understanding of Ms. Elauf's religious beliefs and her need for an accommodation was solely predicated on her assumption, her assumption was actually correct, so Abercrombie was put on adequate notice. *See* Aplee. Br. at 45 ("It is uncontested that Cooke correctly interpreted Elauf's wearing a headscarf as indicating that she is Muslim and wore the headscarf for a religious purpose. As such, . . . the court would still be correct that it was uncontested that Abercrombie was on sufficient notice of Elauf's religious belief."). There is no foundation in the law for the view that the requisite notice for purposes of a Title VII religion-accommodation claim could ever conceivably rest on anything less than an employer's particularized, *actual* knowledge; that an employer was able to make a correct guess or assumption would not mean that the employer possessed such actual knowledge. Simply put, a correct assumption does not equal actual knowledge. And this basic truth takes on considerable significance in the religion-accommodation context because once the employer is found to have received sufficient notice, the employer must actively engage in the interactive accommodation process. But an employer would not know whether its guess or assumption was correct until after the fact, so there would be instances in which the employer would begin participating in the interactive process based upon a guess or assumption—and invariably discuss or explore the purported religious beliefs and needs of an applicant or employee—when there actually was no need to do so (i.e., because the employer's assumption or guess was wrong). This approach would run afoul of the EEOC's own express policy guidance, which discourages employers from initiating discussions about the religious beliefs of applicants (or employees) and from operating in the accommodation process based upon stereotypes, speculation, and conjecture. *See* Part II.B.2, *supra*.

about the head scarf . . . . I told [Mr. Johnson] that I *believed* that [Ms. Elauf]

was Muslim, and that was a recognized religion. And that she was wearing it for

religious reasons." (emphasis added)). She did not possess the requisite actual

knowledge concerning these matters. And any awareness that Mr. Johnson had of

Ms. Elauf's religious beliefs and required practices would have been derived

solely from Ms. Cooke's assumption; so, Mr. Johnson, too, possessed no

particularized, actual knowledge.

Yet, the only two Abercrombie agents who could conceivably be deemed to

have had any responsibility for, or involvement in, the hiring process regarding

Ms. Elauf, were Ms. Cooke and Mr. Johnson.[10] Therefore, even if the EEOC were

permitted as a matter of law to establish the second element of its prima facie

case by showing that the employer possessed particularized, actual knowledge

from a source *other than* the applicant or employee of the key facts that trigger its

duty to provide a reasonable religious accommodation, the EEOC could not do so

here because neither Ms. Cooke nor Mr. Johnson (i.e., the relevant agents of the

---

[10]     It is true that, in responding to Ms. Elauf's inquiry about wearing a
headscarf, Ms. Sepahvand (her friend and an Abercrombie employee) testified
that she had raised the issue with assistant manager Kalen McJilton, who knew
Ms. Elauf from her prior visits to the store. Noting that he had previously worked
at Abercrombie with someone who wore a white yarmulke, Mr. McJilton
suggested that he did not see any problem with Ms. Elauf wearing a headscarf,
"especially if she didn't wear a headscarf that was black." Aplee. Supp. App. at
181 (internal quotation marks omitted). However, there is no evidence that Mr.
McJilton had any responsibility for, or involvement in, the hiring process
regarding Ms. Elauf.

employer) possessed such knowledge.  Accordingly, even under the broader view

of the notice requirement that the EEOC principally espouses here, it cannot

prevail.[11]

---

[11]    We note that the EEOC also takes a different tack to defeat this
outcome.  Recall that, following her discussion with Mr. McJilton, Ms.
Sepahvand communicated to Ms. Elauf that a headscarf would be permitted, but
because of Abercrombie's no-black-clothing policy, she would not be able to
wear a black one.  Based upon this relaying of information, the EEOC argues that
"there is no evidence suggesting that Elauf had any reason to believe that her
headscarf had not already been approved by Abercrombie, or that Elauf had any
reason to ask any questions about her headscarf at the interview."  Aplee. Br. at
45.  The EEOC's argument, however, is wholly unpersuasive.  Ms. Elauf could
not possibly have formed a reasonable judgment in these circumstances based
upon second-hand information delivered by her friend, Ms. Sepahvand—who was
not herself a member of Abercrombie management, nor involved in Ms. Elauf's
hiring process—that Abercrombie had agreed to accommodate her practice of
wearing a hijab and, as a consequence, that she was free to remain silent about
that practice in the interview.  This is especially true because, prior to the
interview, Ms. Elauf was well aware that employee attire was a significant matter
to Abercrombie—that is, a matter of considerable consequence—and the person
who Ms. Elauf reasonably could have concluded had some responsibility in her
hiring process, Ms. Cooke, expressly raised the topic of employee attire in the
interview *without* indicating that Abercrombie would accommodate Ms. Elauf's
practice of wearing a hijab.  Contrary to the EEOC's contention, then, we
conclude that there is no evidence to reasonably support the notion that
Abercrombie's conduct led Ms. Elauf to believe she had no need to speak up to
secure an accommodation for her claimed religious practice of wearing a
headscarf.

Moreover, lest there be any doubt, an employer is not legally obligated
under Title VII to prompt applicants or employees to deliver notice of the need
for a religious accommodation, by initially recounting a laundry list of all of the
practices that employees *cannot* do in the workplace.  The burden rests with
applicants or employees to ensure that the workplace will be a suitable work
environment for them, in light of their required religious practices.  *See
Chalmers*, 101 F.3d at 1019 ("Initially, [the plaintiff] asserts that [the employer]

(continued...)

We do recognize that in its briefing, the EEOC intimates that something less than an employer's particularized, actual knowledge would suffice. *See* Aplee. Br. at 34 ("[T]his is not to say that employers are required to inquire of applicants or employees as to whether there are any religious beliefs that need to be accommodated, absent *some reasonable indication* to the employer that an accommodation *may* be needed." (emphases added)). However, it cites no authorities to support this proposition, and we are not aware of any. *See* Aplt. Reply Br. at 2 ("Had courts intended that 'reasonable indication' (or some other sort of constructive notice) be sufficient to satisfy the *prima facie* case, they would have said so.").

In sum, we hold that, in order to establish the second element of their prima facie case under Title VII's religion-accommodation theory, ordinarily plaintiffs must establish that they initially informed the employer that they engage in a

---

[11](...continued)

never explicitly informed her of a company policy against writing religious letters to fellow employees at their homes and so she had no reason to request an accommodation. However, companies cannot be expected to notify employees explicitly of all types of conduct that might annoy co-workers, damage working relationships, and thereby provide grounds for discharge." (citation omitted) (internal quotation marks omitted)). Thus, the EEOC's suggestion to the contrary is misguided. *See* EEOC Response to Abercrombie's Rule 28(j) Letter, No. 11-5110, at 1 (10th Cir., filed May 11, 2012) ("[I]t is uncontested that Elauf was not informed at any time by Abercrombie that it has an unwritten prohibition on Models wearing headscarves. Therefore, there was no reason for Elauf to believe there was any conflict requiring accommodation." (citation omitted)); *see also* Aplt. App. at 55 (testifying that Ms. Cooke did not tell her (Ms. Elauf) that she "wouldn't be able to wear [her headscarf] or anything like that").

particular practice for religious reasons and that they need an accommodation for the practice, due to a conflict between the practice and the employer's work rules. As noted, we recognize that some courts have taken a different path on this question. However, we are confident that our approach is the sounder one.

## 2

Given Title VII's conception of religion and the interactive nature of the religion-accommodation process, we are hard-pressed to see how we could logically reach another conclusion regarding the notice element of the prima facie case. This is because the answers to the key questions that determine whether an employer has an obligation under Title VII to provide a reasonable religious accommodation ordinarily are only within the ken of the applicant or employee; because an employer's obligation to engage in the interactive religion-accommodation process is only triggered when the employer has answers to those questions; and because, in implementing Title VII's anti-discrimination mandate, the EEOC has expressly disapproved of employers inquiring in the first instance or speculating about the answers to such questions.

For example, recall that Title VII only obliges employers to provide a reasonable accommodation for practices that applicants or employees engage in because of bona fide, sincerely held religious beliefs. *See, e.g.*, *EEOC Q & A*, *supra* ("Title VII requires employers to accommodate only those religious beliefs

48

that are religious and sincerely held . . . ." (internal quotation marks omitted)).

As noted, those beliefs are defined broadly, but "typically concern[] ultimate

ideas about life, purpose, and death."  EEOC Compliance Manual § 12-I(A)(1)

(internal quotation marks omitted).  Title VII does not extend its protections to

practices that are engaged in as a matter of personal preference or for cultural

reasons, *see, e.g.*, *Reed*, 330 F.3d at 935 ("[A]n employee is not permitted to

redefine a purely personal preference or aversion as a religious belief."), and no

matter how strongly an applicant or employee believes in certain political,

economic, or social ideas, if those ideas do not otherwise relate to the stuff of

religion (e.g., ultimate notions about life, purpose, or death), then practices based

upon them do not fall within Title VII's protective ambit, *see, e.g.*, EEOC

Compliance Manual § 12-I(A)(1).

But how is an employer to know that applicants or employees are engaged

in a practice for religious reasons, unless they inform the employer?  *Cf. id.*

("Determining whether a practice is religious turns not on the nature of the

activity, but on the employee's motivation.  The same practice might be engaged

in by one person for religious reasons and by another person for purely secular

reasons.").  To be sure, in certain instances, applicants or employees may engage

in practices that are traditionally associated with a particular religion.  However,

Title VII does not require employers to become knowledgeable about the customs

and observances of religions.  *See, e.g.*, *Wilkerson*, 522 F.3d at 319 ("[W]e do not

impute to the employer the duty to possess knowledge of particularized beliefs of religious sects."); *Reed*, 330 F.3d at 936 (noting that "employers are not charged with detailed knowledge of the beliefs and observances associated with particular sects"); EEOC Compliance Manual § 12-IV(A)(1) (noting that an employee "cannot assume that the employer will already know or understand" "the religious nature of the belief or practice at issue").

Furthermore, even if an employer was generally aware of the beliefs and observances that are traditionally associated with a particular religious group, and also knew that the applicant or employee displayed symbols associated with that group—or even that the applicant or employee specifically claimed to be a member of that group—ordinarily, the employer would still not know whether the conflicting practice in question actually stemmed from religious beliefs unless the particular applicant or employee informed the employer, because under Title VII, as we have discussed, religion is a uniquely personal and individual matter. *See, e.g.*, EEOC Compliance Manual § 12-I(A)(1) ("An employee's belief or practice can be 'religious' under Title VII even if the employee is affiliated with a religious group that does *not* espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it." (emphasis added)); *see also id*. ("[A] person's religious beliefs need not be confined in either source or content to traditional or parochial concepts of religion. A belief is religious for Title VII purposes if it is *religious in the person's own scheme of things . . . .*"

50

(emphasis added) (footnotes omitted) (internal quotation marks omitted)).  In holding that Title VII places a "duty on the employee to give fair warning of the employment practices that will interfere with his religion," *Reed*, 330 F.3d at 935, the Seventh Circuit succinctly and cogently touched on a like point.  Specifically, the court in *Reed* stated: "A person's religion is not like his sex or race—something obvious at a glance.  Even if he wears a religious symbol, such as a cross or a yarmulka, this may not pinpoint *his particular beliefs and observances . . . .*"  *Id.* at 935–36 (emphasis added).

Similarly, in upholding the dismissal of the plaintiff's religion-accommodation claim because she failed to inform her employer of her need for an accommodation due to a conflict between her Christian beliefs and the employer's "libation" or alcohol-drinking ceremony, the Third Circuit in *Wilkerson* rejected the plaintiff's suggestion that the employer's knowledge that she was a Christian was enough to trigger its accommodation obligation.  Specifically, the Third Circuit stated, "that [the employer] knew she was a Christian does not sufficiently satisfy [the plaintiff's] duty to provide 'fair warning' to [the employer] that *she possessed a religious belief* that specifically prevented her from participating in the libations ceremony."  *Wilkerson*, 522 F.3d at 319 (emphasis added).  Indeed, the Third Circuit went further and concluded that even if the employer "suspected" that the libations ceremony would be specifically offensive to the plaintiff, that would not relieve the plaintiff of the

51

obligation to "inform the defendants that the libation ceremony would offend *her religious beliefs*." *Id.* at 319–20 (emphasis added).  In the same vein, in upholding the denial of the plaintiff's religion-accommodation claim, the Fourth Circuit rejected the plaintiff's argument that the employer's knowledge of the plaintiff's strongly held religious beliefs was enough to "put it on notice" that those beliefs would—*in the plaintiff's view*—oblige her to "write, and send, personal, accusatory letters to co-workers at their homes." *Chalmers*, 101 F.3d at 1020 n.3.  Therefore, even if an employer were on notice that an applicant or employee subscribed to a particular religious belief system, because religion under Title VII is a uniquely personal matter, that information would not be enough to tell the employer what practices are religious in "the person's own scheme of things."  EEOC Compliance Manual § 12-I(A)(1) (internal quotation marks omitted).  Ordinarily, the only way the employer would know such information is if the applicant or employee informed the employer.

Knowing this much demonstrates why the most natural reading of Title VII's religion-accommodation provision is one that ordinarily places the burden on the applicant or employee to inform the employer of the conflicting religious practice and the need for an accommodation, and why a contrary reading of the statute would be patently unfair to employers.  *Reed* provides a hypothetical that powerfully underscores this point:

> Suppose the employee is an Orthodox Jew and believes that it is deeply sinful to work past sundown on Friday. He does not tell his employer, the owner of a hardware store that is open from 9 a.m. to 6 p.m. on Fridays, who leaves the employee in sole charge of the store one Friday afternoon in mid-winter, and at 4 p.m. the employee leaves the store. The employer could fire him without being thought guilty of failing to accommodate his religious needs.

330 F.3d at 936. A contrary reading of the statute would be, we think, misguided and quite unfair because "at that time" when the employer fired the employee "there was nothing to accommodate." *Wilkerson*, 522 F.3d at 319. As in *Reed*, "[t]his case is similar" to the hypothetical: Ms. Elauf undisputedly did not inform Abercrombie that her conflicting practice of wearing a hijab stemmed from her religious beliefs and that she needed an accommodation; consequently, as with the hypothetical employer, Abercrombie could elect not to hire Ms. Elauf "without being thought guilty of failing to accommodate [her] religious needs." 330 F.3d at 936. Nothing was present to accommodate.

Moreover, contrary to the EEOC's suggestion at oral argument, *see* Oral Arg. at 26:40–27:10, the fact that an applicant's headscarf (like Ms. Elauf's) was visible would not materially distinguish her circumstances from those of the person whose religious beliefs did not allow for work on the Sabbath. Even though that person's religious beliefs regarding the Sabbath would be invisible to the naked eye, so would the religious significance that the applicant attached to wearing the headscarf. As noted, Muslim women (and certainly non-Muslim

women) wear headscarfs for reasons other than religion, and whether they are doing so for religious reasons depends on their (invisible) "motivation." EEOC Compliance Manual § 12-I(A)(1); *see* Aplt. App. at 292 (indicating that the EEOC's expert opined, regarding the reasons why people maintain certain dress, "it really is, the question is, what is their motivation"). Therefore, employers confronted with the Sabbath-adherent and the headscarf-wearer would be similarly situated—that is, they would not reasonably be put on notice of the need for a religious accommodation unless they were informed of it by the applicant.

Lastly, even if an employer has particularized, actual knowledge of the religious nature of the practice—that is, knowledge that the practice of a *particular* applicant or employee stems from his or her religious beliefs—that still would not be sufficient information to trigger the employer's duty to offer a reasonable accommodation. That is because the applicant or employee may not actually *need* an accommodation. In other words, an applicant or employee may not consider his or her religious practice to be inflexible; that is, he or she may not feel obliged by religion to adhere to the practice. If that is the situation, then there actually is no conflict, nor a consequent need for the employer to provide a reasonable accommodation. Given that "[a] belief is religious for Title VII purposes if it is religious in *the person's own scheme of things*," EEOC Compliance Manual § 12-I(A)(1) (emphasis added) (internal quotation marks omitted), whether a particular practice is religiously *required* is ultimately a

question that only a particular individual can answer—even if the same practice is customarily required in the religion that the person claims to follow. *Cf. Turner*, 2009 WL 2567962, at *2 (noting that the record did not indicate that the plaintiff ever told his employer "that his religious beliefs *required a meeting* with his pastor at that time or that the meeting was anything other than a personal preference" (emphasis added)).

As we suggested in *Thomas*, Title VII's "interactive process . . . requires participation by *both* the employer and the employee." 225 F.3d at 1155 (emphasis added). Yet, how can an employer meaningfully participate in the accommodation process, when it lacks concrete information from which to discern a need to do so? *See Wilkerson*, 522 F.3d at 319 ("Because [the plaintiff] did not inform [her employer] that the [libation] ceremony presented a [religious] conflict, it did not have a duty to accommodate her. Although [the plaintiff] told [her employer] after the fact, *at that time there was nothing to accommodate*." (emphasis added)); Larson, *supra*, § 56.05, at 56-21 ("Indeed, it would seem unreasonable to require an employer to accommodate the religious practices of an employee when the employer is *unaware* of the *need* to do so." (emphases added)).

It is true that logic does not perforce dictate that just because the foregoing critical questions ordinarily must be answered by the particular applicant or

employee, before the employer's duty to offer a reasonable accommodation is

triggered, that the applicant or employee must *initiate* the communication: it is

conceivable that one could fashion a regulatory regime in which the employer was

obliged to inquire in the first instance concerning the religious beliefs and needs

of applicants or employees.  Yet, under Title VII's interactive accommodation

scheme, it is clear that, not only is the employer not obliged to make such

religious inquiries, the employer is *affirmatively discouraged* from doing so

because "an applicant's religious affiliation or beliefs . . . are generally viewed as

non job-related and problematic under federal law."  *EEOC Pre-Employment*

*Inquiries*, *supra*; *see, e.g.*, *Prise*, 657 F. Supp. 2d at 597 (noting that questioning

applicants concerning their religious beliefs could, "under some circumstances,

permit an inference to be drawn that an employer engaged in improper religion-

based discrimination"); *EEOC Best Practices*, *supra* ("In conducting job

interviews, employers can ensure nondiscriminatory treatment by . . . inquiring

about matters directly related to the position in question.").  Furthermore, as we

have discussed, in the religion-accommodation context, the EEOC has specifically

cautioned employers to "avoid assumptions or stereotypes about what constitutes

a religious belief or practice or what type of accommodation is appropriate."

*EEOC Best Practices*, *supra*; *see id.* (noting that "[m]anagers and employees

should be trained not to engage in stereotyping based on religious dress and

grooming practices").  Thus, if under Title VII an employer is affirmatively

discouraged from asking applicants or employees whether their seemingly conflicting practice is based on religious beliefs, and, if so, whether they actually will need an accommodation for the practice, because it is inflexible (i.e., truly conflicting), *and* the employer also is discouraged by the EEOC from speculating about such matters, then the interactive accommodation process ordinarily only can be triggered when applicants or employees first provide the requisite information to the employer.

In sum, in light of Title VII's conception of religion and the interactive nature of the religion-accommodation process, we have difficulty seeing how we could logically reach a conclusion other than the one that we explicate here regarding the notice element of the prima facie case.

**3**

**a**

We also find further support for our view of the notice requirement—which places the onus on the applicant or employee to initially provide explicit notice to the employer of the conflicting religious practice and the need for an accommodation—in references found in the EEOC's own regulations and policy documents regarding the source of the employer's notice. These authorities—repeatedly, expressly, and unequivocally—assign the notice responsibility to the applicant or employee. Beginning with its substantive

regulation, the EEOC states, "*After an employee or prospective employee notifies the employer . . . of his or her need for a religious accommodation, the employer . . . has an obligation to reasonably accommodate the individual's religious practices.*"  29 C.F.R. § 1605.2(c)(1) (emphasis added).  In other words, by its plain terms, the regulation contemplates that the employer's duty to provide a reasonable religious accommodation comes after it receives notice from the prospective employee or employee.  If no such notice is provided, it would seem to ineluctably follow under the regulation that the employer has no duty to provide a reasonable religious accommodation and cannot (as a matter of law) be held liable for failing to do so.

The agency's compliance manual follows suit and, notably, underscores that the notice provided by the applicant or employee cannot consist of "vague reference[s]," *Johnson*, 762 F.2d at 673, but instead must be specific:

> An applicant or employee who seeks religious accommodation must make the employer aware both of the need for accommodation and that it is being requested due to a conflict between religion and work.  The employee is obligated to explain the religious nature of the belief or practice at issue, and cannot assume that the employer will already know or understand it.

EEOC Compliance Manual § 12-IV(A)(1).

To be sure, there is not any particular talismanic litany that the applicant or employee must recite to effectively put the employer on notice.  In this regard,

the EEOC states, "No 'magic words' are required to place an employer on notice of an applicant's or employee's conflict between religious needs and a work requirement. To request an accommodation, an individual may use plain language and need not mention any particular terms such as 'Title VII' or 'religious accommodation.'" *Id.* But the EEOC does insist that the applicant or employee "provide enough information to make the employer aware that there exists a conflict between the individual's religious practice or belief and a requirement for applying for or performing the job."[12] *Id.*

_____

[12] Indeed, the EEOC effectively underscores by a hypothetical that an applicant or employee cannot remain silent before the employer regarding the religious nature of his or her conflicting practice and need for an accommodation and still hope to prevail in a religion-accommodation case:

### EXAMPLE 29
### Failure to Advise Employer That Request Is Due to
### Religious Practice or Belief

Jim agreed to take his employer's drug test but was terminated because he refused to sign the accompanying consent form. After his termination, Jim filed a charge alleging that the employer failed to accommodate his religious objection to swearing an oath. Until it received notice of the charge, the employer did not know that Jim's refusal to sign the form was based on his religious beliefs. Because the employer was not notified of the conflict at the time Jim refused to sign the form, or at any time prior to Jim's termination, *it did not have an opportunity to offer to accommodate him.* The employer has not violated Title VII.

EEOC Compliance Manual § 12-IV(A)(1) (emphasis added). In our view, the facts of this hypothetical are closely akin to the facts present here: at no point

(continued...)

And other policy documents of the EEOC are of similar import, placing the burden on the applicant or the employee to provide notice to the employer of the conflicting religious practice and the need for an accommodation. *See, e.g.*, *EEOC Best Practices*, *supra* (noting that "[e]mployees should advise their supervisors or managers of the nature of the conflict between their religious needs and the work rules" and they "should provide enough information to enable the employer to understand what accommodation is needed, and why it is necessitated by a religious practice or belief"); *EEOC Q & A*, *supra* (responding to the question, "[h]ow does an employer learn that accommodation may be needed?" by stating, "[a]n applicant or employee who seeks religious accommodation *must* make the employer aware both of the need for accommodation and that it is being requested due to a conflict between religion and work" (emphasis added)). In sum, the clear, unequivocal guidance reflected in the EEOC's own regulation and policy documents supports our view that the onus is upon the applicant or employee to initially provide explicit notice to the employer of the conflicting religious practice and the need for an accommodation.

---

[12](...continued)
during her interview with Ms. Cooke (Abercrombie's agent) did Ms. Elauf expressly inform her—directly or indirectly—that she wore her hijab for religious reasons and felt obliged to do so, and, therefore, would need an accommodation. Like the hypothetical employer, Abercrombie did not have a chance to accommodate Ms. Elauf's allegedly religious practice.

**b**

The EEOC intimates that this reading of its regulation and policy documents is too facile. *See* Aplee. Br. at 39 ("These policy documents and regulations do not elevate form over substance and require this Court to take a nonsensical approach to the notice requirement."). In effect, the EEOC contends that the plain language of these materials do not tell the complete story because they do not take into account the circumstances of the instant case—where, in the EEOC's view, the employer had notice from a source other than an explicit communication from the applicant of the need to provide a religious accommodation. *See id.* at 38–39 ("[T]he Commission's policy documents do not address the situation where there is evidence that the employer was aware of the applicant's religious belief without the applicant herself so 'informing' it. . . . As such, none of these policy documents indicates that an employer is excused from its obligation to provide reasonable accommodation for an applicant's religious belief that conflicts with a work requirement simply because someone other than the applicant herself informed the employer of the belief." (quoting EEOC Compliance Manual § 12-IV(A))); *id.* at 39 ("[A]s with the aforementioned policy documents, the regulations do not address the situation where the employer is *otherwise aware* of the individual's religious belief, and accordingly do not preclude a plaintiff from satisfying the notice requirement under such circumstances." (emphasis added)). The EEOC asserts that its reading of the

scope of its regulation, 29 C.F.R. § 1605.2(c), is entitled to *Auer* deference.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

However, we believe that the EEOC's views are unpersuasive and cannot control the outcome here.  Notably, we conclude that "there are strong reasons for withholding the deference that *Auer* generally requires."  *Christopher v. SmithKline Beecham Corp.*, --- U.S. ----, 132 S. Ct. 2156, 2167 (2012).  "*Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief . . . ."  *Id.* at 2166; *see Chase Bank USA, N.A. v. McCoy*, --- U.S. ----, 131 S. Ct. 871, 880 (2011) ("[W]e defer to an agency's interpretation of its own regulation, advanced in a legal brief . . . ."); *see also Decker v. Nw. Envtl. Def. Ctr.*, --- U.S. ----, 133 S. Ct. 1326, 1337 (2013) ("When an agency interprets its own regulation, the Court, as a general rule, defers to it . . . .").

However, "this general rule does not apply in all cases."  *Christopher*, 132 S. Ct. at 2166; *see, e.g.*, Harry T. Edwards et al., *Federal Standards of Review*, ch. XIV (Westlaw Database updated Apr. 2013) [hereinafter *Federal Standards*] ("[T]he deference afforded an agency's interpretation of its own regulations is significant, but it is not without limits.").  As a threshold matter, in order for *Auer* deference to be warranted, "the language of the regulation in question must be ambiguous, lest a substantively new rule be promulgated under the guise of

62

interpretation." *Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002); *see Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous.  The regulation in this case, however, is not ambiguous . . . .  To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

Even if that threshold is crossed, there are other circumstances under which the application of *Auer* deference would be unjustified:

> Deference is undoubtedly inappropriate, for example, when the agency's interpretation is plainly erroneous or inconsistent with the regulation.  And deference is likewise unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question.  This might occur when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position . . . .

*Christopher*, 132 S. Ct. at 2166 (citations omitted) (quoting *Auer*, 519 U.S. at 461–62 (internal quotation marks omitted); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (internal quotation marks omitted)).

In considering the appropriateness of deferring to an agency's interpretation, the *Christopher* Court also highlighted the importance of safeguarding "the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'"  132 S. Ct. at 2167

(alteration in original) (quoting *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.)); *see Drake*, 291 F.3d at 68 (listing as one of the "preconditions for applying this socalled *Auer* deference" that "the agency's reading of its regulation must be fairly supported by the text of the regulation itself, so as to ensure that *adequate notice* of that interpretation is contained within the rule itself" (emphasis added)); *see Federal Standards*, *supra*, ch. XIV (noting that "in *Christopher* . . . , the Court ruled that no *Auer* deference would be afforded to an agency interpretation of a disputed regulation if the statute, published regulations, and the agency's prior enforcement regime gave no notice to regulated parties of the interpretation proposed by the agency during the course of litigation").  As the *Christopher* Court elaborated:

> It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

132 S. Ct. at 2168.

    We decline to accord *Auer* deference to the EEOC's interpretation of its own regulation, 29 C.F.R. § 1605.2(c)(1).  First, it is far from clear that the regulation is actually ambiguous concerning the central question before us: whether applicants or employees initially must provide express notice to the

64

employer of their conflicting religious practice and their need for an accommodation, in order to trigger the employer's legal duty to provide a reasonable religious accommodation. The regulation's language seems to "plainly" answer yes to that question. *Christensen*, 529 U.S. at 588; *see id.* ("Nothing in the regulation even arguably requires that an employer's compelled use policy *must* be included in an agreement. The text of the regulation itself indicates that its command is permissive, not mandatory."); *cf. Chase Bank*, 131 S. Ct. at 879–80 (noting that "the key question" was "whether the [interest-rate] increase actually changed a 'term' of the Agreement that was 'required to be disclosed'" within the meaning of the regulation and concluding that the regulation was "ambiguous as to the question presented, and [the Court] must therefore look to [the agency's] own interpretation of the regulation for guidance in deciding this case"). And "if the text of a regulation is unambiguous," as appears to be the situation here, "a conflicting agency interpretation . . . will necessarily be 'plainly erroneous or inconsistent with the regulation' in question." *Chase Bank*, 131 S. Ct. at 882 (quoting *Auer*, 519 U.S. at 461). Thus, at the threshold, it is doubtful that *Auer* deference to the EEOC's interpretation is appropriate.

Second, even if the regulation were actually "ambiguous in its reach," *Drake*, 291 F.3d at 68, there would be "reason to suspect that the [EEOC's] interpretation does not reflect [its] fair and considered judgment on the matter in

question," *Auer*, 519 U.S. at 462.  As demonstrated above, through its

Compliance Manual and other policy documents, the EEOC has repeatedly,

explicitly, and unequivocally indicated that the notice necessary to trigger an

employer's duty to provide a reasonable religious accommodation is notice that is

initially provided in express terms by applicants and employees.  *See, e.g.*, EEOC

Compliance Manual § 12-IV(A)(1) ("The employee is obligated *to explain* the

religious nature of the belief or practice at issue . . . ." (emphasis added)); *EEOC*

*Best Practices*, *supra* (noting that "[e]mployees should advise their supervisors or

managers of the nature of the conflict between their religious needs and the work

rules" and "should provide enough information to enable the employer to

understand what accommodation is needed, and why it is necessitated by a

religious practice or belief").  In other words, on prior occasions, the EEOC has

repeatedly taken a position on the notice question that is inconsistent, and

conflicts with, the interpretation of that question that it now seeks to engraft onto

its regulation.

        In such a circumstance, *Auer* deference is "unwarranted."  *Christopher*, 132

S. Ct. at 2166; *see id.* (noting that the situation "might occur" where *Auer*

deference is unjustified because "the agency's interpretation conflicts with a prior

interpretation"); *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)

(noting that "an agency's interpretation of a statute or regulation that conflicts

with a prior interpretation is 'entitled to considerably less deference' than a

consistently held agency view" (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987))); *cf. Bowen*, 488 U.S. at 212–13 (noting that "[f]ar from being a reasoned and *consistent* view of the scope of [the statutory] clause," the agency's "current interpretation . . . is contrary to the narrow view of that provision advocated in past cases"); *Drake*, 291 F.3d at 69 ("Where the agency's litigation position is consistent with its past statements and actions, there is good reason for the court to defer, for then the position seems 'simply to articulate an explanation of longstanding agency practice.'" (quoting *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304 (D.C. Cir. 2000))).

Furthermore, the EEOC does not identify any prior instance where it has taken the stance regarding notice that it does here, and its position does not appear to be anything other than a creature of this proceeding—where it is "a party to this case." *Chase Bank*, 131 S. Ct. at 881. At least coupled with its prior inconsistent conduct, this circumstance gives us some reason to suspect that the EEOC's view regarding notice is "nothing more than an agency's convenient litigating position"; as such, giving it *Auer* deference "would be entirely inappropriate." *Bowen*, 488 U.S. at 213; *accord Christopher*, 132 S. Ct. at 2166.

Moreover, we have difficulty concluding that the EEOC has provided "adequate notice" (*Drake*, 291 F.3d at 68) or "fair warning" (*Christopher*, 132 S. Ct. at 2167 (quoting *Gates & Fox Co.*, 790 F.2d at 156) (internal quotation marks

omitted)) to employers that their obligation to provide a reasonable religious

accommodation may be triggered by *something other than* an explicit

communication from applicants or employees regarding their conflicting religious

practice and need for an accommodation.[13]   Nothing in the text of the EEOC's

regulation, 29 C.F.R. § 1605.2(c)(1), would "provide clear notice of this."

*Christopher*, 132 S. Ct. at 2167.   In describing the circumstances under which the

employer's obligation to offer a reasonable religious accommodation is triggered,

the regulation speaks solely of "an employee or prospective employee notif[ying]

the employer [of the need for such an accommodation]."  29 C.F.R.

§ 1605.2(c)(1).   And, as commonly understood, the term "notify" means to "make

a usu[ally] formal communication generally about something requiring or worthy

of attention."  *Webster's Third New Int'l Dictionary* 1160 (2002); *see id.* at 1545

(defining the word "notify" to mean, among other things, to "make known").

---

[13]      This would be especially true to the extent that the EEOC's
interpretation of its regulation would permit plaintiffs to establish their prima
facie case regarding notice by showing the employer possessed *something less*
than actual knowledge of the conflicting religious practice and need for an
accommodation—*viz.*, would allow plaintiffs to demonstrate notice by showing
some form of employer constructive knowledge, or a "*reasonable indication* to
the employer that an accommodation *may* be needed."  Aplee. Br. at 34 (emphases
added).  This is because (as noted *supra*) the EEOC has not identified any judicial
decisions supportive of such a position, nor have we uncovered any.  *Cf.* Aplt.
Reply Br. at 3 n.1 ("[T]he EEOC's regulations nowhere state that a 'reasonable
indication' is sufficient to make a *prima facie* case.  Employers should be able to
rely upon the EEOC's clear pronouncements without having to fear that the EEOC
will suddenly 'change its mind' to support whatever argument most benefits its
then-current litigation.").

In other words, under a natural reading of the regulation, the employer's

obligation to provide a reasonable religious accommodation would be triggered

only when applicants or employees explicitly inform the employer of their

conflicting religious practice and need for an accommodation.  Indeed, this

natural reading of the regulation is bolstered by the construction canon *expressio*

*unius est exlcusio alterius*—the so-called "negative-implication canon," Antonin

Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107

(2012); *see Black's Law Dictionary* 661 (9th ed. 2009) (noting that it is "[a]

canon of construction holding that to express or include one thing implies the

exclusion of the other").  Specifically, by expressly providing only one means by

which an employer's obligation to provide a reasonable religious accommodation

may be triggered—explicit notice from an applicant or employee—the regulation

may be read to exclude other means by which the "thing to be done," *Christensen*,

529 U.S. at 1660 (quoting *Raleigh & Gaston R.R. v. Reid*, 13 Wall. 269, 270

(1872)) (internal quotation marks omitted), may be accomplished.  Accordingly,

because the EEOC's broader view of the notice requirement is divorced from the

regulation's text and is not congruent with the natural reading of that text,

subjecting Abercrombie to it "would result in precisely the kind of 'unfair

surprise' against which [the Supreme Court's] cases have long warned."

*Christopher*, 132 S. Ct. at 2167 (quoting *Long Island Care at Home, Ltd. v. Coke*,

551 U.S. 158, 170–71 (2007)) (internal quotation marks omitted).  This is yet

another reason why according the EEOC's broader view *Auer* deference would be inappropriate.

Therefore, to the extent that we provide deference at all to the EEOC's broader view, the boundaries of that deference would be defined, not by *Auer*, but rather by the Supreme Court's decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See, e.g.*, *Christopher*, 132 S. Ct. at 2168–69 (turning to the *Skidmore* standard after concluding that "whatever the general merits of *Auer* deference, it is unwarranted here"). Under that decision, to give deference "would be proper only if the [EEOC's view] has the *power to persuade*, which 'depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Vance v. Ball State Univ.*, --- U.S. ----, 133 S. Ct. 2434, 2443 n.4 (2013) (second and third alterations in original) (emphasis added) (quoting *Skidmore*, 323 U.S. at 140); *see Christopher*, 132 S. Ct. at 2168–69 (giving the agency's "interpretation a measure of deference proportional to" its satisfaction of *Skidmore*'s criteria). For the reasons that we have noted thus far—including in this subsection and *supra* in Parts II.C.1–3.a—and that we explicate below in Part II.C.4, we conclude that the EEOC's broader view of the notice requirement is "quite unpersuasive." *Christopher*, 132 S. Ct. at 2169; *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2533 (2013) (noting that the EEOC's "explanations lack the persuasive force that is a necessary precondition to deference under

70

*Skidmore*"); *Vance,* 133 S. Ct. at 2443 n.4 ("For the reasons explained below, we do not find the EEOC Guidance persuasive.").[14]

In sum, notwithstanding the EEOC's objections, we find support in the EEOC's own regulations and policy documents for our view of the notice requirement—which places the onus on the applicant or employee to initially provide explicit notice to the employer of the conflicting religious practice and the need for an accommodation.

**4**

Finally, as both parties have expressly recognized, the requirement of employers to provide reasonable accommodations for disabled employees under the ADA is analogous to Title VII's requirement that employers provide reasonable religious accommodations; thus, jurisprudence under the ADA can provide guidance as to when an employer's duty to provide a reasonable religious

---

[14]     It bears mentioning that insofar as the EEOC's broader view of the notice requirement does not involve concepts akin to constructive notice, but rather is limited to the position that the EEOC's regulation permits plaintiffs to establish their prima facie case regarding notice by showing that the employer possessed *actual knowledge* of the conflicting religious practice and need for an accommodation *from a source other than the applicant or employee*, then even if we were obliged to accord some measure of deference to the EEOC's view, this would not materially alter the outcome that we reach here.  That is because (as noted *supra*) there is no genuine dispute of material fact that no Abercrombie agent responsible for, or involved in, the hiring process had actual knowledge—*from any source*—that Ms. Elauf's practice of wearing a hijab stemmed from her religious beliefs and that she needed an accommodation for it.

accommodation is triggered under Title VII. *See Thomas*, 225 F.3d at 1155 &

nn.5 & 6 (recognizing the similarities between reasonable accommodation

requirements in the ADA and Title VII contexts). The ADA's analogous

reasonable-accommodation scheme fortifies in at least two ways our belief that

our interpretation of the notice requirement in the Title VII religion-

accommodation setting is correct.

First, under the ADA, an employer ordinarily has no obligation to engage in

the interactive process or provide a reasonable accommodation unless the

"employee provid[es] notice to the employer of the employee's disability and any

resulting limitations." *Smith*, 180 F.3d at 1171. To provide the employer with

notice, the employee "must make an adequate request" for an accommodation.

*EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011). This request

must be "sufficiently direct and specific," *id.* (quoting *Calero-Cerezo v. U.S.

Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004)) (internal quotation marks

omitted), and "make clear that the [employee] wants assistance *for his or her

disability*," *id.* (quoting *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir.

2010)) (internal quotation marks omitted).

In short, under the ADA, an employer does not have a duty to provide a

reasonable accommodation unless one is specifically requested by an employee.

*See Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013)

("It is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests.").  Our reading of the notice requirement under Title VII is entirely consistent with this: an employer is only obliged to provide a reasonable religious accommodation to applicants or employees *after* they have explicitly informed the employer of their conflicting religious practice and need for an accommodation for it.

Second, the requirement of specific employee notice under the ADA is logically compatible with the nature of the data necessary to trigger the employer's reasonable-accommodation obligations.  "[T]he employer must know of both the disability *and* the employee's desire for accommodations for that disability."  *C.R. England*, 644 F.3d at 1049 (emphasis added) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)) (internal quotation marks omitted).  Mere awareness of the disability is insufficient because the employer remains unaware that the employee *desires an accommodation* for his or her disability.  *See Woodman v. Runyon*, 132 F.3d 1330, 1345 (10th Cir. 1997) ("The 'employee's initial request for an accommodation . . . triggers the employer's obligation to participate in the interactive process.'" (omission in original) (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996))).  Therefore, in order for the employer to gain knowledge of *both* of these facts, ordinarily the employee will need to tell the employer.  *See Mole v.*

73

*Buckhorn Rubber Prods.*, 165 F.3d 1212, 1218 (8th Cir. 1999) ("[An employee] cannot 'expect the employer to read [her] mind and know [she] secretly wanted a particular accommodation and [then] sue the employer for not providing it.'" (second, third, and fourth alterations in original) (quoting *Ferry v. Roosevelt Bank*, 883 F. Supp. 435, 441 (E.D. Mo. 1995))).

Similarly, our view of the notice requirement is likewise compatible with the nature of the data necessary to trigger an employer's duty to provide a reasonable religious accommodation.  Specifically, not only must an employer know that the practice stems from the religious beliefs of the applicant or employee, it must also know that he or she actually *needs* an accommodation for the practice.  As suggested by our discussion in Part II.C.2, *supra*, Title VII's conception of the personal and individualized nature of religion and of the interactive accommodation process—under which the employer is affirmatively discouraged from making religious inquiries of applicants or employees in the first instance, or engaging in guess-work or assumptions about their religious beliefs—virtually dictates that applicants or employees must initially communicate the religious nature of the conflicting practice and their need for an accommodation to the employer, in order to trigger the employer's accommodation duty.

In sum, the ADA's reasonable-accommodation jurisprudence supports our

interpretation of Title VII.  The ADA places the burden on the employee to make the employer aware both of his or her disability and the employee's need for an accommodation for that disability, by adequately communicating this information to the employer in the first instance.  *See C.R. England*, 644 F.3d at 1049.  Our interpretation of Title VII's notice requirement in the religion-accommodation context is essentially the same.  Applicants or employees must initially inform employers of their religious practices that conflict with a work requirement *and* their need for a reasonable accommodation for them.  *See Thomas*, 225 F.3d at 1155; EEOC Compliance Manual § 12-IV(A)(1).

### III

For the foregoing reasons, we hold that district court should have entered summary judgment in favor of Abercrombie because the EEOC did not satisfy the second element of its prima facie case, as there is no genuine dispute of material fact that Ms. Elauf never informed Abercrombie prior to its hiring decision that her practice of wearing her hijab stemmed from her religious beliefs and that she needed an accommodation for this (inflexible) practice.  Accordingly, we **REVERSE** the district court's denial of summary judgment in favor of Abercrombie and likewise, necessarily, **REVERSE** the district court's grant of summary judgment to the EEOC.  We **REMAND** the case to the district court with instructions to **VACATE** its judgment and enter judgment in favor of

Abercrombie, and for further proceedings consistent with this opinion.

Equal Employment Opportunity Commission v. Abercrombie & Fitch Stores, Inc.,
No. 11-5110

**EBEL**, J., concurring in part and dissenting in part

I concur in the majority opinion's ruling that it was error for the district court to grant summary judgment for Plaintiff-Appellee Equal Employment Opportunity Commission ("EEOC") in this case. However, I dissent in part from the majority's opinion, to the extent that it enters summary judgment for Defendant-Appellant Abercrombie & Fitch Stores, Inc. ("Abercrombie"), because I conclude on this record that a jury should decide whether Abercrombie is liable for religious discrimination.

Title VII prohibits religious discrimination in employment, including an employer's refusal to hire a job applicant because of her religion. 42 U.S.C. § 2000e-2(a)(1). Title VII defines religious discrimination to include an employer's failure to accommodate a job applicant's religious practices, if the employer can reasonably do so without incurring undue hardship to the conduct of its business. Id. § 2000e(j); see Thomas v. Nat'l Ass'n of Letter Carriers, 225 F.3d 1149, 1154-55 (10th Cir. 2000). Title VII imposes on the employer the duty to reasonably accommodate the religious practices of a job applicant through "an interactive process that requires participation" by both the employer and the applicant. Thomas, 225 F.3d at 1155.

The EEOC, on behalf of Samantha Elauf, established a triable claim that Abercrombie discriminated against Elauf on the basis of her religion when Abercrombie refused to hire her because of her religious practice of wearing a hijab, or head covering. Specifically, the EEOC set forth evidence from which a jury could find that Abercrombie

refused to hire Elauf, without ever informing her that wearing a hijab conflicted with

Abercrombie's Look Policy, in order to avoid having to discuss the possibility of

reasonably accommodating Elauf's religious practice.  If true, that would be religious

discrimination proscribed by Title VII.  Thus, I would remand this claim for a jury trial.

**I.  The majority's inflexible requirement that the EEOC must first establish, as part of its prima facie claim, that Elauf informed Abercrombie that its Look Policy conflicted with her religious practice of wearing a hijab makes no sense under the law or the circumstances presented by this case**

The majority concludes that an employer's obligation to engage in an interactive

dialogue with a job applicant regarding the need for a reasonable accommodation of her

religious practice is triggered only when the job applicant herself informs the employer

that her religious practice conflicts with a requirement of the job for which she is

applying.  The majority reaches this conclusion after applying the modified <u>McDonnell</u>

<u>Douglas</u> burden-shifting framework applicable to failure-to-accommodate claims and

holding, at the first step of that analysis, that the EEOC failed to establish a prima facie

claim.[1]

---

[1] Generally courts addressing a discrimination claim under Title VII apply the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 800-05 (1973).  Under that analysis, the plaintiff employee or job applicant must first set forth a prima facie claim of discrimination.  <u>Id.</u> at 802.  If the plaintiff is able to do so, the employer must then articulate a legitimate, nondiscriminatory reason for taking the challenged employment action.  <u>Id.</u>  Thereafter, the burden shifts back to the plaintiff to show that the employer's proffered reason was really a pretext for discrimination.  <u>Id.</u> at 804.  In addressing a claim of religious discrimination based upon a failure-to-accommodate theory, however, we apply a modified, two-step <u>McDonnell Douglas</u> analysis, asking first whether the plaintiff employee or job applicant established a prima facie failure-to-accommodate claim.  <u>See</u> <u>Thomas</u>, 225 F.3d at 1155.  If so, then the burden shifts to the employer to do one of three things: (1) rebut one or more of the elements of the plaintiff's prima facie case; (2) show it offered the plaintiff a reasonable

In several previous cases <u>where the existence of a prima facie claim was not</u> <u>disputed</u>, this court stated the elements of a prima facie failure-to-accommodate claim to be that the plaintiff "(1) . . . had a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed his or her employer of this belief; and (3) he or she was [not hired] for failure to comply with the conflicting employment requirement." <u>Thomas</u>, 225 F.3d at 1155 (addressing termination claim); <u>see also</u> <u>Toledo</u> <u>v. Nobel-Sysco, Inc.</u>, 892 F.2d 1481, 1486 (10th Cir. 1989). Applying these elements to this case, the majority rejects the EEOC's failure-to-accommodate claim as a matter of law because Elauf never informed Abercrombie that her religious practice of wearing a hijab conflicted with Abercrombie's Look Policy.

Of course, the reason Elauf never informed Abercrombie of this conflict is that, accepting her evidence as true as we must, Elauf did not know that there was a conflict between her religious practice of wearing a hijab and Abercrombie's Look Policy. However, critically, Abercrombie did know there might be a conflict, because it knew that Elauf wore a headscarf, assumed she was Muslim and that she wore the headscarf for religious reasons, and knew its Look Policy, as ultimately determined by Randall Johnson, the person who made the decision not to hire Elauf, prohibited its sales models from donning headwear. Based on these assumptions, and without ever informing Elauf that Johnson ultimately determined that the hijab would not be allowed, Abercrombie refused to hire her because she wore a hijab. In this way, Abercrombie was able to avoid

accommodation; or (3) show it was unable to reasonably accommodate the plaintiff's religious practice without undue hardship. <u>Id.</u> at 1156.

any interactive dialogue with Elauf about whether Abercrombie could reasonably accommodate Elauf's religious practice.

Under these circumstances, it makes no sense to apply, reflexively and inflexibly, the second element of the ordinary prima facie failure-to-accommodate claim to require Elauf to show first that she informed Abercrombie that her religious practice conflicted with Abercrombie's Look Policy, when that policy's proscription against wearing a headscarf at work had never been disclosed to her. Nor are we bound, as the majority suggests, to apply the elements of a prima facie failure-to-accommodate claim as set forth in prior, factually distinct cases that did not raise or resolve the issue before us of whether it is the applicant's burden in the first instance to request a religious accommodation to an underlined employer's policy.

I conclude we are not bound here to apply this court's prior rendition of the elements of a prima facie failure-to-accommodate claim, for several reasons. First and foremost, the specific elements of a prima facie claim must be flexible, in order to address the specific circumstances presented by a given case. The Supreme Court stressed this when it first set forth the McDonnell Douglas analytical framework. McDonnell Douglas, 411 U.S. at 802 n.13 (noting that "[t]he facts necessarily will vary in Title VII cases, and the specification [in McDonnell Douglas] of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations"). This court has, on numerous occasions, recognized the need to modify the elements of a prima facie discrimination claim to fit the facts of a given case. See Stover v. Martinez, 382 F.3d 1064, 1077 (10th Cir. 2004) (noting McDonnell

<u>Douglas</u> framework, as "modified to reflect the particular factual situation at hand," applied to Title VII religious discrimination claims); <u>Shapolia v. Los Alamos Nat'l Lab.</u>, 992 F.2d 1033, 1036-38 (10th Cir. 1993) (declining to apply prima facie elements of a failure-to-accommodate claim to a cause of action alleging that the employer fired the plaintiff employee because the employee did not share his supervisors' religious beliefs; applying, instead, a modified version of the elements of a straightforward prima facie discrimination claim).[2]  "The <u>prima facie</u> case method established in <u>McDonnell Douglas</u> was 'never intended to be rigid, mechanized, or ritualistic.'"  <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 715 (1983) (quoting <u>Furnco Constr. Co. v. Waters</u>, 438 U.S. 567, 577 (1978)).

> The importance of McDonnell Douglas lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

<u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 358 (1977) (rejecting, in pattern-or-practice case, argument that "the McDonnell Douglas pattern [w]as the only means of establishing a prima facie case of individual discrimination").

Second, the plaintiff's burden of presenting a prima facie discrimination claim under Title VII is not meant to be onerous.  <u>See</u> <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>,

---

[2] <u>See also</u>, <u>e.g.</u>, <u>Garrison v. Gambro, Inc.</u>, 428 F.3d 933, 937 (10th Cir. 2005); <u>Plotke v. White</u>, 405 F.3d 1092, 1099-1100 (10th Cir. 2005); <u>Mattioda v. White</u>, 323 F.3d 1288, 1291-93 (10th Cir. 2003); <u>Rakity v. Dillon Cos.</u>, 302 F.3d 1152, 1164 (10th Cir. 2002); <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997); <u>Greene v. Safeway Stores, Inc.</u>, 98 F.3d 554, 559-60 (10th Cir. 1996); <u>Randle v. City of Aurora</u>, 69 F.3d 441, 451 n.13 (10th Cir. 1995); <u>Lucas v. Dover Corp.</u>, 857 F.2d 1397, 1400-01 (10th Cir. 1988); <u>Crawford v. Ne. Okla. State Univ.</u>, 713 F.2d 586, 588 (10th Cir. 1983).

450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous."); see also Shapolia, 992 F.2d at 1038 (noting burden of establishing prima facie religious discrimination claim is not onerous). Here, the majority not only made this initial burden onerous, but also made it preclusive of a claim for relief.

Third, the purpose of the McDonnell Douglas burden-shifting framework, of which the prima facie claim is a part, is different in the context of a failure-to-accommodate claim than it is for a Title VII claim alleging discrimination generally. See Thomas, 225 F.3d at 1155 n.6. In a straight discrimination claim, the prima facie claim serves the purpose of probing whether the employer intended to discriminate. See id.; Smith v. Midland Brake, Inc., 180 F.3d 1154, 1178 n.12 (10th Cir. 1999) (reh'g en banc). The purpose of applying a modified version of the McDonnell Douglas burden-shifting analysis in the context of an accommodation case, on the other hand, is "simply to provide a useful structure by which the district court, when considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered." Thomas, 225 F.3d at 1155 n.6 (quoting Smith, 180 F.3d at 1178 n.12). So, if the plaintiff asserts evidence which, if believed, would establish the employer's liability for failing to accommodate a job applicant's religious practices, then the plaintiff has established a prima facie failure-to-accommodate claim. As explained below, the EEOC has met that less-than-onerous burden here.

6

Before addressing how the EEOC has established a prima facie failure-to-accommodate claim in this case, however, I would stop to note that I agree with the majority that, in the ordinary case, it is the job applicant who must inform the employer that she has a religious belief that conflicts with the requirements of the job for which she is applying.  This makes sense, of course, because generally it will be the job applicant who will have superior knowledge of that conflict.  It is the job applicant who knows of her religious beliefs and practices.  When she becomes aware that a requirement of the job for which she is applying conflicts with her beliefs, the onus is on the job applicant to inform the employer of this conflict and the need for any accommodation.  Under such circumstances, the employer has no obligation to participate in the interactive process of exploring the possibility of a reasonable accommodation until the employer knows of the conflict.[3]  See E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011) (Americans with Disabilities Act case).[4]  Therefore, I do not doubt that our generalized

---

[3]  It may also be the case in some situations that neither the employer nor the job applicant will know that there is a conflict between the job's requirements and the applicant's religious practices, because the employer will be aware of its work rules and the applicant will know her religious beliefs, but neither side will inform the other of these matters during the course of a job interview.  Under such circumstances, no dialogue will occur between the job applicant and the employer as to this unidentified conflict, through no fault of either party.  In that scenario, the employer would not be liable for failure to accommodate.  However, here the facts are sufficient to permit (though not compel) a jury to find that Abercrombie did know, or thought it knew, of Elauf's religious beliefs and subverted the interactive process by declining to pursue her employment application without discussing the possibility of an accommodation with her.  Thus, it is error, in my opinion, to grant summary judgment to Abercrombie on this record.

[4] Because both the Americans with Disabilities Act and Title VII's proscription against religious discrimination impose an affirmative obligation on employers to make

rendition of the elements of a prima facie failure-to-accommodate claim, which require the plaintiff to show that she informed the employer of a conflict between her religious practices and the job requirements, will still apply to most failure-to-accommodate claims.  But that does not mean that we must force all failure-to-accommodate claims into this prima facie mold when it makes no sense to do so under the particular facts of a given case. And that is the situation here, where, based on the EEOC's evidence, it was Abercrombie with superior knowledge of the conflict between its Look Policy and Elauf's apparent religious practice, a conflict of which Elauf was unaware.

For the reasons that follow, then, I disagree with the majority's approach in this case of requiring the EEOC, in order to state a prima facie claim, to show that Elauf informed Abercrombie that her religious practice of wearing a hijab conflicted with Abercrombie's Look Policy, the relevant provisions of which Elauf was unaware.

## II.  The EEOC established a prima facie claim that Abercrombie failed to accommodate Elauf's religious practice of wearing a hijab

In order to survive summary judgment, the EEOC had to establish a prima facie claim by asserting evidence that, if believed, would support Abercrombie's liability for failing to accommodate Elauf's religious practice of wearing a hijab.  See Thomas, 225 F.3d at 1155 n.6.  I conclude the EEOC met that less-than-onerous burden by showing four things:  (1) Elauf had a bona fide religious belief that conflicts with Abercrombie's Look Policy; (2) she was not aware of Abercrombie's conflicting policy; (3) but

---

reasonable accommodation, the Tenth Circuit applies case law addressing both statutes when considering issues surrounding reasonable accommodation.  See Thomas, 225 F.3d at 1155 & n.5; see also Maj. Op. at 30-31, 71-75.

Abercrombie had knowledge that Elauf might hold religious beliefs that conflicted with its Look Policy; and (4) without informing Elauf of the provisions of its Look Policy that might conflict with her religious beliefs, Abercrombie instead refused to hire Elauf <u>because of</u> that possible conflict.

As to the first element, the district court held that the EEOC established, as a matter of law, that Elauf held a bona fide religious belief that she must wear a hijab in public.  Although Abercrombie challenged that determination on appeal, I would affirm the district court's decision in that regard.

As to the second element, that Elauf was not aware that Abercrombie's Look Policy conflicted with her religious practice of wearing a hijab, it is undisputed that Abercrombie's managers never informed Elauf that the Look Policy prohibited headscarves.[5]  (Aplt. App. at 299; Aple. Supp. App. at 49.)  Further, there was evidence that, before she applied for a job with Abercrombie, Elauf, through a friend, inquired of one of Abercrombie's store managers whether there was a problem with her wearing a hijab while working in an Abercrombie store and was told that it would be no problem so long as the hijab was not black.[6]  (Aplt. App. at 50-52, 393.)

---

[5] Three of the four Abercrombie managers involved here interpreted the Look Policy to permit headscarves, so long as they were not black in color.  (Aplt. App. at 393; Aple. Supp. App. at 49, 51; Maj. op. at 9.)  There is evidence that this would have been an acceptable accommodation of Elauf's religious beliefs.  (Aplt. App. at 52.)

[6] The majority contends that this evidence does not establish that Elauf expressly informed Abercrombie of her religious practice of wearing a hijab and expressly sought an accommodation for that practice.  I agree.  But this evidence is relevant to show Elauf's state of mind, that when she interviewed for a position with Abercrombie, she did not think that the Look Policy prevented her from wearing a hijab at work.  Moreover, it

As to the third element of the EEOC's prima facie claim, that Abercrombie had knowledge that Elauf might hold religious beliefs that conflicted with its Look Policy, it is undisputed that Heather Cooke, the Abercrombie assistant store manager who interviewed Elauf, "assumed that [Elauf] was Muslim," (id. at 307), assumed that Elauf wore a hijab for "religious reasons," (id.), and assumed that Elauf would wear a hijab while working in an Abercrombie store.  (Id. at 306-07; Aple. Supp. App. at 48.)

The EEOC's showing of the second and third elements—that Elauf was unaware that her religious practice of wearing a hijab conflicted with the Look Policy, but that Abercrombie was aware there might be such a conflict—establishes circumstances that justify applying here a common sense exception to the usual rule that, in order to trigger an employer's duty to participate in the interactive dialogue regarding reasonable accommodation, the job applicant must first inform the employer that she holds religious beliefs that conflict with the job's requirements.  Recognizing such a common sense exception under these circumstances is consistent with cases generally recognizing similar exceptions.  For example, in the context of an employer's reasonable accommodation of disabilities under the Americans with Disabilities Act ("ADA"), we require, as a precondition to suit, that the employee have requested an accommodation "unless the employer has foreclosed the interactive process through its policies or explicit

---

seems reasonable for a job applicant to check with an employer (here, the employer's representative, an assistant store manager) as to the requirements for the job and to rely upon that information unless told differently in her interview.  Further, this evidence arguably suggests that Abercrombie affirmatively misled Elauf into believing that there was no problem with her wearing a hijab while working in one of Abercrombie's stores, which may explain why she did not raise the issue during her job interview.

actions." Koessel v. Sublette Cnty. Sheriff's Dep't, 717 F.3d 736, 744 (10th Cir. 2013) (emphasis added) (internal quotation marks omitted). And the Ninth Circuit, again under the ADA, has recognized an exception to the requirement that the employee request an accommodation for his disability, under circumstances where the employer knows that the employee has a disability, knows that the employee is having trouble at work due to his disability, and knows, or has reason to know, that the disability prevents the employee from requesting an accommodation. See Brown v. Lucky Stores, Inc., 246 F.3d 1182, 1188 (9th Cir. 2001). There are, then, exceptions to the general rule that an employer's obligation to consider a reasonable accommodation is not triggered unless and until an employee or job applicant informs the employer of the need for an accommodation.

Even more directly analogous to the situation here, other circuits have held that a job applicant or employee can establish a prima facie religious failure-to-accommodate claim if she can show that the employer knew of a conflict between the plaintiff's religious beliefs and a job requirement, regardless of how the employer acquired knowledge of that conflict.[7] These cases conclude that "[a]n employer need have 'only

---

[7] See Dixon v. Hallmark Cos., 627 F.3d 849, 855-56 (11th Cir. 2010) (rejecting argument that plaintiff employees who operated a property management office had failed to assert a prima facie failure-to-accommodate claim because they did not inform the employer of their specific belief that God should not be removed from public places, where there was ample evidence that their supervisor was already aware that there was a tension between the plaintiffs' religious beliefs and the employer's policy against displaying religious artwork in the employer's property management offices); Brown v. Polk Cnty., 61 F.3d 650, 652-53 (8th Cir. 1995) (rejecting employer's argument that employee never explicitly requested an accommodation of his religious activities because employer was already aware of "the potential for conflict" between the employee's religious activities and the employer's work rules because the employee had previously been reprimanded for his religious activities at work); Hellinger v. Eckerd Corp., 67 F. Supp. 2d 1359,

enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements.'"  Brown, 61 F.3d at 654 (8th Cir.) (quoting Heller, 8 F.3d at 1439 (9th Cir.)).  I would rely on this principle here.  To my mind, once the employer knows of, or should know of, a conflict, or the likelihood of a conflict, the employer is then obligated to interact with the job applicant about the likely conflict in order to determine if there is a reasonable accommodation for the job applicant's religious practices.  At that point, the need for accommodation has been put on the table for discussion and the employer, with superior knowledge of its ability to accommodate, can no longer ignore the need to initiate dialogue with the employee regarding reasonable accommodations.

---

1361-63 (S.D. Fla. 1999) (holding orthodox Jew who applied for pharmacist position and whose religious beliefs precluded his selling condoms, stated at least a prima facie failure-to-accommodate claim even though the employer discovered this conflict between the applicant's religious beliefs and the job requirements, not from the applicant, but from one of the applicant's job references; noting that "[i]t would be hyper-technical, based on the facts of this case, to require notice of the Plaintiff's religious beliefs to come only from the Plaintiff.  The notice requirement is meant in part to allow the company an opportunity to attempt to reasonably accommodate the Plaintiff's beliefs.  The [employer] was not deprived of the opportunity to attempt to accommodate the Plaintiff's beliefs merely because the notice did not come from the Plaintiff.") ; see also Heller v. EBB Auto Co., 8 F.3d 1433, 1436-37, 1439 (9th Cir. 1993) (in addressing claim that car dealership fired one of its salesmen for missing work to attend a ceremony for his wife's conversion to Judaism, rejecting argument that the salesman failed to state a prima facie failure-to-accommodate claim because he did not explain the ceremony sufficiently to his employer; concluding that "[a] sensible approach would require only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious needs and the employer's job requirements").

12

Thus, where, as here, the employer has knowledge of a credible potential conflict between its policies and the job applicant's religious practices, the employer has a duty to inquire into this potential conflict. This duty does not, however, obligate the employer to inquire, open-endedly, about the applicant's religious beliefs and practices. Under the circumstances presented here, Abercrombie only had a duty to disclose to Elauf that its Look Policy prohibited Elauf from wearing any headwear while working in one of Abercrombie's stores, when it had notice of facts that suggested to it the possibility of such a conflict. This inquiry would have been sufficient to initiate any needed dialogue between the job applicant, Elauf, and the employer, Abercrombie, as to whether Elauf had religious beliefs that conflicted with Abercrombie's dress code, beliefs which perhaps would be addressed by an accommodation.[8]

The majority disagrees with the cases from these other circuits (thereby creating a conflict among the circuits) which permit a plaintiff to establish a prima facie failure-to-accommodate claim by establishing that the employer knew, by any means, of a conflict between the plaintiff's religious practices and the employer's work rules. I would follow the holdings in those case but, even without relying on those cases here, the EEOC has still put forth evidence establishing the fourth element of her prima facie claim, that Abercrombie assumed that Elauf was Muslim, that she wore a hijab for religious reasons,

---

[8] This duty is not unlike the duties of inquiry recognized by the law in other contexts, when facts are sufficient to put a party on notice he needs to make inquiry or be held to know the facts which such inquiry would have uncovered. See TRW Inc. v. Andrews, 534 U.S. 19, 30 (2001) (in parenthetical to citation for Stone v. Williams, 970 F.2d 1043, 1049 (2d Cir. 1992); addressing when statute of limitations begins to run)); see also Sterlin v. Biomune Sys., 154 F.3d 1191, 1201-02 (10th Cir. 1998) (addressing when statute of limitations for private securities fraud action began to run).

and that she would insist on wearing a hijab while working in an Abercrombie store, and then, based on those assumptions and without first initiating any dialogue with Elauf to verify its assumptions, Abercrombie refused to hire Elauf because she wore a hijab. (Aplt. App. at 306-07; Aple. Supp. App. at 48, 51.)

Those facts, if found by a jury, smack of exactly the religious discrimination that Title VII prohibits.  And a jury could further find, from such facts, that Abercrombie, based on its superior knowledge of a possible conflict between Elauf's religious practice and Abercrombie's Look Policy, was able affirmatively to avoid its obligation to engage in an interactive dialogue with Elauf about a reasonable accommodation of Elauf's religious practice by not mentioning the possible conflict and then not hiring her because of it.  See Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 916 (10th Cir. 2004) (noting, in ADA case, that employer's refusal to participate in an interactive process could result in liability); Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d 1242, 1253 (10th Cir. 2004) (noting, in an ADA case, that "[n]either party may create or destroy liability by causing a breakdown of the interactive process").[9]  On the record in this particular case, a

---

[9] Other circuits have noted, in addressing this interactive process in the context of reasonable accommodation under the ADA, that an employer can be liable for refusing to participate in good faith in that process:

> [C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary.  A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.  In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

jury could find Abercrombie liable for violating Title VII's proscription against religious

discrimination in employment on this basis. The EEOC, therefore, has established a

prima facie failure-to-accommodate claim.

In conclusion, let me be very clear. I am not suggesting that the employer has a

general duty, during a job interview, to give the applicant a comprehensive "laundry list"

of all of the employer's work policies in order to determine if those job requirements

might possibly conflict with an applicant's unstated religious beliefs or practices. I agree

that the burden ordinarily remains with the job applicant to inform the employer of any

conflict between the job's requirements and her religious beliefs and practices, because it

will usually be the applicant, and not the employer, who knows of such a conflict.

However, I am also not suggesting, as the majority appears to be, that a job applicant

must initiate a general discussion of her religious beliefs during the job interview just in

case her religious beliefs and practices might conflict with some unstated policy or work

rule of the employer. The EEOC has shown here that it was the employer, Abercrombie,

which had superior knowledge of a possible conflict between its Look Policy and Elauf's

apparent religious practice of wearing a hijab. Under those facts, established after

viewing the evidence in light most favorable to the EEOC,[10] Abercrombie had a duty to

---

Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312 (3d Cir. 1999) (emphasis added)
(quoting Bultemeyer v. Fort Wayne Cmty. Sch., 100 F.3d 1281, 1285 (7th Cir. 1996)).

[10] The facts presented here include the fact that Elauf wore a black hijab to her interview
(Aplt. App. at 368), exhibiting the very practice that Abercrombie's Look Policy was
ultimately determined to forbid. Further, Abercrombie assumed that Elauf was Muslim,
wore the hijab for religious reasons, and would insist on wearing a hijab while working in
one of Abercrombie's stores. (Id. at 306-07; Aple. Supp. App. at 48.) Abercrombie then

initiate a dialogue with Elauf by informing her that Abercrombie's Look Policy

prohibited its sales models from wearing headwear and then inquiring whether she could

comply with that policy, or whether Abercrombie could accommodate her belief in some

reasonable way.  Said another way, a jury could find Abercrombie liable under Title VII

for assuming that Elauf was a Muslim who wore a hijab for religious reasons and that she

would insist on wearing a hijab while working in one of Abercrombie's stores, and then,

without initiating a dialogue with Elauf to verify those assumptions, refused to hire Elauf

based upon the company's assumptions.[11]

### III.  Because Abercrombie's evidence contradicted the EEOC's prima facie evidence, that created a triable issue of fact as to whether Abercrombie failed to accommodate Elauf's religious practice of wearing a hijab; therefore, a jury trial is required

The district court entered summary judgment for the EEOC.  The majority

reverses that determination and concludes that summary judgment should enter, instead,

for Abercrombie.  I agree that the EEOC is not entitled to summary judgment because

there is conflicting evidence on both sides.  However, for the same reason, I dissent from

the entry of summary judgment on behalf of Abercrombie.  I would, instead, remand for a

jury trial because there are factual disputes as to whether the circumstances presented

here triggered Abercrombie's duty to initiate an interactive dialogue with Elauf in order

---

acted on those assumptions, without first verifying them with Elauf, when it decided not to hire her.  (Aple. Supp. App. at 48, 51.)  So this is not a case where the employer can claim to have been blindsided by some objectionable practice of the job applicant that the employer did not realize was religiously based.

[11] All of the above could reasonably be inferred from the record in this case, read in the light most favorable to the EEOC on behalf of Elauf.

to determine whether she had a religious practice that conflicted with Abercrombie's

Look Policy.  In light of these factual disputes, a jury must decide the EEOC's failure-to-

accommodate claim asserted on Elauf's behalf.  Therefore, I would remand that claim for

trial.[12]

---

[12]  The district court granted the EEOC summary judgment on an alternative basis, holding as a matter of law that Abercrombie had failed to establish that it could not accommodate Elauf's religious practice of wearing a hijab without suffering undue hardship to the conduct of its business.  Abercrombie challenges that determination on appeal.  Because I conclude there is conflicting evidence as to that issue, as well, I would not affirm the district court's decision to grant summary judgment for the EEOC on that basis.